# EXHIBIT INDEX

**Supplement to Consolidated Reply to Defendants' Responses in Opposition to Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction and Motion to Proceed Under Pseudonym**

*Arizona Student Doe #1*

*v.*

*Donald J .Trump, et al.*

| Exhibit No. | Description |
| --- | --- |
| A | Order, *Student Doe v. Noem, et. al.*, 2025 WL 1134977 *5 (E.D. Cal. April 17, 2025) |
| B | Order, *Doe v. Noem*, __ F. Supp. 3d __, 2025 WL 1141279 at *7 (W.D. Wash. Apr. 17, 2025) |
| C | Transcript, *Patel v. Lyons*, 1:25-cv-01096-ACR, April 16, 2025 |
| D | Order, *Patel v. Lyons*, 1:25-cv-01096-ACR, April 17, 2025 |
| E | Transcript, *Nali v. Noem, et al.,* 1:25-cv-03969, April 18, 2025 |
| F | Order, *Nali v. Noem, et al.,* 1:25-cv-03969, 04/18/2025 |
| G | Declaration of Brian Childs, Senior Director of the International Student & Scholar Services Office of Western Michigan University |
| H | Copy of Notice of Intent to Deny, U.S. Citizenship and Immigration Services, April 18, 2025 |

# Exhibit A

Order, *Student Doe v. Noem, et. al.*, 2025 WL
1134977 *5 (E.D. Cal. April 17, 2025)

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    STUDENT DOE,                          No. 2:25-cv-01103-DAD-AC

12              Plaintiff,

13        v.                                ORDER GRANTING PLAINTIFF'S
                                            MOTIONS TO PROCEED UNDER
14    KRISTI NOEM, et al.,                  PSEUDONYM, FOR A PROTECTIVE
                                            ORDER AND FOR TEMPORARY
15              Defendants.                 RESTRAINING ORDER

16                                          (Doc. No. 5)

17

18          This matter came before the court on April 17, 2025 for hearing on plaintiff's motion to

19   proceed under pseudonym and for protective order and plaintiff's motion for temporary

20   restraining order. (Doc. Nos. 2, 5.) Attorney Joye Wiley appeared in person on behalf of

21   plaintiff. Assistant United States Attorney Shelley D. Weger appeared in person on behalf of

22   defendants. For the reasons explained below, plaintiff's motions to proceed under pseudonym,

23   for a protective order and for a temporary restraining order will be granted.

24                                    **BACKGROUND**

25          On April 14, 2025, plaintiff Student Doe filed his complaint against defendants Kristi

26   Noem, Todd Lyons, and Department of Homeland Security ("DHS") for terminating plaintiff's

27   Student and Exchange Visitor Information System ("SEVIS") record, which had the effect of

28

                                              1

1    terminating plaintiff's F-1 visa status.  (Doc. No. 1.)  In support of the pending motions, plaintiff

2    presents evidence of the following.

3        Plaintiff, an international student with an F-1 visa, received an email on April 8, 2025

4    from his university notifying plaintiff that "SEVIS has terminated your record" and that the

5    "[e]xplanation" provided by the government was that plaintiff had been "[i]dentified in" a

6    "criminal records check and/or had their VISA revoked."  (Doc. Nos. 2-2 at 2; 5-6 at 2.)  The

7    email also stated that ICE "agents may investigate to confirm the departure of the student[,]"

8    "[n]o grace period is allowed[,]" and "[r]emaining in the United States on a terminated status may

9    have serious consequences."  (Doc. Nos. 2-2 at 3–4; 5-6 at 3–4.)  There has been a recent surge in

10   hate crimes, and the White House and DHS have communicated anti-immigrant sentiment.  (Doc.

11   No. 2 at 4–5.)

12       Plaintiff has "never been convicted of any crime[,]" and has "never had criminal charges

13   filed against" him.  (Doc. No. 5-5 at 2.)  He "was detained two times by law enforcement in 2024,

14   but no charges were filed and [he] received correspondence from law enforcement that no charges

15   would be filed for lack of evidence." (*Id.*)

16       Based upon the allegations of his complaint, plaintiff asserts the following claims against

17   defendants:  (1) unauthorized SEVIS termination in violation of the Administrative Procedure Act

18   ("APA"); (2) deprivation of procedural due process rights in violation of the Fifth Amendment;

19   (3) unlawful detention in violation of the Fifth Amendment; (4) deprivation of procedural due

20   process in violation of the APA; and (5) arbitrary and capricious SEVIS termination in violation

21   of the APA.  (Doc. No. 1 at ¶¶ 37–55.)

22       On April 14, 2025, plaintiff filed a motion to proceed under pseudonym and for protective

23   order.  (Doc. No. 2.)  On April 15, 2025, plaintiff filed a motion for temporary restraining order.

24   (Doc. No. 5.)  That same day, the court required plaintiff to serve defendants with a copy of the

25   complaint, the motion to proceed under pseudonym, the emergency motion for temporary

26   restraining order, and accompanying papers.  (Doc. No. 6.)  The court also set the deadline for

27   defendants to file any opposition to the pending motions on April 16, 2025 at 4:00 p.m., and set a

28   hearing on the motions for April 17, 2025 at 10:00 a.m.  (*Id.*.)  The court further ordered that

1    defendants not take any action to remove plaintiff from the United States or out of this District

2    pending the scheduled hearing and unless and until the court ordered otherwise. (*Id.*)  Also on

3    April 15, 2025, defendants filed designation of counsel for service. (Doc. No. 7.)  On April 16,

4    2025, plaintiff filed proof of service of the required documents. (Doc. Nos. 8, 9.)

5    **LEGAL STANDARD**

6           The standard governing the issuing of a temporary restraining order is "substantially

7    identical" to the standard for issuing a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v.*

8    *John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).  "The proper legal standard for

9    preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the

10   merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

11   balance of equities tips in his favor, and that an injunction is in the public interest.'" *Stormans,*

12   *Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council,*

13   *Inc.*, 555 U.S. 7, 20 (2008)); *see also Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th

14   Cir. 2011) ("After *Winter*, 'plaintiffs must establish that irreparable harm is likely, not just

15   possible, in order to obtain a preliminary injunction.'"); *Am. Trucking Ass'n, Inc. v. City of Los*

16   *Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).  A plaintiff seeking a preliminary injunction must

17   make a showing on all four of these prongs. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

18   1135 (9th Cir. 2011).  The Ninth Circuit has also held that "[a] preliminary injunction is

19   appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were

20   raised and the balance of hardships tips sharply in the plaintiff's favor." *Id.* at 1134–35 (citation

21   omitted).  The party seeking the injunction bears the burden of proving these elements. *Klein v.*

22   *City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009); *see also Caribbean Marine Servs. Co.*

23   *v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citation omitted) ("A plaintiff must do more than

24   merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate*

25   immediate threatened injury as a prerequisite to preliminary injunctive relief.").  Finally, an

26   injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the

27   plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

28   /////

The likelihood of success on the merits is the most important *Winter* factor.  *See Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017).  Plaintiff bears the burden of demonstrating that he is likely to succeed on the merits of his claims or, at the very least, that "serious questions going to the merits were raised." *All. for Wild Rockies*, 632 F.3d at 1131.

### ANALYSIS

**A.    Motion to Proceed Under Pseudonym and for Protective Order**

Plaintiff moves to proceed under pseudonym with respect to the public and for a protective order that would:  (1) require the parties to redact or file any information identifying plaintiff under seal; (2) limit sharing by defendants' counsel of any information about plaintiff's identity or related personal information beyond what is reasonably necessary for this litigation and to comply with this court's orders; (3) prohibit the use of the information for any purpose outside of this litigation; and (4) prohibit disclosing the identity of plaintiff for purposes of detention or removal during the pendency of this litigation or until further order of the court. (Doc. No. 2 at 7–8.)  Defendants filed no opposition to plaintiff's motion to proceed under pseudonym but stated at the hearing that they opposed the motion on the grounds that it was unnecessary.

"The normal presumption in litigation is that parties must use their real names." *Doe v. Kamehameha Schs./Bernice Pauahi Bishop Est.*, 596 F.3d 1036, 1042 (9th Cir. 2010).  However, the court may "conceal[] parties' identities in order to protect them from retaliation by third parties and also to protect nonparties from reprisals." *Does I thru XXIII v. Advanced Textile*, 214 F.3d 1058, 1067 (9th Cir. 2000).  "[A] party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity." *Id.* at 1068.  Where "pseudonyms are used to shield the anonymous party from retaliation, the district court should determine need for anonymity by evaluating the following factors:  (1) the severity of the threatened harm; (2) the reasonableness of the anonymous party's fears; and (3) the anonymous party's vulnerability to such retaliation." *Id.* (citations omitted).

/////

1    Here, plaintiff presents evidence that the threatened harm includes "public shame,

2    potential vigilante justice by community members with anti-immigrant sentiment, reputational

3    harm, and possible detention and removal." (Doc. No. 2 at 3–6.)  Plaintiff has provided evidence

4    regarding surging hate crimes, anti-immigrant messaging from the White House and DHS, and

5    the email plaintiff received warning that ICE "agents may investigate to confirm the departure of

6    the student[,]" "[n]o grace period is allowed[,]" and "[r]emaining in the United States on a

7    terminated status may have serious consequences." (Doc. Nos. 2 at 4–5; 2-2 at 3.)  This evidence

8    is sufficient to show that the threatened harm is severe, plaintiff's fears are reasonable, and

9    plaintiff is vulnerable to retaliation.  *See Doe v. Becerra*, No. 2:25-cv-00647-DJC-DMC, 2025

10   WL 691664, at *7 (E.D. Cal. Mar. 3, 2025) ("Given Petitioner is still at risk of removal should his

11   asylum application be denied, he is also acutely vulnerable to retaliation.").  Because defendants'

12   counsel will have access to plaintiff's identity and be permitted to share that information as

13   necessary for purposes of this litigation, the court identifies no prejudice to defendants, and the

14   public's interest in knowing plaintiff's identity is minimal.  *Doe*, 2025 WL 691664, at *7 ("There

15   is no prejudice to Respondents here — Petitioner's identity is fully known to the Court and

16   Respondents — and the public interest in knowing Petitioner's identity is minimal and

17   outweighed by Petitioner's need for anonymity.").

18       Federal Rule of Civil Procedure 5.2(e) provides that a court may require redaction of

19   private information from court filings "for good cause."  To show "good cause," the party seeking

20   redaction must show that "specific harm or prejudice will result" if the protective order is not

21   granted.  *In re Roman Catholic Archbishop of Portland in Or.*, 661 F.3d 417, 424 (9th Cir. 2011).

22   For the same reasons discussed previously, the court concludes plaintiff has shown good cause for

23   requiring redaction of information identifying plaintiff.  *Beilarus1 v. Mayorkas*, No. 2:24-cv-

24   01925-MJP, 2025 WL 104387, at *2 (W.D. Wash. Jan. 15, 2025) (finding good cause to redact

25   information regarding immigration status).

26       "[O]rdinarily a party must show 'compelling reasons' to keep a court document under

27   seal."  *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1095 (9th Cir. 2016).  For the

28   reasons discussed above, the court finds compelling reasons to require filing under seal of any

1   information identifying plaintiff.  *Doe*, 2025 WL 691664, at *7 ("While there is a strong

2   presumption in favor of access to public records, for the same reasons stated above [regarding

3   risk of removal], Petitioner has articulated compelling reasons that outweigh the general history

4   of access and the public policies favoring disclosure.").  Accordingly, plaintiff's motion to

5   proceed under pseudonym with respect to the public and for a protective order will be granted.

6   **B.    Motion for Temporary Restraining Order**

7       Plaintiff moves for a temporary restraining order stating that defendants are:  (1) enjoined

8   from terminating plaintiff's SEVIS record; (2) required to set aside their termination

9   determination; (3) prohibited from detaining, initiating removal proceedings, or removing

10  plaintiff based on the SEVIS termination; and (4) enjoined from directly or indirectly enforcing,

11  implementing, or otherwise taking any action or imposing any legal consequences as a result of

12  the termination of his SEVIS record.  (Doc. No. 5 at 17–18.)  As noted, defendants oppose

13  plaintiff's motion.  (Doc. No. 11.)

14      1.    Likelihood of Success on the Merits

15      Plaintiff brings two types of claims in his complaint—claims brought under the APA and

16  claims alleging violations of the Fifth Amendment.  The court first addresses plaintiff's first and

17  fifth claims for unauthorized SEVIS termination in violation of the APA and arbitrary and

18  capricious SEVIS termination in violation of the APA, respectively.  (Doc. No. 1 at ¶¶ 37–40,

19  52–55.)

20      a.    *Status Quo Ante Litem*

21      Defendants first argue plaintiff's requested injunction seeks to alter the status quo by

22  issuing an expedited order that would grant him the ultimate relief he seeks.  (Doc. No. 11 at 5.)

23  The court is not persuaded by this argument.  Instead, plaintiff properly seeks to restore the status

24  quo *ante litem*.  "The status quo ante litem refers not simply to any situation before the filing of a

25  lawsuit, but instead to the last uncontested status which preceded the pending controversy[.]"

26  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (citation omitted).  The

27  last uncontested status existed before defendants terminated plaintiff's SEVIS record, placing

28  plaintiff at risk of detention and removal on that basis.  *See id.* ("In this case, the status quo ante

litem existed before Disney began using its allegedly infringing logo.  The interpretation of this concept that Disney advocates would lead to absurd situations, in which plaintiffs could never bring suit once infringing conduct had begun.").

### b.    *APA Legal Framework*

"The APA sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts."  *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 16 (2020) (internal quotation marks and citation omitted).  Only "final agency actions are reviewable under the APA."  5 U.S.C. § 704; *see also* 5 U.S.C. § 701 (for purposes of the APA's judicial review provisions, "agency action" has "the meaning[] given" by 5 U.S.C. § 551).  An "'agency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  Under § 706 of the APA, the court is "to assess only whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judg[]ment."  *Regents*, 591 U.S. at 16 (internal quotation marks and citation omitted); *see also Transp. Div. of the Int'l Ass'n of Sheet Metal, Air, Rail, & Transp. Workers v. Fed. R.R. Admin.*, 988 F.3d 1170, 1178 (9th Cir. 2021).

The APA "requires agencies to engage in reasoned decisionmaking, and directs that agency actions be set aside if they are arbitrary or capricious."  *Regents*, 591 U.S. at 16. (internal citations and quotation marks omitted).  The district court's role "is simply to ensure that the [agency] made no 'clear error of judgment' that would render its action 'arbitrary and capricious.'"  *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).  "Factual determinations must be supported by substantial evidence," and "[t]he arbitrary and capricious standard requires 'a rational connection between facts found and conclusions made.'"  *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 759–60 (9th Cir. 2014) (internal citations omitted).  This requires the court to ensure that the agency has not, for instance:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence

1    before the agency, or [an explanation that] is so implausible that it
2    could not be ascribed to a difference in view or the product of agency
     expertise.

3    *McNair*, 537 F.3d at 993 (quoting *Motor Vehicle Mfrs. Assn., Inc. v. State Farm Mut. Auto. Ins.*

4    *Co.*, 463 U.S. 29, 43 (1983)); *see also All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 492 (9th

5    Cir. 2023) (articulating the same arbitrary or capricious standard).

6              c.    *Whether Privacy Act Bars Plaintiff from Seeking Relief Under APA*

7         In their opposition, defendants note that plaintiff "frames several of his claims as arising

8    under the APA," and they argue that "though the APA generally waives the government's

9    immunity," such waiver is not applicable here.  (Doc. No. 11 at 6.)

10        The APA waives sovereign immunity for actions in federal district court by "person[s]

11   suffering legal wrong because of agency action."  5 U.S.C. § 702.  That waiver, however, is

12   subject to three limitations:  (1) the plaintiff must "seek[ ] relief other than money damages";

13   (2) the plaintiff must have "no other adequate remedy"; and (3) the plaintiff's action must not be

14   "expressly or impliedly forbid[den]" by "any other statute."  *United Aeronautical Corp. v. United*

15   *States Air Force*, 80 F.4th 1017, 1022 (9th Cir. 2023) (citing 5 U.S.C. §§ 702, 704).  Here,

16   defendants argue that plaintiff's claims are subject to the second limitation, namely that "[t]he

17   Privacy Act provides an alternative, adequate remedy to the APA."  (Doc. No. 11 at 7.)

18        To be adequate, however, an alternative remedy must at a minimum provide the plaintiff

19   "specific procedures" by which the agency action can receive judicial review or some equivalent.

20   *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988).  The adequacy of the relief available need not

21   provide review identical to that which the APA would provide, so long as the alternative remedy

22   offers the "same genre" of relief.  *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of*

23   *Justice*, 846 F.3d 1235, 1245 (D.C. Cir. 2017).  Nonetheless, an alternative remedy will not be

24   adequate "if the remedy offers only 'doubtful and limited relief.'"  *Garcia v. Vilsack*, 563 F.3d

25   519, 522 (D.C. Cir. 2009) (quoting *Bowen*, 487 U.S. at 901).

26        The court concludes that the Privacy Act clearly does not provide plaintiff another

27   adequate remedy, as plaintiff's ability to seek relief under the Privacy Act is not even "doubtful,"

28   but nonexistent.  As defendants concede, the Privacy Act provides that an "individual" is "a

1    citizen of the United States or an alien lawfully admitted for permanent residence," (Doc. No. 11

2    at 7) (citing 5 U.S.C.A. § 552a(a)(2)), but plaintiff "is a national of an undisclosed African

3    country," (Doc. No. 11 at 7).  Accordingly, as defendants also concede, "the Privacy Act

4    precludes judicial review of Plaintiff's claims."  (*Id.* at 8.)  Because plaintiff would not qualify for

5    relief under the Privacy Act, the court concludes that he clearly does not have an alternative,

6    adequate remedy that limits the APA's waiver of the government's immunity.  *See Stenson*

7    *Tamaddon, LLC v. United States Internal Revenue Serv.*, 742 F. Supp. 3d 966, 988 (D. Ariz.

8    2024) (rejecting the IRS's argument that the plaintiff tax advisory firm is precluded from APA

9    review because the "plaintiff's clients can file a refund suit," noting that "it is immaterial whether

10    Plaintiff's clients possess an alternative remedy, as Plaintiff does not"); *Wagafe v. Biden*, No. 17-

11    cv-00094-LK, 2024 WL 2274349, at *5, 7 (W.D. Wash. May 20, 2024) (rejecting the defendants'

12    argument that "the INA provides an adequate alternative remedy for the [plaintiffs'] APA claims"

13    where "precluding district court jurisdiction could foreclose meaningful judicial review of the

14    [plaintiffs'] claims"); *Scholl v. Mnuchin*, 494 F. Supp. 3d 661, 681 (N.D. Cal. 2020) (finding that

15    the "plaintiffs have no adequate alternative remedy to the APA," noting that courts have rejected

16    alternative remedy arguments where the process to seek alternative relief would be "arduous,

17    expensive, and long"); *see also Kashkool v. Chertoff*, 553 F. Supp. 2d 1131, 1142 (D. Ariz. 2008)

18    ("District courts have consistently found that there is no adequate alternative remedy available to

19    aliens seeking adjudication of adjustment of status applications. . . .  This Court cannot discern a

20    reasonable alternative and, thus, concludes that Plaintiff has no adequate alternative remedy.").

21    /////

22    /////

23    /////

24    /////

25    /////

26    /////

27    /////

28    /////

d.    *Application of APA*

Plaintiff has provided the court with evidence that defendants terminated plaintiff's SEVIS record, effectively terminating plaintiff's F-1 status.[1]  (Doc. No. 5-6 at 2–4.)  This action constitutes a final decision reviewable under the APA.  *See Jie Fang v. Dir. United States Immigr. & Customs Enf't*, 935 F.3d 172, 182 (3d Cir. 2019) ("The order terminating these students' F-1 visas marked the consummation of the agency's decisionmaking process, and is therefore a final order[.]"); *Yerrapareddypeddireddy v. Albence*, No. 20-cv-01476-PHX-DWL, 2021 WL 5324894, at *7 n.10 (D. Ariz. Nov. 16, 2021) ("Defendants contend this Court lacks jurisdiction because Yerrapareddypeddireddy has applied for reinstatement and is facing removal proceedings, both of which render the SEVIS termination non-final.  However, the Third Circuit rejected similar arguments in *Fang v. Director U.S. Immigration & Customs Enforcement*, 935 F.3d 172 (3d Cir. 2019).") (citation omitted), *aff'd,* No. 21-17070, 2022 WL 17484323 (9th Cir. Dec. 7, 2022).

Therefore, pursuant to the APA, the court shall "hold unlawful and set aside" this "agency action" if it is "found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).  Here, plaintiff has presented evidence regarding the official explanation for the termination of plaintiff's SEVIS record.  (Doc. No. 5-6.)  According to this official explanation, plaintiff was "[i]dentified in" a "criminal records check and/or has had their VISA revoked."  (*Id.* at 2.)

"A nonimmigrant's conviction in a jurisdiction in the United States for a crime of violence for which a sentence of more than one year imprisonment may be imposed (regardless of whether such sentence is in fact imposed) constitutes a failure to maintain status."  8 C.F.R. § 214.1(g).

---

[1]  Defendants argue termination of the SEVIS record does not equate to termination of plaintiff's F-1 visa status and in fact has no legal consequences.  (Doc. No. 11 at 9.)  However, defendants cite no authority for this proposition, and district courts addressing terminated SEVIS records have found that such an action necessarily involves terminating the plaintiff's F-1 status.  *See, e.g.*, *John Roe, et al.*, 2025 WL 1114694, at *3 (finding that regulations limiting the circumstances in which F-1 student status may be terminated apply to "termination of Plaintiffs' F-1 student status under the SEVIS").  Furthermore, the notification plaintiff received warned that "[r]emaining in the United States on a terminated status may have serious consequences."  (Doc. No. 5-6 at 4) (emphasis added).

1   However, plaintiff's declaration states that plaintiff has "never been convicted of any crime[,]"

2   and indeed has "never had criminal charges filed against" him. (Doc. No. 5-5 at 2.) He "was

3   detained two times by law enforcement in 2024, but no charges were filed and [he] received

4   correspondence from law enforcement that no charges would be filed for lack of evidence." (*Id.*)

5   According to this evidence, plaintiff is likely to establish that he did not fail to maintain status

6   because he has not been convicted of a crime, much less a crime of violence for which a sentence

7   of more than one year imprisonment may be imposed. 8 C.F.R. § 214.1(g). Furthermore, no

8   other ground for failure to maintain status is at issue here. *See* 8 C.F.R. §§ 214.1(e)–(g).

9       "[T]he Code of Federal Regulations permits termination of a student's F-1 visa status in

10   three ways: 1) by revoking a waiver that the Attorney General had previously authorized under

11   § 212(d)(3) or (4) of the Immigration and Nationality Act; 2) 'by the introduction of a private bill

12   to confer permanent resident status,' or 3) 'pursuant to notification in the Federal Register, on the

13   basis of national security, diplomatic, or public safety reasons.'" *Jie Fang*, 935 F.3d at 176

14   (quoting 8 C.F.R. § 214.1(d)). Revocation of plaintiff's F-1 visa is not among the permitted

15   reasons for terminating his F-1 visa status in the SEVIS system. *John Roe, et al. v. Noem, et al.*,

16   No. 25-cv-00040-BU-DLC, 2025 WL 1114694, at *3 (D. Mont. Apr. 15, 2025) ("8 C.F.R. §

17   214.1(d) does not provide statutory or regulatory authority to terminate F-1 student status in

18   SEVIS based upon revocation of a visa.").

19       Because plaintiff offers evidence supporting the conclusion that neither reason given for

20   termination is permitted by the applicable regulations, plaintiff will also likely show that

21   defendants' decision to terminate his SEVIS record, effectively terminating his F-1 status, was

22   arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law in

23   violation of the APA.[2] *See Liu v. Noem et al.*, No. 1:25-cv-00133-SE-TSM, Doc. No. 13 at 3

24   (D.N.H., Apr. 10, 2025) ("Based on the record before the court, Liu is likely to show that DHS's

---

25   [2]  Because plaintiff is likely to succeed on the merits of at least one of his claims brought under

26   the APA, the court need not address plaintiff's remaining claims. *Liu v. Noem et al.*, No. 1:25-cv-
     00133-SE-TSM, Doc. No. 13 at 3 n.2 (Dist. N.H., Apr. 10, 2025) ("Because the court finds that

27   Liu has shown a likelihood of success on the merits of his APA claim in Count 2, it does not
     address at this time his claim in Count 1 that DHS violated his due process rights under the Fifth

28   Amendment when it terminated his F-1 status in the SEVIS system.").

1    termination of his F-1 student status was not in compliance with 8 C.F.R. § 214.1(d) and was

2    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.");

3    *Isserdasani, et al. v. Noem, et al.*, No. 25-cv-00283-WMC, 2025 WL 1118626, at *5 (W.D. Wis.

4    Apr. 15, 2025) ("Specifically, based on the record currently before the court, Isserdasani is likely

5    to show that DHS's termination of his F-1 student status was not in compliance with 8 C.F.R. §

6    214.1(d) and was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

7    law under 5 U.S.C. § 706(2)(A)."); *John Roe, et al.*, 2025 WL 1114694, at *3 ("Therefore, the

8    Court finds that Plaintiffs are likely to succeed on the allegation that Defendants' termination of

9    Plaintiffs' F-1 student status under the SEVIS is arbitrary and capricious, an abuse of discretion,

10   contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction."); *cf.*

11   *Orlando Language Sch., Inc. v. Holder*, No. 6:13-cv-00703-ORL-37-GJK, 2013 WL 12141400,

12   at *3 (M.D. Fla. May 24, 2013) (finding termination of the plaintiff's SEVIS access was contrary

13   to law under the APA because the applicable statute did not provide for this option as a response

14   to the school's failure to apply for accreditation within one year).

15          e.    *The Court's Authority to Prohibit Removal and Detention*

16          One of the forms of relief plaintiff requests is a temporary stay preventing defendants

17   from removing plaintiff on the basis of his terminated SEVIS record or consequently terminated

18   F-1 visa status.  (Doc. No. 5 at 17–18.)  Defendants argue that 8 U.S.C. § 1252(g) prohibits

19   district courts from hearing challenges to decisions and actions about whether, when, and where

20   to commence removal proceedings, and that § 1226(e) bars relief that would impact where and

21   when to detain a noncitizen.  (Doc. No. 11 at 9–10.)

22          Title 8 U.S.C. § 1252(g) states as follows:

23                Except as provided in this section and notwithstanding any other
                  provision of law (statutory or nonstatutory), including section 2241
24                of Title 28, or any other habeas corpus provision, and sections 1361
                  and 1651 of such title, no court shall have jurisdiction to hear any
25                cause or claim by or on behalf of any alien arising from the decision
                  or action by the Attorney General to commence proceedings,
26                adjudicate cases, or execute removal orders against any alien under
                  this chapter.
27

28   /////

                                            12

1    Title 8 U.S.C. § 1226(e) states as follows:

2        The Attorney General's discretionary judgment regarding the
         application of this section shall not be subject to review.  No court
3        may set aside any action or decision by the Attorney General under
         this section regarding the detention of any alien or the revocation or
4        denial of bond or parole.

5        "The Ninth Circuit has held consistently that Section 1252(g) should be interpreted

6    narrowly." *Sied v. Nielsen*, No. 17-cv-06785-LB, 2018 WL 1142202, at *21 (N.D. Cal. Mar. 2,

7    2018) (citing *United States v. Hovsepian*, 359 F.3d 1144, 1155 (9th Cir. 2004) (en banc)).  "The

8    focus of Section 1252(g) is to limit 'judicial constraints upon prosecutorial discretion.'"  *Id.*  "By

9    contrast, Section 1252(g) does not divest courts of jurisdiction over cases that do not address

10   prosecutorial discretion and address 'a purely legal question, which does not challenge the

11   Attorney General's discretionary authority[.]'"  *Id.*  The Supreme Court has "indicated that the

12   reference to 'execut[ing] removal orders' appearing in that provision should be interpreted

13   narrowly, and not as referring to the underlying merits of the removal decision."  *Maharaj v.*

14   *Ashcroft*, 295 F.3d 963, 965 (9th Cir. 2002) (citing *Reno v. Am.-Arab Anti-Discrimination*

15   *Comm.*, 525 U.S. 471, 482–87 (1999)).  "The district court may consider a purely legal question

16   that does not challenge the Attorney General's discretionary authority, even if the answer to that

17   legal question—a description of the relevant law—forms the backdrop against which the Attorney

18   General later will exercise discretionary authority."  *Hovsepian*, 359 F.3d at 1155.

19       "District courts have reached different conclusions regarding the scope of § 1252(g) when

20   a party requests a stay of removal."  *Fatty v. Nielsen*, No. 17-cv-1535-MJP-BAT, 2018 WL

21   2244713, at *5 (W.D. Wash. Apr. 5, 2018) (collecting cases).  This court is persuaded that

22   § 1252(g) addresses challenges predicated on purported improper use of discretionary authority to

23   commence removal proceedings, which is not at issue here.  8 U.S.C. § 1252(g).  Instead, here,

24   plaintiff seeks a temporary stay preventing removal, which is permitted under 8 U.S.C. § 1252(g)

25   where the basis for the stay is distinct from how the government's prosecutorial discretion was

26   deployed.  *See Dhillon v. Mayorkas*, No. 10-cv-00723-EMC, 2010 WL 1338132, at *9 (N.D. Cal.

27   Apr. 5, 2010) ("[T]he Court rejects the government's position that § 1252(g) is a jurisdictional bar

28   to the relief requested by the Dhillons-*i.e.,* a stay of removal.  As those authorities indicate, the

13

1  stay sought on the removal order is not based on the Attorney General's decision to commence,

2  adjudicate, or execute a remand order within the meaning of § 1252(g).  Indeed, the Dhillons'

3  claim challenging the I-130 petition denial is fully collateral to the removal proceedings[.]");

4  *Chhoeun v. Marin*, 306 F. Supp. 3d 1147, 1159 (C.D. Cal. 2018) ("Contrary to the Government's

5  assertion, the Court has jurisdiction to hear Petitioners' claims regarding due process violations

6  and to order adequate injunctive relief."); *Ilyabaev v. Kane*, 847 F. Supp. 2d 1168, 1174 (D. Ariz.

7  2012) ("Respondents also argue that under 8 U.S.C. § 1252(g), as amended by the REAL ID Act,

8  the Court lacks jurisdiction to stay Petitioners' removal from the United States. . . .  Petitioners

9  are not challenging the Attorney General's discretionary decision to remove them.  Rather they

10  claim that it would be unlawful to remove them before they have had the opportunity to exercise

11  their legal right to challenge CIS's basis for revoking the I–140 Petition.  Because this is a legal

12  claim, not a challenge to the Attorney General's exercise of prosecutorial discretion, § 1252(g)

13  does not deprive the Court of jurisdiction."); *see also Arce v. United States*, 899 F.3d 796, 801

14  (9th Cir. 2018) ("[W]e are guided here, as elsewhere, by the general rule to resolve any

15  ambiguities in a jurisdiction-stripping statute in favor of the narrower interpretation, and by the

16  strong presumption in favor of judicial review[.]") (citations omitted).  Here the basis for the

17  requested stay preventing removal is the arbitrary and capricious or unlawful termination of

18  plaintiff's SEVIS record, which is distinct from any potential decision to initiate proceedings.[3]

19  *Id.*  The same reasoning applies to § 1226(e) regarding detention.  *See Jennings v. Rodriguez*, 583

20  U.S. 281, 295 (2018) ("As we have previously explained, § 1226(e) precludes an alien from

21  'challeng[ing] a "discretionary judgment" by the Attorney General or a "decision" that the

22  Attorney General has made regarding his detention or release.'  But § 1226(e) does not preclude

23  'challenges [to] the statutory framework that permits [the alien's] detention without bail.'").

24      Therefore, plaintiff's request to temporarily stay detention and removal on the basis of the

25  SEVIS termination is proper.  *John Roe, et al.*, 2025 WL 1114694, at *3 ("Defendants are

26  _____

27  [3]  Another provision does specifically regulate whether and when injunctions preventing removal are allowed, but that provision, 8 U.S.C. § 1252(f), limits "only permanent injunctions, not stays for temporary relief."  *Singh v. United States Citizenship & Immigr. Servs.*, No. 17-cv-01538-

28  JVS-JCG, 2018 WL 6265006, at *2 (C.D. Cal. Mar. 8, 2018) (citing *Maharaj*, 295 F.3d at 965).

1   prohibited from initiating removal proceedings against or deporting either Plaintiff on the basis of

2   the termination of their F-1 student status."); *Zheng v. Lyons*, No. 25-cv-10893-FDS, Doc. No. 8

3   at 1 (D. Mass. April 11, 2025) ("Defendant Todd Lyons, Acting Director, United States

4   Immigration and Customs Enforcement, and any agents acting under his authority or control, are

5   temporarily restrained . . . from arresting or detaining plaintiff Huadan Zheng, a/k/a Carrie Zheng,

6   under 8 U.S.C. § 1226(a), or otherwise for being unlawfully present in the United States without

7   legal permission or authority, based on the termination or revocation of her F-1 student visa.");

8   *Arizona Student Doe #2 v. Trump, et al.*, No. 4:25-cv-00175-AMM, Doc No. 7 at 2 (D. Ariz.

9   April 15, 2025) ("Defendants are temporarily enjoined for fourteen days from arresting and

10  detaining Plaintiff pending these proceedings, transferring Plaintiff away from the jurisdiction of

11  this District pending these proceedings, or removing Plaintiff from the United States pending

12  these proceedings").

13          2.      Likelihood of Irreparable Harm, Balance of Equities & the Public Interest

14          Here, plaintiff received an email from his school stating that as a result of the termination

15  of his SEVIS record, ICE agents may investigate to confirm his departure, no grace period is

16  allowed, and "remaining in the United States on a terminated status may have serious

17  consequences." (Doc. No. 5-6 at 3–4.)  In the absence of a temporary restraining order, plaintiff

18  may experience detention and deportation, including to a third country, and this risk has left

19  plaintiff "very distressed[.]" (Doc. No. 5-5 at 2–3.)  These current and threatened consequences

20  constitute risk of irreparable harm for which an award of monetary damages would not be

21  sufficient.  *Liu*, No. 1:25-cv-00133-SE-TSM, Doc. No. 13 at 4.  They also outweigh any minimal

22  hardship defendants may experience.  *Id.*

23          Plaintiff argues the public interest is served by granting the temporary restraining order

24  because it "avoids undermining the missions of U.S. universities, preserves the substantial

25  benefits of international research and collaboration, and prevents potential chilling of

26  international student enrollment."  (Doc. No. 5 at 16.)  Additionally, based upon the evidence

27  now before the court, public safety is not jeopardized because plaintiff has no criminal

28  convictions and has never even been charged with a crime.  (*Id.*)  Defendants argue control over

1  immigration is a sovereign prerogative. (Doc. No. 11 at 11.) The court is persuaded that the

2  public interest favors plaintiff in this case. *See Liu*, No. 1:25-cv-00133-SE-TSM, Doc. No. 13 at

3  4 ("The balance of the hardships and whether injunctive relief is in the public interest both weigh

4  in Liu's favor. The only argument that the defendants offered on these factors was a concern that

5  a TRO in this case may interfere with ICE's ability to carry out its duties.").

6                                    **CONCLUSION**

7        For the reasons explained above,

8     1.     Plaintiff's motion to proceed under pseudonym and for protective order is

9            GRANTED;

10    2.     The court orders that:

11           a.   Plaintiff has permission to proceed pseudonymously with respect to the public;

12           b.   The parties are required to redact or file any information identifying plaintiff

13                under seal;

14           c.   Defendants' counsel may not share any information about plaintiff's identity

15                beyond what is reasonably necessary for the litigation and to comply with this

16                court's orders;

17           d.   The parties are prohibited from using the protected information for any

18                purpose outside of this litigation; and

19           e.   The parties are prohibited from disclosing the identity of plaintiff for purposes

20                of detention or removal for the pendency of this litigation or until further order

21                of the court;

22    3.     Plaintiff's motion for a temporary restraining order (Doc. No. 5) is GRANTED;

23    4.     The court orders that, pending the hearing and determination of the motion for

24           preliminary injunction, defendants are:

25           a.   Enjoined from terminating plaintiff's SEVIS record;

26           b.   Required to set aside their SEVIS record termination determination;

27           c.   Prohibited from detaining or removing plaintiff based on the SEVIS

28                termination; and

d. Enjoined from directly or indirectly enforcing, implementing, or otherwise taking any action or imposing any legal consequences as a result of the termination of his SEVIS record; and

5. The court sets the following schedule with respect to plaintiff's motion for preliminary injunction:

   a. Plaintiff shall file his motion for preliminary injunction by June 2, 2025;

   b. Defendant shall file its opposition to the motion by June 16, 2025;

   c. Plaintiff shall file any reply to the opposition by June 23, 2025;

   d. The motion for preliminary injunction will be heard by the court on July 7, 2025 at 1:30 PM in Courtroom 4;

6. No bond shall be required to be posted by plaintiff pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.

Dated:  **April 17, 2025**                    _____
                                             DALE A. DROZD
                                             UNITED STATES DISTRICT JUDGE

# Exhibit B

Order, *Doe v. Noem*, __ F. Supp. 3d __, 2025
WL 1141279 at *7 (W.D. Wash. Apr. 17, 2025)

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JOHN DOE,

              Plaintiff,

     v.

KRISTI NOEM et al.,

              Defendant.

CASE NO. 2:25-cv-00633-DGE

ORDER ON MOTION FOR
TEMPORARY RESTRAINING
ORDER (DKT. NO. 3)

## I     INTRODUCTION

Plaintiff Doe[1] is a doctoral student at the University of Washington, in good academic

standing, and scheduled to graduate in December of 2025. (Dkt. No. 7 at 3.) On April 7, 2025,

the University of Washington informed Plaintiff his record within the Student and Exchange

Visitor Information System ("SEVIS") maintained by Immigration and Customs Enforcement

---

[1] A motion for Plaintiff to proceed pseudonymously remains pending. (Dkt. No. 4.) By referring
to Plaintiff as Doe at this stage, the Court expresses no view on that motion. During a TRO
hearing held on April 17, 2025, the Parties confirmed that Defendants are aware of Doe's
identity and that Plaintiff has disclosed that information to them, and as such, referring to him as
Doe in the TRO order would not be an obstacle to compliance.

(ICE) had been terminated and was no longer in an active status. (*Id.*) The purported reason for termination was Plaintiff's alleged failure to maintain his nonimmigrant status based on a "criminal records check" and/or a visa revocation. (Dkt. No. 7-2 at 1.)

Plaintiff brings claims under the Administrative Procedures Act ("APA") and the Fifth Amendment against the Secretary of Homeland Security and the Department, the ICE Acting Director, and other officials (collectively, "Defendants"). Plaintiff moves for a Temporary Restraining Order ("TRO") requiring Defendants to restore his SEVIS record and status, and to prevent the Defendants from initiating removal proceedings based on the termination of his SEVIS record. (*See* Dkt. No. 3.) Because Plaintiff is likely to succeed in his argument that Defendants' actions were arbitrary and capricious, and not in accordance with law, the Court will grant the TRO. *See* 5 U.S.C. § 706(2)(A).

## II    BACKGROUND

### A.  The F-1 Visa Program and SEVIS

Pursuant to the Immigration and Nationality Act ("INA"), a foreign student may enter the United States in a nonimmigrant status to complete a course of study at an approved educational institution. 8 U.S.C. § 1101(a)(15)(F)(i); 8 C.F.R. § 214.2(f). If approved, the State Department will issue a visa allowing the student admission to the United States to pursue their course of study. *See* 22 C.F.R. § 41.61(b)(1). If admitted, DHS may administratively designate the student as an F-1 nonimmigrant classification. 8 C.F.R. § 214.1(a)(2). A key component to admission as an F-1 nonimmigrant student is the presentment of Form I-20, which is "issued in the student's name by a school certified by the Student and Exchange Visitor Program (SEVP) for attendance by F-1 foreign students." 8 C.F.R. § 214.2(f)(1)(i)(A). The F-1 student's Form I-20 is endorsed at the time of entry into the United States and the F-1 student is responsible for

1  "retain[ing] for safekeeping the initial form I-20 or successor form bearing the admission number

2  and any subsequent form I-20 issued to them."  8 C.F.R. § 214.2(f)(1)(ii), (f) (2).

3       An F-1 student may remain in the United States for the duration of their studies so long

4  as they continue to meet the requirements outlined in the regulations.  8 C.F.R. § 214.2(f)(5)(i)

5  ("Duration of status is defined as the time during which an F–1 student is pursuing a full course

6  of study at an educational institution certified by SEVP for attendance by foreign students").  If a

7  student "fails to maintain a full course of study without the approval of a [Designated School

8  Official ("DSO")] or otherwise fails to maintain status," they must depart the United States

9  immediately or seek reinstatement.[2]  8 C.F.R. § 214.2(f)(5)(iv); *see also* 8 U.S.C. § 1184(a)(1).

10       A nonimmigrant student's legal status is governed by the F-1 visa system, which is

11  administered by ICE through its Student and Exchange Visitor Program (SEVP).  *Jie Fang v.*

12  *Dir. U.S. Immigr. & Customs Enf't*, 935 F.3d 172, 175 (3d Cir. 2019).  In turn, SEVIS is an

13  SEVP-managed internet system that tracks and maintains information on nonimmigrant students.

14  *See* 8 C.F.R. § 214.3(a)(l).  To implement the F-1 visa program, SEVP certifies participating

15  educational institutions, allowing those institutions to issue a Form I-20 in the student's name in

16

---

17  [2] A student may seek reinstatement by submitting an I-539, Application to Extend/Change
    Nonimmigrant status to United States Citizenship & Immigration Service ("USCIS") and a Form
18  I-20 or a successor form indicating a DSO's recommendation for reinstatement.  8 C.F.R.
    § 214.2(f)(16)(i).  Pursuant to the regulations, a district director "may consider" reinstatement if:
19  (1) student has not been out of status for more than five months at the time of filing or the failure
    to seek reinstatement within five months was due to exceptional circumstances; (2) student
20  "[d]oes not have a record of repeated or willful violations of DHS regulations; (3) student is
    pursuing or intending to pursue a full course of study at the school that issued the Form I-20 or
21  successor form; (4) student has not engaged in unauthorized unemployment; (5) student is not
    deportable pursuant to § 237 of the INA; and (6) USCIS is satisfied the violation of status was
22  beyond the student's control, or the "violation relates to a reduction in the student's course load
    that would have been within a DSO's power to authorize, and that failure to approve
23  reinstatement would result in extreme hardship to the student."  8 C.F.R.§ 214.2(f)(16)(i)(A)–(F).
    USCIS's decision to deny reinstatement is unreviewable.  *See* 8 C.F.R. § 214.2(f)(16)(ii).

24

SEVIS.[3]  SEVP regulations also govern the termination of F-1 student status in SEVIS.  8 C.F.R. § 214.2(f).  A student may fall out of F-1 status by: (1) failing to meet the regulatory requirements for F-1 student status or (2) via an agency related termination of status.  8 C.F.R. §§ 214.1(d), 214.2(f)(5)(iv).[4]  DHS can terminate an F-1 student's status in three ways: 1) by revoking a previously authorized waiver under 8 U.S.C. § 1182(d)(3) or §1182(d)(4); 2) through the introduction of a private bill in Congress to confer permanent resident status; or 3) if DHS publishes a notification in the Federal Register, on the basis of national security, diplomatic, or public safety reasons.  8 C.F.R. § 214.1(d).  DHS's ability to terminate an F-1 student's status is limited to the three ways enumerated in § 214.1(d).  *See Jie Fang*, 935 F.3d at 185 n.100.

**B.  Defendants Terminate Plaintiff's Record in SEVIS**

Plaintiff is a Chinese national who entered the United States lawfully on an F-1 visa on May 22, 2021.  (Dkt. No. 7 at 3.)  Plaintiff has been continuously enrolled in his doctoral program.  (*Id.*)  Although Plaintiff's F-1 visa expired on May 9, 2022, the most recent Form I-20 issued on his behalf by the University of Washington was valid through December 12, 2025.  (*Id.*; Dkt. No. 1 at 5.)

In September 2023, Plaintiff was arrested and charged with, but not convicted of, driving under the influence (DUI) under Washington Revised Code § 46.61.502, a misdemeanor.  (Dkt. Nos. 1 at 5; 7 at 4.)  Plaintiff's criminal defense lawyer, Robert J. Ault, submitted a declaration attesting that Doe was charged under § 46.61.502 in October 2023 and entered a plea of Not Guilty at an arraignment that month.  (Dkt. No. 5 at 1.)  Further, "[a]s of today's date [April 10,

---

[3] *Study in the States*, Dep't of Homeland Sec. (last accessed Apr. 16, 2025), https://studyinthestates.dhs.gov/site/about-sevis; 8 C.F.R. § 214.2(f)(1)(i)–(iii).

[4] The regulations detail circumstances under which the visa holder may be considered to fail to maintain status, including unauthorized employment, willful failure to provide truthful information to DHS, or certain qualifying criminal convictions.  8 C.F.R § 214.1(e)–(g).

1  2025], [Doe's] case is still pending and he has not been convicted of any offense." (*Id.*)  The

2  maximum penalty for a misdemeanor DUI under that section is 364 days imprisonment, plus

3  fines.  *See* Wash. Rev. Code §§ 46.61.502(5); 46.61.5055.  Under DHS regulations, "[a]

4  nonimmigrant's conviction in a jurisdiction in the United States for a crime of violence for which

5  a sentence of more than one year imprisonment may be imposed (regardless of whether such

6  sentence is in fact imposed) constitutes a failure to maintain status."  8 C.F.R. § 214.1(g).

7         Plaintiff learned via email from the University of Washington that his "SEVIS record and

8  I-20 were marked as 'terminated'" by SEVP as of April 7, 2025.  (Dkt. No. 7-2 at 1.)  The only

9  information provided regarding the termination was that it related to: "Otherwise failing to

10  maintain status - individual identified in criminal records check and/or has had their VISA

11  revoked."  (*Id.*)  He has not received any notice or contact from Defendants directly regarding his

12  termination, nor any opportunity to contest the determination.  (*See* Dkt. No. 7 at 3.)  Plaintiff

13  fears that termination of his SEVIS record will cause him reputational damage, because "[m]y

14  academic peers, colleagues, and future employers will inevitably suspect me of having

15  committed a crime of violence, well beyond my pending misdemeanor DUI charge."  (*Id.* at 4.)

16         Plaintiff initiated this action on April 9, 2025, arguing that "[t]his arbitrary termination

17  abruptly stripped Doe of his lawful immigration status, endangers his ability to complete his

18  doctoral program at the University of Washington, and subjects him to immediate risk of

19  detention and removal."  (Dkt. No. 1 at 2.)  He alleges three causes of action under the APA:

20  arbitrary and capricious agency action, action in excess of statutory and regulatory authority, and

21  action without observance of procedure required by law.  5 U.S.C. §§ 706(2)(A), 706(2)(C),

22  706(2)(D).  (Dkt. No. 1 at 6–7.)  He further alleges a Fifth Amendment Procedural Due Process

23  violation.  (*Id.* at 8.)  He seeks a TRO and subsequently a Preliminary Injunction (PI) "requiring

24

Defendants to restore and maintain Plaintiff's SEVIS record in active status pending final

resolution of this case" and "enjoining Defendants DHS and ICE from initiating removal

proceedings, detaining Plaintiff, or otherwise interfering with Plaintiff's lawful presence and

ability to pursue his academic program, solely based on the claims raised in this Complaint."

(*Id.* at 9.)  He seeks declaratory relief, vacatur of the termination of the SEVIS record, damages

pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), and costs.  (*Id.*)

### III      LEGAL STANDARD

Federal Rule of Civil Procedure 65(b) governs the issuance of a TRO.  "The legal

standard for a TRO is substantially identical to the standard for a preliminary injunction."

*Facebook, Inc. v. BrandTotal Ltd.*, 499 F. Supp. 3d 720, 732 (N.D. Cal. 2020).  To obtain

injunctive relief, the moving party must show: (1) a likelihood of success on the merits; (2) a

likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that

the balance of equities tips in favor of the moving party; and (4) that an injunction is in the

public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Generally, a TRO

is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is

entitled to such relief."  *Id.* at 22.  The moving party has the burden of persuasion.  *Hill v.

McDonough*, 547 U.S. 573, 584 (2006).  "The third and fourth factors, harm to the opposing

party and the public interest, merge when the Government is the opposing party."  *Nken v.

Holder*, 556 U.S. 418 (2009).

The Ninth Circuit has also articulated an alternative "sliding scale" approach pursuant to

which the first and third *Winter* factors are analyzed on a continuum; under such standard, a

weaker showing on the merits, combined with a stronger demonstration on the balancing test,

might warrant preliminary injunctive relief, assuming the second and fourth *Winter* elements are

met.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–1135 (9th Cir. 2011).

Under this "sliding scale" method, the movant need only raise "serious questions going to the

merits," but the balance of hardships must tip "sharply" in the movant's favor.  *Id.* at 1131–1132;

*see also Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012).

## IV    JURISDICTION

"Section 704 of the APA provides for judicial review of '[a]gency action made

reviewable by statute and final agency action for which there is no other adequate remedy in a

court.'"  *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 861 F.3d 944, 952 (9th Cir. 2017)

(quoting 5 U.S.C. § 704).  As no statute authorizes judicial review over the termination of SEVIS

records, the singular issue here is whether Defendants' termination of Plaintiff's SEVIS record

was "final" agency action for which there was no other "adequate remedy."  5 U.S.C. § 704.  *C.f.*

*Cabaccang v. U.S. Citizenship & Immigr. Servs.*, 627 F.3d 1313, 1316 (9th Cir. 2010).  For

agency action to be deemed final, it must "mark the consummation of the agency's decision-

making process" and "the action must be one by which rights or obligations have been

determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–

178 (1997) (internal quotation marks omitted).

As an initial matter, it is apparent that the termination of Plaintiff's SEVIS record is an

agency action that implicates "rights and obligations" and may well result in "legal

consequences."  *Id.*; *see also Jie Fang*, 935 F.3d at 180.  Next, the action appears to constitute

the consummation of the agency's decimating process for two reasons.  First, "there is no

statutory or regulatory requirement that a student seek reinstatement" of student status in SEVIS,

and even if a student attempts to pursue the administrative procedure for SEVIS reinstatement,

there is no "mechanism to review the propriety" of the original termination.  *Jie Fang*, 935 F.3d

at 182; *see* 8 C.F.R § 214.2(f)(16)(ii) ("The adjudicating officer will update SEVIS to reflect USCIS' decision. If USCIS does not reinstate the student, the student may not appeal the decision.").  Second, since neither immigration judges nor the BIA have the authority to review SEVIS termination or a USCIS denial of reinstatement, there is no proceeding in which a student can contest the agency action at issue here.  *Jie Fang*, 935 F.3d at 185.; *Ghorbani v. I.N.S.*, 686 F.2d 784, 791 (9th Cir.1982); *Tooloee v. I.N.S.*, 722 F.2d 1434, 1438–1439 (9th Cir. 1983).  Thus, the termination of Plaintiff's F-1 student status in SEVIS was not "of a merely tentative or interlocutory nature," but rather a unilateral determination with immediate legal consequences over which Plaintiff has no ability to seek administrative review.  *Bennett*, 520 U.S. at 177–178.  Accordingly, the Court finds it has jurisdiction to proceed.  *C.f. Jie Fang*, 935 F.3d at 182 ("[t]he order terminating these students' F-1 visas marked the consummation of the agency's decisionmaking process, and is therefore a final order").

## V    ANALYSIS

### A.  Plaintiff is Likely to Succeed in the Argument that Termination of His SEVIS Record was Unlawful

Under the APA, a court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Here, based on the limited record before the Court, Plaintiff has demonstrated a likelihood of success on two independent grounds under § 706(2)(A): that Defendants' termination of his SEVIS record was not in accordance with law, and that it was arbitrary and capricious.[5]

#### 1.  Not In Accordance with Law

---

[5] Because the Court finds that Plaintiff has established likelihood of success on his APA claim, the Court does not reach his Fifth Amendment Due Process claim at this time.

i.    *Agencies Must Follow Their Own Regulations*

It is contrary to law for an agency to disregard its own regulations and policies.  *See Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 852 (9th Cir. 2003); *Wallace v. Christensen*, 802 F.2d 1539, 1552 n.8 (9th Cir. 1986) (an agency is "bound by its own regulations so long as they remain in force.").  As the District of Columbia Circuit has explained:

> In a series of decisions, the Supreme Court has entertained challenges to agency actions that failed to conform to agency regulations. In *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943), the Court held that an agency is bound to the standards by which it professes its action to be judged. In *Accardi,* a case involving a habeas challenge to the denial of suspension of deportation, the Court objected to the agency's 'alleged failure to exercise its own discretion contrary to existing valid regulations.'

*Lopez v. Fed. Aviation Admin.*, 318 F.3d 242, 246 (D.C. Cir. 2003), *as amended* (Feb. 11, 2003) (quoting *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268, (1954)) (parallel citation omitted).  Moreover, "'a court's duty to enforce an agency regulation, while most evident when compliance with the regulation is mandated by the Constitution or federal law,' embraces as well agency regulations that are not so required."  *Id.* at 247 (alterations omitted) (quoting *United States v. Caceres*, 440 U.S. 741, 749 (1979)).

The Ninth Circuit has affirmed that "[p]ursuant to the *Accardi* doctrine, an administrative agency is required to adhere to its own internal operating procedures."  *Church of Scientology of California v. United States*, 920 F.2d 1481, 1487 (9th Cir. 1990); *see also United States v. Nixon*, 418 U.S. 683, 696 (1974)*; Arizona Grocery Co. v. Atchison, T. & S. F. Ry. Co.*, 284 U.S. 370, 389 (1932).  Courts have framed the obligation for an agency to follow its own regulations as deriving from § 706(2)(A) or other APA provisions.  *See, e.g., Suncor Energy (U.S.A.), Inc. v. United States Env't Prot. Agency*, 50 F.4th 1339, 1352 (10th Cir. 2022) (holding that EPA action violated § 706(2)(A) because it ignored the agency's regulatory definition of "facility"); *Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 983–984 (C.D. Cal. 2024) (ICE policy of warrantless "knock

1    and talk" violated agency's regulations and thus § 706(2)(A)).  Agencies must also adhere to

2    internal procedures designed to provide protections to individuals.  *Morton v. Ruiz*, 415 U.S. 199,

3    235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to

4    follow their own procedures."); *see also Lopez*, 318 F.3d at 247; *Beshir v. Holder*, 853 F.Supp.2d

5    1, 11 (D.D.C. 2011) (DHS Secretary's discretion to issue procedural rule pausing processing of

6    adjustment of status applications limited by regulation requiring adjudication in certain

7    timeframe).

8            Accordingly, Defendants are bound to follow their own rules and regulations governing

9    the proper termination of an F-1 student's record in SEVIS.

10           *ii.  Defendants Failed to Follow Their Own Regulations and Procedures*

11           On April 17, 2025, the Court held a hearing on the pending TRO motion, during which

12   counsel for Defendants confirmed that Plaintiff's DUI arrest was the sole reason for his SEVIS

13   record termination.  That confirmed the action was likely unlawful.  As discussed *supra*, a

14   student's record in the SEVIS system can be terminated either because the student fails to

15   maintain status, or when the agency initiates a termination of status.  8 CFR §§ 214.1(d);

16   214.2(f).  In this instance, Plaintiff states that he maintains full-time enrollment in his doctoral

17   program at the University of Washington (Dkt. No. 1 at 5), and Defendants have introduced no

18   evidence to the contrary.  Agency-initiated termination is governed by 8 CFR § 214.1(d), which

19   enumerates circumstances that result in termination:

20           Within the period of initial admission or extension of stay, the nonimmigrant status of an
             alien shall be terminated by the revocation of a waiver authorized on his or her behalf
21           under section 212(d)(3) or (4) of the Act; by the introduction of a private bill to confer
             permanent resident status on such alien; or, pursuant to notification in the Federal
22           Register, on the basis of national security, diplomatic, or public safety reasons.

23   Defendants do not argue that any of these criteria are present here.

24

Additionally, Plaintiff's DUI arrest is not a qualifying crime that could lawfully result in SEVIS termination.  DHS's regulations specifically explain what criminal activity results in failure to maintain status for a nonimmigrant:

> A condition of a nonimmigrant's admission and continued stay in the United States is obedience to all laws of United States jurisdictions which prohibit the commission of crimes of violence and for which a sentence of more than one year imprisonment may be imposed. A nonimmigrant's conviction in a jurisdiction in the United States for a crime of violence for which a sentence of more than one year imprisonment may be imposed (regardless of whether such sentence is in fact imposed) constitutes a failure to maintain status under section 241(a)(1)(C)(i) of the Act.

8 CFR § 214.1(g).  Plaintiff's DUI arrest fails to meet these criteria in at least two ways.  One, Plaintiff has not been convicted of any crime, he has only an arrest and charge.  (Dkt. No. 1 at 5.) Two, the maximum penalty for a misdemeanor DUI in Washington is 364 days, which is just short of a year imprisonment.  *See* Wash. Rev. Code §§ 46.61.502(5); 46.61.5055.  Additionally, the DUI likely does not qualify as a "crime of violence."  *See Leocal v. Ashcroft*, 543 U.S. 1, 11–13 (2004) (holding that a Florida DUI was not a "crime of violence" under 18 USC § 16, because it does not involve a "substantial risk" of "using physical force against another person.").  To the extent that Defendants terminated Plaintiff's SEVIS record merely because his name appeared in a criminal records check, that is inconsistent with their own regulation, which renders the decision invalid under § 706(2)(A).  *See supra*.

During the April 17 hearing, counsel for Defendants stated that the Government was not relying on 8 CFR § 214.1(d) as granting authority for the termination but rather invoked 8 U.S.C. § 1372.  That statute confers authority to *create* the SEVIS system but says nothing about termination of a student's record in the system.  Contrastingly, 8 C.F.R. § 214.1(d) enumerates the sole grounds under which DHS may initiate the termination of F-1 student's record in SEVIS.  *See Jie Fang*, 935 F.3d at 185 n.100.  When one section of a statutory scheme passes

specifically upon the question at hand and the other section is silent, Courts understand the specific to govern the general. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). Here, 8 CFR § 214.1(d) speaks specifically to when a SEVIS record may be terminated, 8 U.S.C. § 1372 does not.[6]

Accordingly, termination of the SEVIS record because of the DUI arrest is inconsistent with agency regulations, which renders the decision invalid. *Nat'l Ass'n of Home Builders*, 340 F.3d at 852; *Wallace*, 802 F.2d at 1552 n.8. Because Defendants' termination of Plaintiff's SEVIS record was—based on the limited information currently available—not authorized by and violated their own regulations, Plaintiff is likely to succeed in the argument that the agency action is not in accordance with law under § 706(2)(A).

### 2. Arbitrary and Capricious for Lack of Explanation

Agency action is considered arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). As the Ninth Circuit has explained, the "critical factor in *Motor Vehicle* was that the agency 'submitted no reasons at all' for its decision." *McFarland v. Kempthorne*, 545 F.3d 1106, 1113 (9th Cir. 2008) (citing *Motor Vehicle*, 463 U.S. at 50). The *Motor Vehicle* standard has been applied to review individualized agency decisions as well as agency rules.

---

[6] When asked during the hearing if there is a specific provision in 8 U.S.C. § 1372 that provides authority for the termination of a student's SEVIS record, Defendants were unable to provide one.

1  *See, e.g.*, *Does 1 through 16 v. U.S. Dep't of Homeland Sec.*, 843 F. App'x 849, 852 (9th Cir.

2  2021); *McNeely v. United States Dep't of Lab.*, 720 F. App'x 825, 827 (9th Cir. 2017).

3        In this instance, Defendant has failed to meet "the general administrative-law requirement

4  that an agency 'articulate a satisfactory explanation for its action.'" *Hernandez v. Garland*, 52

5  F.4th 757, 768 (9th Cir. 2022) (quoting *State Farm*, 463 U.S. at 43).  Indeed, Defendant has

6  failed to suggest any lawful grounds as to why its action here is lawful under the APA.  *Motor*

7  *Vehicle*, 463 U.S. at 50.  Defendants' submission that they "do not concede that Doe has

8  demonstrated a likelihood of success on the merits on his APA claim" but cannot defend it

9  because "DHS and from the Department of State, and Defendants have not completed

10  [factfinding] efforts in time to respond to Doe's motion" is inadequate under governing law.

11  (Dkt. No. 12 at 9.)  *C.f. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1,

12  30 (2020).[7]  The Court declines to "deny Doe's motion even in the absence of this factual

13  information related to the APA claim."  (Dkt. No. 12 at 9.)  Indeed, Defendant's failure to

14  provide a single plausibly lawful explanation for its action—an explanation reasonably grounded

15  somewhere in the statutory scheme—is the exact circumstance contemplated by the arbitrary and

16  capricious standard.  *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 968 (9th Cir.

17  2015) (en banc) ("[*Motor Vehicle*] teaches that even when reversing a policy after an election, an

18  agency may not simply [change courses] without a reasoned explanation.").

19        Accordingly, Plaintiff is also likely to prevail on the claim that the agency action is

20  arbitrary and capricious for failing to "articulate a satisfactory explanation for its action

21  _____

22  [7] An agency need not consider every conceivable alternative, but when it is "not writing on a
   blank slate" it must consider the impact of its actions on vested reliance interests, especially in

23  the immigration context, where individuals make "time-bounded commitment[s], to allow them
   to, say, graduate from their course of study."  *Regents*, 591 U.S. at 32–33.

24

including a rational connection between the facts found and the choice made." *Motor Vehicle*, 463 U.S. at 43.

## B. Remaining TRO Factors Favor Plaintiff

As discussed *supra*, Plaintiff has established likelihood of success on the merits of his APA claim. The other injunctive relief factors favor Plaintiff as well. He faces multiple forms of irreparable harm as a result of termination of his SEVIS record, and the balance of equities weigh in his favor.

### 1. Plaintiff Faces Irreparable Harm

Plaintiff faces several forms of irreparable harm as a result of the termination of his SEVIS record. First, he cannot carry out research on his grant-funded doctoral program without an active SEVIS record. (Dkt. No. 3 at 5.) Accordingly, his research is stalled. Ultimately, if he is unable to complete the research and his doctoral program, he will lose four years' worth of full-time work, face diminished career prospects, and suffer reputational harm. (*Id.* at 12.) Second, while Defendants have not yet placed Plaintiff in removal proceedings, he faces the prospect of detention, removal proceedings, and ultimately deportation because termination of his SEVIS record indicates that he is not maintaining status in his program. *See* 8 U.S.C. § 1227(a)(1)(B) (a person who is not lawfully present is removable). And so long as Plaintiff is out of status, he may be accruing unlawful presence time, which acts as a future bar to admission and reentry to the United States. *See* 8 U.S.C. § 1182(a)(9)(B). Plaintiff's fears are not speculative, as DHS's own public-facing guidance states that a person whose SEVIS record is terminated faces the following consequences:

- Student loses all on- and/or off-campus employment authorization.

- Student cannot re-enter the United States on the terminated SEVIS record.

- Immigration and Customs Enforcement (ICE) agents may investigate to confirm the departure of the student.

- Any associated F-2 or M-2 dependent records are terminated. [8]

Turning now to examine each irreparable harm in more detail, the Court begins by considering the matter of employment authorization.  Multiple courts have held that loss of or delay in obtaining employment authorization is an irreparable harm.  *See Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 968 (D. Md. 2020), *order dissolved sub nom. Casa de Maryland, Inc. v. Mayorkas*, No. 8:20-CV-2118-PX, 2023 WL 3547497 (D. Md. May 18, 2023) (a delay in an asylum seeker obtaining work authorization is an irreparable harm because "every additional day these individuals wait will visit[] on them crippling dependence on the charity and good will of others"); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 434 (E.D.N.Y. 2018), *vacated and remanded sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1 (2020) (finding that if the DACA program were terminated, resulting loss of work authorization for DACA recipients would be an irreparable harm).  Under these unique circumstances where Plaintiff's continued work and lawful immigration status are interlinked, the prospect of Plaintiff losing his grant-funded work as a doctoral candidate is likewise irreparable.  *See e.g., Karakozova v. Univ. of Pittsburgh*, No. 09CV0458, 2009 WL 1652469, at *4 (W.D. Pa. June 11, 2009) (holding that plaintiff, a research assistant who alleged her position was terminated on a discriminatory basis, could show irreparable harm from loss of position because she could lose her H-1B visa and have to leave the country voluntarily or by removal, with no certainty of alternative relief).

---

[8] *See* Dep't Homeland Security*, SEVIS Help Hub: Terminate A Student* (Nov. 7, 2024.) https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/terminate-a-student.

Likewise, courts have held that interruption of educational programs or progress can be an irreparable harm. For instance, in *Tully v. Orr*, the court held that disenrolling a cadet from the United States Air Force Academy "just prior to his examinations and graduation" would be an irreparable harm where the cadet would face the prospect of having to repeat courses, "delay[] in both his graduation and commissioning," and a "deleterious effect" on his future in the force. 608 F. Supp. 1222, 1225, 1226 (E.D.N.Y. 1985). Some courts have specifically held that loss of opportunity to participate in post-secondary education programs is an irreparable harm. *See Maria v. Loyola Univ. of Chicago Stritch Sch. of Med.*, No. 24 C 1698, 2025 WL 96482, at *8 (N.D. Ill. Jan. 14, 2025) (accepting that loss of opportunity to participate in psychiatry residency is an irreparable harm, though denying injunction on other grounds); *Lujan v. United States Dep't of Educ.*, 664 F. Supp. 3d 701, 721 (W.D. Tex. 2023) (finding that erroneous loss of even one point on Fulbright scholarship application grading would be an irreparable harm, due to loss of opportunity to obtain scholarship). Here, as discussed, Plaintiff is currently unable to continue in his academic work,[9] and should that condition persist, he faces loss of grants and an inability to complete his degree—which is especially harmful where Plaintiff is just months away from graduation.

Next, the Court considers the threat of removal. Removal is not by itself an irreparable harm, in part because removal is (in at least some instances) reversible. *See Nken*, 556 U.S. at 430. However, in this case, the ordinary harms of removal would compound the other harms Plaintiff faces by effectively eliminating his ability to complete his degree program, causing him

---

[9] At the hearing, Plaintiff's counsel identified Plaintiff's grant is federally funded, which presumably means Plaintiff must maintain lawful status and that termination of Plaintiff's work authorization prevents Plaintiff from engaging in the grant funded work. The record though is not complete on this issue. Nonetheless, the Court concludes irreparable harm has been established based on the other harms identified.

economic and reputational loss wherever he ultimately resides. Even if a removal order could be reversed and Plaintiff ultimately repatriated to the United States if he were wrongfully removed, it is unclear if Plaintiff's educational loss could be reversed (e.g., needing to reapply for admission, repeating incomplete coursework, and/or competing for funding to replace lost grants). *See e.g.*, *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (D.D.C. 2020) (in case challenging removal conditions during pandemic, finding that deportation was an irreparable harm because plaintiffs could not challenge deportation conditions and get effective relief after removal). As counsel for Plaintiff explained at the April 17 hearing, doctoral programs typically involve supervision of the doctoral candidate by an adviser with specialized knowledge and reputation in the field, so the inability to complete a doctoral program due to status termination and removal cannot necessarily be remedied with re-starting another program at a different time and place.

Finally, as Plaintiff points out, he may also be accruing unlawful presence as a result of the SEVIS revocation, which other courts have held is irreparable. In *Guilford College v. McAleenan*, the court set aside a USCIS policy memorandum purporting to redefine how accrual of unlawful presence is calculated for students deemed to be out-of-status on F or J visas. 389 F. Supp. 3d 377, 384 (M.D.N.C. 2019). With respect to injunctive relief, the Court found that unlawful or unknowing accrual of unlawful presence would be irreparable because it could expose plaintiffs to three- or ten-year reentry bars, which are not judicially reviewable. *Id.* at 394. Other courts, including in this district, are in accord. *See Garcia v. United States Customs & Border Prot.*, No. CV215468DMGJEMX, 2021 WL 4815945, at *4 (C.D. Cal. Aug. 20, 2021) (granting motion for preliminary injunction to prevent accrual of unlawful presence, and rejecting arguments that discretionary waiver or possibility of voluntary removal would render the harm not irreparable); *Ruiz-Diaz v. United States*, No. C07-1881RSL, 2008 WL 3928016, at

*2 (W.D. Wash. Aug. 21, 2008) ("The Court finds that halting the accrual of unlawful presence time and/or unauthorized employment for all class members during the pendency of this litigation will continue the *status quo ante litem,* will prevent irreparable harm to class members and their families, and will not cause defendants any undue hardship."). During the April 17 hearing, Defendants could not confirm or deny if they consider Plaintiff to currently be out of status. This places Plaintiff in a Catch-22: the University has advised him not to engage in any employment for risk of making him ineligible for reinstatement (*see* Dkt. No. 7-2 at 2), but Defendants suggest his failure to continue his grant-funded research may make him ineligible going forward.

2. There is a Public Interest in Enforcement of Valid Regulations, and Balance of Equities Favor Plaintiff

"When the government is a party, the balance of equities and the public interest factors merge." *Nken*, 556 U.S. at 435. The public has a vested interest in a federal government that follows its own regulations. As one court framed it: "the public has a strong interest in having a [government] that conducts itself fairly and according to its stated regulations and policies." *Cooney v. Dalton*, 877 F. Supp. 508, 515 (D. Haw. 1995); *see also Eight N. Indian Pueblos Council, Inc. v. Kempthorne*, No. CV 06-745 WJ/ACT, 2006 WL 8443876, *5 (D.N.M. Sept. 15, 2006) ("It is in the public interest that federal agencies comply with their own policies and with federal statutes."). Here, Defendants assert that the public interest factors tip in their favor because the "public interest lies in the Executive's ability to enforce U.S. immigration laws." (Dkt. No. 12 at 9.) However, Defendants have provided *no indication* that they complied with the relevant statutory scheme in "enforcing immigration laws" in this case. (Dkt. No. 12 at 9.) Accordingly, this is a set of circumstances where the government and its decision-making processes will be best served by judicial review of a decision—and maintenance of the status quo

during that review—that appears both unlawful and likely to cause Plaintiff irreparable harm. Moreover, Defendants have not put forth evidence of how a TRO would cause them injury or harm. For these reasons, the Court determines that the balance of the equities and public interest factors tip sharply in Plaintiff's favor.

Finally, the Court addresses Defendant's argument that Plaintiff is "not only seeking to preserve the status quo on a temporary basis" but is rather requesting "an order compelling the defendants to change the status quo" because "he seeks emergency restoration of a record that has already been marked as terminated." (Dkt. No. 12 at 6.) Courts have long held that the "status quo ante litem" for the purposes of considering a temporary restraining order or preliminary injunction "refers not simply to any situation before the filing of a lawsuit, but instead to 'the last uncontested status which preceded the pending controversy.'" *GoTo.com, Inc. v. Walt Disney Co*., 202 F.3d 1199, 1210 (9th Cir. 2000) (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc*., 316 F.2d 804, 809 (9th Cir. 1963). An interpretation of "status quo as the moment before filing a lawsuit but after alleged misconduct began "would lead to absurd situations, in which plaintiffs could never bring suit once infringing conduct had begun." *Id*.

This standard has been applied to government action as well as private disputes. *See, e.g., Doe #1 v. Trump*, 957 F.3d 1050, 1068–1069 (9th Cir. 2020); *S.A. v. Trump*, No. 18-CV-03539-LB, 2019 WL 990680, *13 (N.D. Cal. Mar. 1, 2019). For example, in *S.A.*, the court concluded that the status quo ante litem was the point before DHS stopped processing conditionally approved beneficiaries under a dual refugee/parole program. *See S.A.,* 2019 WL 990680, at *13. Accordingly, the court vacated DHS's decision to mass-rescind conditional approvals for 2,714 beneficiaries pending a final determination on the merits because that maintained the status quo ante litem. *Id*. at *17. Similarly, in this case, the "legally relevant

relationship between the parties before the controversy arose," describes the state of affairs *prior* to the termination of Plaintiff's SEVIS record. *Ariz. Dream Act Coalition v. Brewer*, 757 F. 3d 1053, 1060–1061 (9th Cir. 2014). Accordingly, Defendant's argument that "the relief Doe seeks is not a prohibitory injunction to maintain the status quo" is frustrated by decades of Ninth Circuit caselaw. (Dkt. No. 12 at 2.)

Finally, Defendant advances a confused argument that posits Plaintiff seeks "a final judgement on the merits" because a TRO is part of the final relief outlined in his complaint. (Dkt. No. 12 at 2.) Defendants are correct that "it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). But what the *Camenisch* court was communicating was that findings of fact and conclusions of law made by a court in a preliminary injunction or TRO posture are preliminary and do not bind the court at the trial on the merits. *Id.* at 395–398. Thus, it is not appropriate to enter a *final judgement* at a TRO stage. *Id.* That is not what the Court is doing here. As the *S.A.* court emphasized, "nothing in *Camenisch* holds that the scope of a preliminary injunction cannot overlap with the relief requested for an eventual final judgment." S.*A*, 2019 WL 990680, at *16 n.59. Here, as in *S.A.*, the order makes no final findings on the merits and merely returns the parties to the status quo ante litem.

## C.  The Court Will Not Require a Bond

Under Federal Rule of Civil Procedure 65(c), in granting a PI or TRO, the court must require a movant to pay security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Ninth Circuit has held that "[d]espite the seemingly mandatory language, Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*." *Johnson v. Couturier*,

572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)) (cleaned up). "In particular, '[t]he district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct.'" *Id.* (quoting *Jorgensen,* 320 F.3d at 919). Here, Defendants request that the Court impose a bond "in an amount the Court determines to be appropriate." (Dkt. No. 12 at 10.) Defendants do not account for any costs they allege they will face if the TRO is issued erroneously, and the Court perceives none. Here, Defendants will face no cost from Plaintiff continuing his studies as he did before his SEVIS was terminated, and negligible or zero cost from restoring his SEVIS status to active. Plaintiff's only criminal history is the misdemeanor DUI for which he has been charged but not convicted, and he poses little if any risk to the public. The Court therefore exercises its discretion to waive the bond requirement.

## VI    CONCLUSION

Accordingly, it is ORDERED that Plaintiff's Motion for a Temporary Restraining Order (Dkt. No. 3) is GRANTED. Defendants are ENJOINED for a period of fourteen days from the date of this order, as follows:

1) Defendants shall restore Plaintiff's F-1 student record and I-20 in the Student and Exchange Visitor Information System (SEVIS);

2) Defendants shall set aside the April 7, 2025 F-1 student record and I-20 termination as to Plaintiff;

3) Defendants shall not terminate Plaintiff's student record and I-20 in SEVIS absent a valid ground as set forth in 8 C.F.R. §§ 214.1(d)–(g); 214.2(f).

4) Defendants are prohibited from detaining or transferring Plaintiff out of this Court's jurisdiction, or ordering the detention or transfer of Plaintiff out of this

Court's jurisdiction, as a result of the termination of his F-1 student record or I-20 in SEVIS on April 7, 2025; and

5) Defendants are prohibited from initiating removal proceedings against or deporting Plaintiff on the basis of the April 7, 2025 termination of his F-1 student record or I-20 in SEVIS.

It is furthered ORDERED that the security requirement of Rule 65(c) is waived.

Dated this 17th day of April, 2025.



David G. Estudillo
United States District Judge

# Exhibit C

Transcript, *Patel v. Lyons*, 1:25-cv-01096-ACR,
April 16, 2025

```
 1                IN THE UNITED STATES DISTRICT COURT
                       DISTRICT OF COLUMBIA
 2

 3   AKSHAR PATEL                  ) CIVIL NO.:
                                   ) 25-1096-ACR
 4          Plaintiff,             )
         vs.                       )
 5                                 )
     TODD M. LYONS,                )
 6                                 ) April 16, 2025
              Defendant.           ) Washington, D.C.
 7   _____) 10:45 a.m.

 8
                       Transcript of Motions Hearing
 9              Before the Honorable Ana C. Reyes
                     United States District Judge
10

11   APPEARANCES:

12   For the Plaintiff:   Steven A. Brown, Esquire
                          Reddy Neumann Brown, P.C.
13                        10333 Richmond Avenue, Ste 1050
                          Houston, TX 77042

14                        Bradley B. Banias, Esquire
                          Banias Law LLC
15                        602 Rutledge Avenue
                          Charleston, SC 29403
16
     For the Defendant:   Joseph F. Carilli , Jr., , Esquire
17                        United States Attorney's Office
                          Civil Division
18                        601 D Street, NW
                          Washington, DC 20001
19
     Also Present:  MacKlin Everly
20                  Andre Watson

21   Reported by:   Christine T. Asif, RPR, FCRR
                    Federal Official Court Reporter
22                  333 Constitution Avenue, NW
                    Washington, D.C. 20001
23                  (202) 354-3247

24
     Proceedings recorded by machine shorthand; transcript produced
25   by computer-aided transcription
```

P R O C E E D I N G S

1

2          THE CLERK:  This is civil action 25-1096, Akshar

3   Patel versus Todd M. Lyons.

4          Will the parties please identify themselves for the

5   record.

6          MR. BROWN:  Good morning, Your Honor.  Steven Brown

7   and Brad Banias for the plaintiffs.

8          THE COURT:  Government counsel.

9          MR. CARILLI:  Joseph F. Carilli for the

10  Government.

11          THE COURT:  In the future gentleman if I or any

12  court orders you to meet and confer, there are two components

13  of a meet and confer meet and confer.  One that you actually

14  meet, which you do not do over email.  And two is that you

15  actually confer.  The second I saw your --

16          Mr. Carilli, could you please look up and not be

17  writing whatever you're writing right now and listen to me.

18          The second I saw your first joint status report I

19  knew immediately that none of you had done either of those two

20  things, which is why I asked for the further report which

21  confirmed everything that I thought.  Now did you all meet and

22  confer by video this morning?

23          MR. BROWN:  Yes, Your Honor.

24          THE COURT:  How long did the meet and confer last?

25          MR. BROWN:  About 40 minutes, Your Honor.

1          THE COURT:  Okay.  Did you guys make any progress?

2          MR. BROWN:  Not towards a resolution, Your Honor,

3   but I think we have a understanding of each -- better

4   understanding of each other's position, Your Honor.

5          THE COURT:  All right.  So Mr. Carilli, can you

6   explain the SEVIS system to me exactly what it is and what it

7   does.

8          MR. CARILLI:  SEVIS is an information system that

9   was established under 8 U.S.C., I'm sorry --

10          THE COURT:  1372.

11          MR. CARILLI:  1372, excuse me.  That was established

12   post 9/11 for the Secretary of Homeland Security to be able to

13   monitor individuals who are in the country in F, M, and J

14   status.  Obviously, the issue here is the portions of SEVIS

15   that are used by F.  Immigration and Customs Enforcement

16   maintains that system under that statute and it is used to,

17   like I said, monitor and then also for individual schools to

18   be able to provide information about F-1 students that are

19   enrolled at their schools.

20          THE COURT:  Okay.  So the purpose of SEVIS is to

21   monitor people who are here in part on F-1 visas?

22          MR. CARILLI:  Yes, Your Honor.

23          THE COURT:  Okay.  So what's the impact of taking

24   someone off of SEVIS, why would we not want to monitor

25   somebody?

1          MR. CARILLI:  Well, to clarify, Your Honor, what

2     occurred here was, in SEVIS there is a drop down menu that

3     allows you to list active -- there's categories about an

4     individual.  So the record wasn't deleted, it's just in SEVIS

5     that it was changed from active to terminated.

6          THE COURT:  Okay.  And what's the consequence of

7     moving someone from active to terminated?

8          MR. CARILLI:  The consequence is exactly as

9     described, that it changed the status of the individual inside

10    SEVIS.  It did not change the individual's immigration

11    status.

12         THE COURT:  So what's the impact of it being changed

13    within SEVIS, why -- what happens when that occurs?

14         MR. CARILLI:  I mean, it's an indication that in

15    system that the individual -- that their record in the system

16    has been -- the status is terminated.  I can't --

17         THE COURT:  No, I understand that.  But what is the

18    impact -- what's the impact of it having been terminated?  If

19    there's no impact, then I'm sure you have no problem moving it

20    back to active and we can all go home; right?

21         MR. CARILLI:  Well, I think that the government

22    has -- ICE has indicated they're not going to change it back.

23    I think that --

24         THE COURT:  That wasn't my question.  I'm not really

25    concerned what ICE thinks they can and can't do, I'm concerned

1    with what I can do.  And my understanding from the plaintiff's

2    argument is that a change of SEVIS from active to terminated

3    either automatically cancels their F-1 visa or is a precursor

4    to canceling their visa.  I'm not quite sure what the argument

5    is, but I think it's the first.  And the government says no,

6    no, no, that has nothing to do with immigration.  So if it has

7    nothing to do with immigration, it must have something to do

8    with something, or else we would all change it back to active

9    and we could all go home.

10         So explain to me please what the consequence is of

11   changing something from active to inactive or terminated.  And

12   do not say it's terminated within the SEVIS system, because

13   that is not an answer to my question.  What is the impact of

14   terminating somebody within SEVIS?

15         MR. CARILLI:  I'm not prepared to answer that --

16         THE COURT:  How are you not prepared to answer --

17   I'm sorry how are you not here prepared to answer that

18   question?  That's the only question in this litigation, Mr.

19   Carilli.

20         MR. CARILLI:  The question here is whether --

21         THE COURT:  No, Mr. Carilli -- Mr. Carilli.  I'm the

22   one who decides what the questions here are, okay, not you.

23   Now, obviously, the first question in this case is what is the

24   practical import of canceling someone within SEVIS.  And if

25   you don't know, we're all going to wait here while you call

1    someone and find out, because I'm not going to get jerked

2    around by you telling me you're not prepared to answer the key

3    question in this case.

4           What is the impact of someone being terminated

5    within SEVIS?

6           MR. CARILLI:  I do not know --

7           THE COURT:  All right.  Mr. Carilli, that's fine --

8    Mr. Carilli, that's totally fine.  We're all going to stay on

9    the phone here.  You're going to go some other phone or you're

10   going to put yourself on mute.  And you're going to call your

11   client and you're going to ask.  And we're going to stay here

12   until you get an answer.

13          MR. CARILLI:  Yes, Your Honor.

14          THE COURT:  So, gentleman, you guys can hang back

15   and we'll hear from Mr. Carilli when he's done.  And I'm going

16   to stay on the bench while you get this done.  And if you

17   can't get someone on the phone.  Get the next person on the

18   phone.  Because I'm going to stay here until you get someone

19   on the phone.  I'm ordering you to get your client on the

20   phone.  So we're all going to stay here while you do that.

21          And you can put yourself on mute and turn yourself

22   off the video if you would like Mr. Carilli.

23          Gentleman, you guys can put yourselves off video if

24   you want to, just stay around in case we get back from him.

25   And Ms. White mute, please.  Turn off my video.

1          (Pause in the proceedings from 10:53 a.m. to 12:06

2    p.m.)

3          THE COURT:  Mr. Carilli, where are we?

4          MR. CARILLI:  Your Honor, I'm still waiting for a

5    response from the Agency, in terms of the practical effects of

6    changing the record in SEVIS to terminated.

7          THE COURT:  Can you explain to me please why it has

8    taken over an hour and I still don't have an answer, to what

9    must be the most obvious simple question that this case

10    presents as to what happens when someone gets taken off of

11    SEVIS?  I mean, you know, why there's a delay, right, Mr.

12    Carilli?  Do you want to tell me why there's a delay or do you

13    want to me to tell you why there's a delay?

14          MR. CARILLI:  Your Honor, I don't know why there's a

15    delay.

16          THE COURT:  Well, I'll tell you why there's a delay,

17    Mr. Carelli, because what happens when you take someone off of

18    SEVIS and you terminate them they lose their status and that's

19    not something you all want to tell the Court.  Now, why you

20    all don't want to tell the Court, I don't know.  But we're

21    going to get an answer to the question.

22          So I want agency counsel to stop whatever

23    conversations she's having or he's having right now and get on

24    the video so I can ask agency counsel what's going on.

25    Because we asked -- apparently agency counsel was on the phone

1    no later than 11:40 having this conversation.  And it's not a

2    25-minute answer.  So get agency counsel on the phone.  And

3    after we get agency counsel on the phone, if I'm not

4    satisfied, we're going to have the declarant Mr. Watson come

5    to my courtroom and testify today.  So get agency counsel on

6    the phone, please.

7             MR. CARILLI:  Yes, Your Honor.  Honor, excuse me,

8    before I go off video may I go off video to --

9             THE COURT:  Yeah.  Sure.  Of course.

10            MR. CARILLI:  Thank you, Your Honor.

11            (Pause in the proceedings from 12:08 p.m. to 12:19

12    p.m.)

13            THE COURT:  Mr. Carilli, what's going on?

14            MR. CARILLI:  Your Honor, I just forwarded the

15    invite to one of the agency counsel.  Agency counsel indicated

16    there was also going to be another individual that was going

17    to join.  So I have been waiting for that second name, but I

18    just forwarded it to the person that told me --

19            THE COURT:  Okay.  While we're waiting for them, is

20    the government's position that Mr. Patel's F-1 visa is in

21    effect or not in effect?

22            MR. CARILLI:  Mr. Patel's F-1 visa is no longer

23    valid.  So -- and I think there's a different genre between a

24    individual who has a valid visa which allows them to seek

25    admission into the United States versus when an individual has

1  lawful status after they have been admitted into the United

2  States.

3          THE COURT:  Okay.  Is he lawfully in the United

4  States right now?

5          MR. CARILLI:  The government's position is that he

6  has not -- ICE has not taken -- has not terminated his F-1

7  status.  And for ICE to be able to terminate his F-1 status,

8  they would have to put him in 1229a removal proceedings.

9          THE COURT:  Is he lawfully in the United States

10  right now, yes or no?

11          MR. CARILLI:  I'm not able to answer that question,

12  Your Honor.

13          THE COURT:  How are you not able to answer that

14  question?  What does that even mean?  He's either here legally

15  or he's not here legally.  You're the government's lawyer.  Is

16  he here legally?  I mean, how is Mr. Patel supposed to know if

17  he's here legally if you don't even know if he is here

18  legally?

19          MR. CARILLI:  He was lawfully admitted to the United

20  States --

21          THE COURT:  No, no, Mr. Carilli, there's a -- no, no

22  Mr. Carilli, there is a yes or no answer here.  We are not --

23  this is not Schrodinger's visa, either he's here legally or

24  he's not here legally.  If you cannot answer the question, you

25  have to explain to me why you cannot answer that question.

1          MR. CARILLI:  I cannot answer that question.  I have

2     talked to ICE as to whether or not they consider at this point

3     in time the individual, whether or not they are maintaining

4     lawful status.

5          THE COURT:  And what does ICE say to that?

6          MR. CARILLI:  I have not received a response, Your

7     Honor.

8          THE COURT:  Do you realize that this is Kafkaesque?

9     I've got two experienced immigration lawyers on behalf of a

10     client who is months away from graduation, who has done

11     nothing wrong, who has been terminated from a system that you

12     all keep telling me has no effect on his immigration status,

13     although that clearly is BS.  And now, his two very

14     experienced lawyers can't even tell him whether or not he's

15     here legally, because the Court can't tell him whether or not

16     he's here legally, because the government's counsel can't tell

17     him if he's here legally.

18          And you know what's going to happen when he gets

19     picked up?  He's going to be accused of being here illegally

20     in the United States because when he is picked up and put

21     through deportation proceedings, everyone's going to say he

22     was here illegally and he was obviously here illegally and he

23     should have known that.  And then some court down there is

24     going to say no, no, no, the Court up in D.C. asked and the

25     government said they didn't know.  And those lawyers, do you

1    know what they are going to do?  They're going to be like, I

2    don't know what that lawyer was thinking.

3              We are not going to do that here, Mr. Carilli.  That

4    is not happening in this courtroom.  We're going to get an

5    answer.  And if the answer somehow contradicts what is in your

6    brief, or what is in God willing no, Mr. Watson's declaration,

7    there are going to be serious consequences.  Where is your

8    agency counsel?

9              MR. CARILLI:  Will you allow me to confer with the

10   agency --

11             THE COURT:  No, you've been conferring with the

12   agency for -- I want the agency counsel on the phone, you sent

13   them the thing; right?

14             MR. CARILLI:  Your Honor, what I meant by confer was

15   please let me try and get them back on the phone to find out

16   why they have not joined the call.

17             THE COURT:  Fine.

18             MR. CARILLI:  That's what I meant by --

19             THE COURT:  Fine.

20             (Pause in the proceedings.)

21             MR. CARILLI:  Your Honor, agency counsel is joining

22   on the line.

23             THE COURT:  Plaintiff's counsel, is your client

24   allowed to go to classes right now?

25             MR. BROWN:  Your Honor, it is our client's position

1    that based off of ICE he cannot be in status and thus cannot

2    attend classes.

3             THE COURT:  Is anyone at the school preventing him

4    from going to classes?

5             MR. BROWN:  I don't think there's anybody physically

6    preventing him, no, Your Honor.

7             THE COURT:  All right.  Government counsel, I assume

8    while this is pending you are okay if he goes to classes?

9             MR. CARILLI:  I would need to confer with the Agency

10   about that, Your Honor.  I asked that specific question before

11   this hearing and did not receive a response.

12            THE COURT:  Is it they just don't respond to you or

13   they just don't give you an answer?

14            MR. CARILLI:  I have received that they don't have a

15   response to my question.  In other words, it's not a -- it is

16   not a they did not respond.  It's -- as the Agency counsel

17   just explained to me, when I asked him to join the link is he

18   indicated that those are operational decisions that are with

19   the client, with their client.

20            THE COURT:  Okay.  Well, then I want someone from

21   the client -- where is agency counsel?  How long does it take

22   to log on to a video?  We've been waiting for the agency

23   counsel now 20 minutes.

24            (Pause in the proceedings.)

25            MR. CARILLI:  Just communicated, Your Honor, that

1    he's trying to log in right now.

2            THE COURT:  Mr. Everly, could you please enter your

3    appearance.

4            THE CLERK:  Mr. Everly this is the courtroom deputy,

5    can you hear me, sir?  I can't hear you.

6            MR. EVERLY:  Can you hear me now?

7            THE COURT:  Mr. Everly, can you please enter your

8    appearance.

9            MR. EVERLY:  Yes.  MacKlin Keith Everly, agency

10    counsel for U.S. Immigration and Customs Enforcement.

11            THE COURT:  How long have you been agency counsel,

12    sir.

13            MR. EVERLY:  Little less than two years.

14            THE COURT:  Where were you before then?

15            MR. EVERLY:  I was with Progressive and

16    (indiscernible) company.

17            THE COURT:  All right.  Government counsel asked you

18    some questions today about Mr. Patel, sort of rather obvious

19    questions that I have asked government counsel.  He says he's

20    asked you and you said you can't -- you don't have an answer

21    for him because it was above your pay grade or with some

22    operational people.  So I'm going to ask the two questions and

23    there will be more.  And then we're going to get answers to

24    those questions, Mr. Everly, before we all get off the phone.

25    Am I understood?

1    MR. EVERLY:  I understand.  I understand, Your

2  Honor.  I will preface my responses with I won't have any

3  additional information --

4    THE COURT:  We're going to get additional

5  information, Mr. Everly, because you're going to tell me who

6  has that additional information and we're going to get that

7  person on the phone.  And if we have to, I'm going to get them

8  under oath.  All right?

9    MR. EVERLY:  Understood, Your Honor.

10    THE COURT:  The first question is, is Mr. Patel here

11  legally?  Is he lawfully in the United States?

12    MR. EVERLY:  Your Honor, since that's an operational

13  decision by my client, we're actively conferring with the

14  client, I don't have a response to provide at this time.  I

15  believe --

16    THE COURT:  Is Mr. Patel free to go to his classes

17  at Wisconsin?

18    MR. EVERLY:  I have to reiterate the same.  Same

19  response, Your Honor.

20    THE COURT:  Well, what's the effect of terminating

21  someone on SEVIS?  That's just a mechanical question, what's

22  the effect of terminating someone from SEVIS?

23    MR. EVERLY:  Again, Your Honor, that's an

24  operational --

25    THE COURT:  It's not an operational question,

1    Mr. Everly.  That is a mechanical question.  There is a policy

2    somewhere that says what the effect is, so tell me what the

3    effect is of terminating somebody from SEVIS.

4            MR. EVERLY:  Your Honor, I apologize, I do not have

5    the answer to the question.

6            THE COURT:  Okay.  Who has -- Mr. Everly, name me

7    the individual who has the answer to the first two questions

8    and then the third question.

9            MR. EVERLY:  Your Honor, all I can offer at this

10   point is that we have provided a declarant in this case --

11           THE COURT:  Yes, fine.  All right.  That's fine.

12   We're going to get Watson, Mr. Watson here under oath since

13   he's filed a declaration.  And if he doesn't give me the

14   answers that I need then we're going to get somebody else.

15   Because Mr. Watson's declaration doesn't tell me if Mr. Patel

16   is here legally.  It doesn't tell me if Mr. Patel can go to

17   classes.  And it doesn't tell me what the practical effect is

18   of terminating someone from SEVIS, but if we want to start

19   with Mr. Watson under oath subject to penalty of perjury, I'm

20   very happy to do that.  Is there anybody else other than Mr.

21   Watson, who can give me answers to those questions?  Let me

22   put it to you this way, who have you been communicating with

23   at the agency?

24           MR. EVERLY:  I've been communicating with other

25   agency counsel.

1          THE COURT:  Who?  Names, names, Mr. Everly, who?

2          I am ordering you to tell me who have you been

3    communicating with.  Now if you want to violate a court order

4    by stalling --

5          MR. EVERLY:  Your Honor, I have no desire --

6          THE COURT:  Okay.  Great.  Then tell me the name of

7    the person that you've been communicating with.

8          MR. EVERLY:  I have been communicating with -- and I

9    will provide names, I'm just prefacing, I've been

10   communicating with individuals from our National Security Law

11   Division, primarily deputy chief Nina Gleiberman and the chief

12   of the division also Kate Briscoe.  And also in communication

13   with my management deputy chief -- excuse me, deputy chief

14   Christa Leash and Chief Henry (indiscernible.)

15         THE COURT:  Okay.  Of those four people who is most

16   likely to have an answer to my questions.

17         MR. EVERLY:  Unfortunately, they are all in the same

18   position as I am.

19         THE COURT:  Who are they communicating with?

20         MR. EVERLY:  They're communicating with the

21   client --

22         THE COURT:  Who is the client?  Who at the client is

23   the person who's making these decisions or can give me an

24   answer?

25         MR. EVERLY:  We've been working with the

1    declarant --

2            THE COURT:  All right.  Fine.  Fine.  Get Mr. Watson

3    on the phone right now.  I'm ordering him to appear to this

4    hearing.  And he's going to be put under oath.

5            MR. EVERLY:  Understood, Your Honor.  I will take

6    those steps, if I can go on hold for a moment while I go do

7    that.

8            THE COURT:  Yup.

9            MR. EVERLY:  Thank you.

10           (Pause in the proceedings.)

11           THE COURT:  I'm going to take a ten minute recess

12   I'm going to be back here at 12:45.  Mr. Carelli, Mr. Watson

13   had better be on this phone when we get back, are we

14   understood?

15           MR. CARILLI:  Yes, Your Honor.

16           THE COURT:  All right.

17           (A recess was taken from 12:35 p.m. to 12:45 p.m.)

18           THE COURT:  All right.  Do we have Mr. Watson?

19           MR. EVERLY:  Your Honor, we're in active contact

20   with him and we're working to get him here as soon as we can.

21   If we could just have 10 or 15 more minutes to accomplish

22   that, I would really appreciate that.

23           THE COURT:  All right.  I'm going to give you until

24   1:15.

25           MR. EVERLY:  Thank you, Your Honor.

1          THE COURT:  Have him here by then, all right?

2          MR. EVERLY:  Yes, Your Honor.

3          THE COURT:  If something happens and you can't get

4     him here by 1:15, alert my law clerk we'll all get back on

5     with the video.  We'll figure out where to go from there, but

6     it's not going to be pretty.  Okay?

7          MR. EVERLY:  Yes, Your Honor.  Thank you.

8          THE COURT:  Thank you.

9          (A recess was taken from 12:47 p.m. to 1:15 p.m.)

10         THE COURT:  All right.  Mr. Watson, welcome.  You're

11    on mute, sir.

12         MR. WATSON:  My apologies.  Good afternoon, Your

13    Honor.

14         THE COURT:  No worries.  All right.  So you filed a

15    declaration on behalf of the government in this case.  And I

16    have some questions for you about that declaration.  I'm not

17    going to put you under oath at this time, but if I feel like

18    I'm getting the run around, which I hope I will not, I will

19    put you under oath.  Okay?

20         MR. WATSON:  Yes, ma'am.

21         THE COURT:  All right.  So first of all, can you

22    explain to me what the practical effect is of terminating

23    someone on SEVIS?  How do I say that by the way, SEVIS, SEVIS?

24         MR. WATSON:  SEVIS is appropriate.

25         THE COURT:  Okay.  So what happens, what's the

1    effect of terminating someone on SEVIS?

2         MR. WATSON:  So it does not terminate their

3    nonimmigrant status, but what it does is it essentially raises

4    a flag as it relates to the student and their participation in

5    the student and exchange visitor program.

6         THE COURT:  Okay.  And so what happens if that flag

7    is raised, what's the effect of the flag raised?  First of

8    all, who does it raise a flag to, ICE?

9         MR. WATSON:  Well, it raises a flag to a designated

10   school official.

11        THE COURT:  Okay.

12        MR. WATSON:  Because they have access to the student

13   and exchange visitor information system.  So a designated

14   school official works with ICE in managing the student and

15   exchange visitor program to ensure compliance with applicable

16   code of federal regulations as it relates to nonimmigrant

17   students studying in the United States.  So it alerts the DSO,

18   the designated school official or the PSO as to that matter.

19        THE COURT:  Okay.  And so that flag tells the

20   official what?  What does the official take from that flag?

21   I'm the school official, I have a flag on Mr. Patel, what do I

22   do now?

23        MR. WATSON:  So it raises a -- it raises a gap, if

24   you will, a question about the student, and compliance as it

25   relates to the terms of their -- as it relates to the terms of

1    their participation in the program.

2              THE COURT:  Okay.  And how does that question get

3    answered?  What question is asked, if they're in compliance?

4              MR. WATSON:  Well, the question can be what

5    happened, what occurred.  So there can be a notation in the

6    record saying what happened, or that someone may or may not be

7    in compliance.

8              THE COURT:  Okay.  So I'm -- so I'm the school

9    official, and I have Mr. Patel's transcripts and he's attended

10   all his classes.  And so far as I, the school official, know

11   he's done everything he's supposed to do.  I see that -- I

12   mean, I don't know if I see this from SEVIS, but I see from

13   somewhere that he got arrested -- or he got pulled over for

14   driving too fast in Texas, but that the charges were

15   dismissed.  And so now am I satisfied that he's in compliance,

16   is everything kosher?  If the answer to that is yes, what do I

17   do next?

18             MR. WATSON:  So great question.  And here's another

19   novelty as well too, designated school officials can also

20   reach out to field representatives.

21             THE COURT:  Field representatives for -- I'm sorry,

22   field representatives for ICE?

23             MR. WATSON:  Yes, ma'am.

24             THE COURT:  Okay.

25             THE WITNESS:  And there's a hand -- there's a

1    working relationship there as to compliance and oversight with

2    the program.  So questions can be raised in that dialogue and

3    discussion.  So like in this instance with the case being

4    dismissed, the question would be then what would the next

5    steps be in terms of in this case the defendant.  So with

6    those charges being dismissed the question then becomes is

7    there a matter there that requires further review.

8                THE COURT:  Okay.

9                MR. WATSON:  As it relates to immigration.

10               THE COURT:  All right.  So let's say you're the

11   field representative for Wisconsin, and I'm -- you're the

12   field representative that there was cause for school officials

13   to contact, you and I have a good working relationship.  I'm

14   the school official in Wisconsin.  I get a notice, a flag that

15   Mr. Patel has been terminated on SEVIS.  I call you and I say

16   what's this flag about?  I've looked at his transcript I've

17   talked to his professors, he's in compliance with all our

18   obligations.  Either I know or you tell me that he had been

19   arrested or pulled over for reckless -- for driving too fast

20   in Texas, but the charges were dismissed.  And so then you --

21   so I say, okay, so now you field representative say what to

22   me?

23               MR. WATSON:  The field representative in that

24   instance can say, well, based on this matter, as it relates to

25   the arrest, the question then becomes is there shall I say a

1    continuing requirement or a situation where this can or should

2    be revisited.  So what's interesting to note --

3            THE COURT:  I'm sorry, if what can be revisited?

4    His termination on SEVIS or his --

5            MR. WATSON:  That's correct.

6            THE COURT:  Okay.  All right.

7            MR. WATSON:  Yes, that's correct.  His termination

8    in SEVIS.  So the question then becomes by what means would

9    this person seek to do so, because what's interesting to note

10   about SEVIS is that there's also an ability for, if I'm

11   correct, CIS, Citizenship and Immigration Services to also do

12   the same as well too.

13           So this is a novelty, I'd like to note, in this

14   instance, where it was turned off pursuant to, I think what's

15   in the declaration, collaboration with State as to criminality

16   of nonimmigrant student studying in the United States.  So

17   pursuant to --

18           THE COURT:  Well, to be clear -- to be clear,

19   though, Mr. Watson, he's not a criminal.  He hasn't been

20   charged of anything, much less found guilty of anything, but I

21   understand your point.

22           But so let -- so let me ask you this, right now as

23   of this moment, is Mr. Patel legally in the United States?

24           MR. WATSON:  In terms of his status, this action in

25   itself, it doesn't terminate his nonimmigrant status at this

1    point.  It doesn't.

2            THE COURT:  So he's legally in the U.S.  So the

3    answer to my question is yes, he's legally in the United

4    States, as of this moment?

5            MR. WATSON:  I can't say that he's legally in the

6    United States.

7            THE COURT:  Who can tell me if he's legally in the

8    United States?

9            MR. WATSON:  So I would say right now the Department

10   of State by way of a nonimmigrant visa being issued would be

11   the starting point.  Now, if the visa has been revoked or it

12   has expired, then the question becomes whether or not duration

13   of status would apply.

14           THE COURT:  Okay.  But let me -- well, I'm happy to

15   get someone from State on the phone with us, but before I do

16   that, I have your declaration -- I imagine you filed a lot of

17   these declarations recently, right, because apparently somehow

18   all this has happened, like a lot of dozens of people have

19   been terminated from SEVIS, this isn't the only declaration

20   you've filed; right?

21           MR. WATSON:  Yes, ma'am.

22           THE COURT:  Okay.  All right.  Well, for this one in

23   particular, I don't know if you have it in front of you, but

24   in paragraph 8, and this is for Akshar Patel, if I go to

25   paragraph 8 it says, on April 2nd, 2025, CTLD received

1    communications from the Department of State indicating that

2    Patel did not have a valid visa and requesting that the SEVIS

3    record be terminated.  Was that -- I didn't -- are plaintiff's

4    counsel aware that his -- that State apparently terminated his

5    visa?

6                    MR. BROWN:  Your Honor, I don't believe his visa is

7    the issue we're challenging, because he had a B visa and then

8    changed his status to F-1.  So he is not on that B visa.  I

9    can double -- I'm going to double check right now.

10                   THE COURT:  But he's on a valid F-1 visa.

11                   MR. BROWN:  He has valid F-1 status until this

12   happened, Your Honor.

13                   MR. CARILLI:  Your Honor, if I may?

14                   THE COURT:  Yeah, sure, please.

15                   MR. CARILLI:  Yes, Your Honor.  Plaintiff initially,

16   as I understand from the Department of State, plaintiff

17   initially was issued an H-4 visa based on his -- based on his

18   mother coming in on an H -- I believe an H-1B.

19                   THE COURT:  Okay.

20                   MR. CARILLI:  And he was admitted into the country

21   on that H-4 visa in an H-4 status.  He then sought an I

22   believe adjusted status to that of an F status, and then is in

23   the country on an F status.

24                   THE COURT:  Okay.  So then Mr. -- I'm sorry, sir.

25                   MR. CARILLI:  And the H-4 visa validity period has

1    expired, which routinely happens for -- depending on how

2    individuals come into the country with a nonimmigrant

3    category, their visa validity period will be different than

4    the stamp that is provided on their I-94, which is their entry

5    document, which the periods may be different or in a lot of

6    cases individuals will be admitted into the United States in a

7    duration of status.

8              So, for example, Your Honor, if you've seen H-1B

9    case where is an individual says they've been in the United

10   States, they've been working but they had to leave for a

11   family issue or they have to leave and depart the United

12   States to get a new visa so that they can come and go from the

13   United States on that H-1B, that's why there's a different

14   between those two things.  And again the visa is just an

15   admission document, but also I would note that visa

16   revocations can form some basis for deportability under 327.

17             THE COURT:  Okay.  Thank you, sir.

18             So this April 2nd, 2025, communication that you

19   received from the State Department, Mr. Watson, do you have it

20   available to you?  I mean, was that a mistake by the State

21   Department that he was on an H-1 visa and he shouldn't be

22   terminated, but State just didn't pick up he was here validly

23   as a student.  I'm trying to figure out why State communicated

24   with you to have this record terminated?

25             MR. WATSON:  So, Your Honor, I don't have that

1    record in front of me.  And we are actually rescrubbing these

2    lists, because to the point that the gentleman that just spoke

3    pointed out, there are some of those nuances that have come

4    about.  So I don't have the information in front of me.  And I

5    believe State is re-examining various cases in a quality

6    control measure as well.

7           THE COURT:  Okay.  So let me put it to you this way.

8    So far as I can understand this kid has done everything that

9    he's supposed to have done.  And it seems like there's been

10   some miscommunication or something has happened.  And I'm

11   happy for State to do quality control.  I'm happy for you to

12   follow up on this and other individuals.  But what I want

13   coming out of this hearing is to at least either order

14   either -- I want this student to be able to go to class and

15   not get picked up by ICE.

16          Now, we can do that by, Mr. Watson, you agreeing to

17   that, or someone agreeing to that, and the plaintiffs going

18   and talking to Wisconsin people and saying he can go to

19   classes.  And if the Wisconsin person wants to talk to the

20   field representative, that's fine.  And if I need to put this

21   in an order, I will.  And I want him not to be picked up by

22   ICE.

23          Now, we can do this one of two ways.  One, we can

24   all agree that this is what's going to happen and Mr. Patel,

25   his lawyers can tell him legitimately that he can go to class,

1    or I can enter a temporary restraining order saying that he

2    can go to class and that he can't be deported.  And since

3    everything I've heard from you all is that that seems not

4    inconsistent with what you all know as of this moment, not

5    something that you all would challenge.

6              So Mr. Carilli, how should we proceed here?

7              MR. CARILLI:  Your Honor, I would comment that under

8    8 U.S.C. 1252(g), which addresses the jurisdiction of courts

9    to be able to over the decision by the Department of Homeland

10   Security to initiate removal proceedings and stripped that

11   jurisdiction from district courts.  And so for any matters

12   arising from a decision as to whether or not to place an

13   individual in removal proceedings, the Congress has said that

14   there's no jurisdiction for district courts in those

15   decisions.

16             THE COURT:  All right.  Well, let's take the classes

17   first.  We can all agree that I can order him to be allowed to

18   go to class as a TRO for now; right?  Mr. Carilli?

19             MR. CARILLI:  Your Honor, if you just give me a

20   moment to look through the relief that has been sought in the

21   TRO, I just need -- I need a moment to ensure that I -- and I

22   also, I mean, that's a -- you're asking me for potentially

23   something that is beyond the scope of my authority.

24             THE COURT:  Okay.  Here's what we're going to do,

25   Mr. Carilli, because I understand you guys are in a tough

1    spot, because you have a bunch of these cases and you don't

2    want a bunch of bad case law.  I get it.  One way or the other

3    this kid is going back to school today if he has classes,

4    tomorrow if he has classes tomorrow.  And if ICE touches this

5    guy there's going to be repercussions.

6            So now we can do this with you all agreeing that

7    amongst yourselves, and if anything happens you all bring it

8    to my attention, or we can do it through a subsequent hearing

9    this afternoon where I enter a TRO order.  I would rather the

10   former.  And I assume you guys are fine with both of those, at

11   least agreeing with plaintiffs to those because -- or just

12   some agreement that if ICE is going to pick up the guy that,

13   you know, they have 24 hours notice so that they can seek

14   emergency relief, I mean, we can just do that, right.  He can

15   go to class.  And if ICE is going to do anything with him,

16   which I don't suspect they are going to, the plaintiffs get 24

17   hours notice.  All right.

18           You guys come to that agreement, make life easy for

19   everyone, or you can continue to deal with me, Mr. Carilli.

20   And I will not stop with you or Mr. Everly or Mr. Watson,

21   we're going to continue down the road.  All right?

22           MR. CARILLI:  Yes, Your Honor.

23           THE COURT:  All right.  So I'm going to set another

24   hearing for 4:30, but you guys tell me that we don't need it.

25           Mr. Watson, do you have any idea how long State is

1    going to take with this quality review?

2            MR. WATSON:  Ma'am, I can tell you that they are

3    proceeding in earnest to do so, with the level of effort

4    they've made great strides in progress in coordination with my

5    team.

6            THE COURT:  Okay.

7            MR. WATSON:  So ma'am, I can emphasize to you that

8    sooner than better is occurring, ma'am.

9            THE COURT:  Perfect.  All right.  So it seems like,

10   Mr. Carilli, since my hope -- my strong hope is that State is

11   going to realize that this guy was on an F-1 visa and should

12   not have been terminated from SEVIS, my strong hope is that

13   that happens, that this was all an unfortunate mix up, that I

14   don't have to enter a TRO.  So I'm hopeful Mr. Carilli that

15   you and plaintiffs can figure something out amongst

16   yourselves.  Knowing, of course, that if anything happens,

17   plaintiff's lawyers, you can always seek relief from me.

18           Plaintiff's lawyers, do not make Mr. Carilli's life

19   miserable here.  Let's just practically try to get this guy

20   back to class and at least settled in the U.S. until we have

21   final determination of something.  Okay?

22           So I'm setting a hearing for 4:30 tentatively.

23   Hopefully, you all will tell me that we don't need it.

24           Mr. Watson, I understand that you're incredibly

25   busy.  And the last thing that you ever want to hear is

1    lawyers saying I need you on the phone right now with the

2    Court.  So I appreciate you getting on the phone.  And I

3    appreciate you giving me this information.  Thank you,

4    everybody.

5             MR. WATSON:  Thank you, ma'am.

6             MR. BROWN:  Thank you, Your Honor.

7             (The proceedings were concluded.)

8

9             I, Christine Asif, RPR, FCRR, do hereby certify that
     the foregoing is a correct transcript from the stenographic
10   record of proceedings in the above-entitled matter.

                  _____/s/_____
11                    Christine T. Asif
                  Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

< Dates >.
April 2nd,
  2025,  23:25,
  25:18.
.
.
< 0 >.
06 7:1.
08 8:11.
.
.
< 1 >.
1 17:24, 18:4,
  18:9.
10 7:1,
  17:21.
10333 1:24.
1050 1:24.
10:45 a.m.
  1:13.
11 8:1.
12 7:1, 8:11,
  17:12, 17:17,
  18:9.
1229a 9:8.
1252(g 27:8.
1372 3:10,
  3:11.
15 17:21,
  17:24, 18:4,
  18:9.
19 8:11.
.
.
< 2 >.
20 12:23.
20001 1:36,
  1:44.
202 1:45.
2025 1:11.
24 28:13,
  28:16.
25-1096 2:2.
25-1096-ACR
  1:6.
25-minute
  8:2.
29403 1:30.
.
.

< 3 >.
30 28:24,
  29:22.
327 25:16.
333 1:43.
35 17:17.
354-3247
  1:45.
.
.
< 4 >.
4 28:24,
  29:22.
40 2:25, 8:1.
45 17:12,
  17:17.
47 18:9.
.
.
< 5 >.
53 7:1.
.
.
< 6 >.
601 1:35.
602 1:29.
.
.
< 7 >.
77042 1:25.
.
.
< 8 >.
8 3:9, 23:24,
  23:25,
  27:8.
.
.
< 9 >.
9/11 3:12.
_____/s/___
  _____
  30:13.
.
.
< A >.
A. 1:22.
a.m. 7:1.
ability
  22:10.

able 3:12,
  3:18, 9:7,
  9:11, 9:13,
  26:14,
  27:9.
above 13:21.
above-entitled
  30:11.
access 19:12.
accomplish
  17:21.
accused
  10:19.
action 2:2,
  22:24.
active 4:3,
  4:5, 4:7,
  4:20, 5:2,
  5:8, 5:11,
  17:19.
actively
  14:13.
actually 2:13,
  2:15, 26:1.
additional
  14:3, 14:4,
  14:6.
addresses
  27:8.
adjusted
  24:22.
admission 8:25,
  25:15.
admitted 9:1,
  9:19, 24:20,
  25:6.
afternoon
  18:12,
  28:9.
Agency 7:5,
  7:22, 7:24,
  7:25, 8:2,
  8:3, 8:5,
  8:15, 11:8,
  11:10, 11:12,
  11:21, 12:9,
  12:16, 12:21,
  12:22, 13:9,
  13:11, 15:23,
  15:25.

agree 26:24,
  27:17.
agreeing 26:16,
  26:17, 28:6,
  28:11.
agreement
  28:12,
  28:18.
Akshar 2:2,
  23:24.
AKSHAR PATEL
  1:5.
alert 18:4.
alerts 19:17.
allow 11:9.
allowed 11:24,
  27:17.
allows 4:3,
  8:24.
although
  10:13.
amongst 28:7,
  29:15.
Ana C. Reyes
  1:17.
Andre 1:39.
answer 5:13,
  5:15, 5:16,
  5:17, 6:2,
  6:12, 7:8,
  7:21, 8:2,
  9:11, 9:13,
  9:22, 9:24,
  9:25, 10:1,
  11:5, 12:13,
  13:20, 15:5,
  15:7, 16:16,
  16:24, 20:16,
  23:3.
answered
  20:3.
answers 13:23,
  15:14,
  15:21.
anybody 12:5,
  15:20.
apologies
  18:12.
apologize
  15:4.

apparently
 7:25, 23:17,
 24:4.
appear 17:3.
appearance
 13:3, 13:8.
APPEARANCES
 1:20.
applicable
 19:15.
apply 23:13.
appreciate
 17:22, 30:2,
 30:3.
appropriate
 18:24.
April 16
 1:11.
argument 5:2,
 5:4.
arising
 27:12.
around 6:2,
 6:24,
 18:18.
arrest 21:25.
arrested 20:13,
 21:19.
Asif 1:41,
 30:9,
 30:14.
assume 12:7,
 28:10.
attend 12:2.
attended
 20:9.
attention
 28:8.
Attorney
 1:33.
authority
 27:23.
automatically
 5:3.
available
 25:20.
Avenue 1:24,
 1:29, 1:43.
aware 24:4.
away 10:10.

.
.
< B >.
B. 1:27.
back 4:20,
 4:22, 5:8,
 6:14, 6:24,
 11:15, 17:12,
 17:13, 18:4,
 28:3,
 29:20.
bad 28:2.
Banias 1:27,
 1:28, 2:7.
based 12:1,
 21:24,
 24:17.
basis 25:16.
becomes 21:6,
 21:25, 22:8,
 23:12.
behalf 10:9,
 18:15.
believe 14:15,
 24:6, 24:18,
 24:22,
 26:5.
bench 6:16.
better 3:3,
 17:13,
 29:8.
beyond 27:23.
Brad 2:7.
Bradley 1:27.
brief 11:6.
bring 28:7.
Briscoe
 16:12.
Brown 1:22,
 1:23, 2:6.
BS 10:13.
bunch 28:1,
 28:2.
busy 29:25.
.
.
< C >.
C. 1:12, 1:23,
 1:44, 3:9,
 10:24,

27:8.
call 5:25,
 6:10, 11:16,
 21:15.
canceling 5:4,
 5:24.
cancels 5:3.
Carelli 7:17,
 17:12.
Carilli 1:32,
 2:9, 2:16,
 3:5, 5:19,
 5:21, 6:7,
 6:8, 6:15,
 6:22, 7:3,
 7:12, 8:13,
 9:21, 9:22,
 11:3, 27:6,
 27:18, 27:25,
 28:19, 29:10,
 29:14,
 29:18.
case 5:23, 6:3,
 6:24, 7:9,
 15:10, 18:15,
 21:3, 21:5,
 25:9, 28:2.
cases 25:6,
 26:5, 28:1.
categories
 4:3.
category
 25:3.
cause 21:12.
certify 30:9.
challenge
 27:5.
challenging
 24:7.
change 4:10,
 4:22, 5:2,
 5:8.
changed 4:5,
 4:9, 4:12,
 24:8.
changing 5:11,
 7:6.
charged
 22:20.
charges 20:14,

21:6,
 21:20.
Charleston
 1:30.
check 24:9.
Chief 16:11,
 16:13,
 16:14.
Christa
 16:14.
Christine 1:41,
 30:9,
 30:14.
CIS 22:11.
Citizenship
 22:11.
Civil 1:5,
 1:34, 2:2.
clarify 4:1.
class 26:14,
 26:25, 27:2,
 27:18, 28:15,
 29:20.
classes 11:24,
 12:2, 12:4,
 12:8, 14:16,
 15:17, 20:10,
 26:19, 27:16,
 28:3, 28:4.
clear 22:18.
clearly
 10:13.
CLERK 13:4,
 18:4.
client 6:11,
 6:19, 10:10,
 11:23, 11:25,
 12:19, 12:21,
 14:13, 14:14,
 16:21,
 16:22.
code 19:16.
collaboration
 22:15.
COLUMBIA 1:2.
coming 24:18,
 26:13.
comment 27:7.
communicated
 12:25,

25:23.
communicating
  15:22, 15:24,
  16:3, 16:7,
  16:8, 16:10,
  16:19,
  16:20.
communication
  16:12,
  25:18.
communications
  24:1.
company
  13:16.
compliance
  19:15, 19:24,
  20:3, 20:7,
  20:15, 21:1,
  21:17.
components
  2:12.
computer-aided
  1:49.
concerned
  4:25.
concluded.
  30:7.
confer 2:12,
  2:13, 2:15,
  2:22, 2:24,
  11:9, 11:14,
  12:9.
conferring
  11:11,
  14:13.
confirmed
  2:21.
Congress
  27:13.
consequence
  4:6, 4:8,
  5:10.
consequences
  11:7.
consider
  10:2.
Constitution
  1:43.
contact 17:19,
  21:13.

continue 28:19,
  28:21.
continuing
  22:1.
contradicts
  11:5.
control 26:6,
  26:11.
conversation
  8:1.
conversations
  7:23.
coordination
  29:4.
correct 22:5,
  22:7, 22:11,
  30:10.
counsel 2:8,
  7:22, 7:24,
  7:25, 8:2,
  8:3, 8:5,
  8:15, 10:16,
  11:8, 11:12,
  11:21, 11:23,
  12:7, 12:16,
  12:21, 12:23,
  13:10, 13:11,
  13:17, 13:19,
  15:25,
  24:4.
country 3:13,
  24:20, 24:23,
  25:2.
course 8:9,
  29:16.
courtroom 8:5,
  11:4, 13:4.
courts 27:8,
  27:11,
  27:14.
criminal
  22:19.
criminality
  22:15.
CTLD 23:25.
Customs 3:15,
  13:10.
  .
  .
< D >.

DC 1:36.
deal 28:19.
decides 5:22.
decision 14:13,
  27:9,
  27:12.
decisions
  12:18, 16:23,
  27:15.
declarant 8:4,
  15:10,
  17:1.
declaration
  11:6, 15:13,
  15:15, 18:15,
  18:16, 22:15,
  23:16,
  23:19.
declarations
  23:17.
Defendant 1:12,
  1:32, 21:5.
delay 7:11,
  7:12, 7:13,
  7:15, 7:16.
deleted 4:4.
depart 25:11.
Department
  23:9, 24:1,
  24:16, 25:19,
  25:21,
  27:9.
depending
  25:1.
deportability
  25:16.
deportation
  10:21.
deported
  27:2.
deputy 13:4,
  16:11,
  16:13.
described
  4:9.
designated
  19:9, 19:13,
  19:18,
  20:19.
desire 16:5.

determination
  29:21.
dialogue
  21:2.
different 8:23,
  25:3, 25:5,
  25:13.
discussion
  21:3.
dismissed
  20:15, 21:4,
  21:6,
  21:20.
District 1:1,
  1:2, 1:18,
  27:11,
  27:14.
Division 1:34,
  16:11,
  16:12.
document 25:5,
  25:15.
done 2:19,
  6:15, 6:16,
  10:10, 20:11,
  26:8, 26:9.
double 24:9.
down 4:2,
  10:23,
  28:21.
dozens 23:18.
driving 20:14,
  21:19.
drop 4:2.
DSO 19:17.
duration 23:12,
  25:7.
  .
  .
< E >.
earnest 29:3.
easy 28:18.
effect 8:21,
  10:12, 14:20,
  14:22, 15:2,
  15:3, 15:17,
  18:22, 19:1,
  19:7.
effects 7:5.
effort 29:3.

Either 2:19,
  5:3, 9:14,
  9:23, 21:18,
  26:13,
  26:14.
email 2:14.
emergency
  28:14.
emphasize
  29:7.
Enforcement
  3:15,
  13:10.
enrolled
  3:19.
ensure 19:15,
  27:21.
enter 13:2,
  13:7, 27:1,
  28:9,
  29:14.
entry 25:4.
Esquire 1:22,
  1:27, 1:32.
essentially
  19:3.
established
  3:9, 3:11.
Everly 1:38,
  13:2, 13:4,
  13:7, 13:9,
  13:24, 14:5,
  15:1, 15:6,
  16:1,
  28:20.
everybody
  30:4.
everyone 10:21,
  28:19.
everything
  2:21, 20:11,
  20:16, 26:8,
  27:3.
exactly 3:6,
  4:8.
example 25:8.
exchange 19:5,
  19:13,
  19:15.
excuse 3:11,

8:7, 16:13.
experienced
  10:9,
  10:14.
expired 23:12,
  25:1.
explain 3:6,
  5:10, 7:7,
  9:25,
  18:22.
explained
  12:17.
.
.
< F >.
F-1 3:18, 3:21,
  5:3, 8:20,
  8:22, 9:6,
  9:7, 24:8,
  24:10, 24:11,
  29:11.
F. 1:32, 2:9,
  3:15.
family 25:11.
far 20:10,
  26:8.
fast 20:14,
  21:19.
FCRR 1:41,
  30:9.
Federal 1:42,
  19:16.
feel 18:17.
Field 20:20,
  20:21, 20:22,
  21:11, 21:12,
  21:21, 21:23,
  26:20.
figure 18:5,
  25:23,
  29:15.
filed 15:13,
  18:14, 23:16,
  23:20.
final 29:21.
find 6:1,
  11:15.
Fine 6:7, 6:8,
  11:17, 11:19,
  15:11, 17:2,

26:20,
  28:10.
First 2:18,
  5:5, 5:23,
  14:10, 15:7,
  18:21, 19:7,
  27:17.
flag 19:4,
  19:6, 19:7,
  19:8, 19:9,
  19:19, 19:20,
  19:21, 21:14,
  21:16.
follow 26:12.
foregoing
  30:10.
form 25:16.
former 28:10.
forwarded 8:14,
  8:18.
found 22:20.
four 16:15.
free 14:16.
front 23:23,
  26:1, 26:4.
future 2:11.
.
.
< G >.
gap 19:23.
genre 8:23.
Gentleman 2:11,
  6:14, 6:23,
  26:2.
gets 7:10,
  10:18.
getting 18:18,
  30:2.
give 12:13,
  15:13, 15:21,
  16:23, 17:23,
  27:19.
giving 30:3.
Gleiberman
  16:11.
God 11:6.
Government 2:8,
  2:10, 4:21,
  5:5, 8:20,
  9:5, 9:15,

10:16, 10:25,
  12:7, 13:17,
  13:19,
  18:15.
grade 13:21.
graduation
  10:10.
Great 16:6,
  20:18,
  29:4.
guilty 22:20.
guy 28:5,
  28:12, 29:11,
  29:19.
guys 3:1, 6:14,
  6:23, 27:25,
  28:10, 28:18,
  28:24.
.
.
< H >.
H-1 25:21.
H-1B 24:18,
  25:8,
  25:13.
H-4 24:17,
  24:21,
  24:25.
hand 20:25.
hang 6:14.
happen 10:18,
  26:24.
happened 20:5,
  20:6, 23:18,
  24:12,
  26:10.
happening
  11:4.
happens 4:13,
  7:10, 7:17,
  18:3, 18:25,
  19:6, 25:1,
  28:7, 29:13,
  29:16.
happy 15:20,
  23:14,
  26:11.
hear 6:15,
  13:5, 13:6,
  29:25.

heard 27:3.
hearing 12:11,
  17:4, 26:13,
  28:8, 28:24,
  29:22.
Henry 16:14.
hereby 30:9.
hold 17:6.
home 4:20,
  5:9.
Homeland 3:12,
  27:9.
Honorable
  1:17.
hope 18:18,
  29:10,
  29:12.
hopeful
  29:14.
Hopefully
  29:23.
hour 7:8.
hours 28:13,
  28:17.
Houston 1:25.
.
.
< I >.
I-94 25:4.
ICE 4:22, 4:25,
  9:6, 9:7,
  10:2, 10:5,
  12:1, 19:8,
  19:14, 20:22,
  26:15, 26:22,
  28:4, 28:12,
  28:15.
idea 28:25.
identify 2:4.
illegally
  10:19,
  10:22.
imagine
  23:16.
immediately
  2:19.
Immigration
  3:15, 4:10,
  5:6, 5:7,
  10:9, 10:12,

13:10, 21:9,
  22:11.
impact 3:23,
  4:12, 4:18,
  4:19, 5:13,
  6:4.
import 5:24.
inactive
  5:11.
inconsistent
  27:4.
incredibly
  29:24.
indicated 4:22,
  8:15,
  12:18.
indicating
  24:1.
indication
  4:14.
indiscernible
  13:16.
indiscernible.
  16:14.
individual
  3:17, 4:4,
  4:9, 4:10,
  4:15, 8:16,
  8:24, 8:25,
  10:3, 15:7,
  25:9,
  27:13.
individuals
  3:13, 16:10,
  25:2, 25:6,
  26:12.
information
  3:8, 3:18,
  14:3, 14:5,
  14:6, 19:13,
  26:4, 30:3.
initially
  24:15,
  24:17.
initiate
  27:10.
inside 4:9.
instance 21:3,
  21:24,
  22:14.

interesting
  22:2, 22:9.
invite 8:15.
issue 3:14,
  24:7,
  25:11.
issued 23:10,
  24:17.
itself 22:25.
.
.
< J >.
jerked 6:1.
join 8:17,
  12:17.
joined 11:16.
joining
  11:21.
joint 2:18.
Joseph 1:32,
  2:9.
Jr 1:32.
Judge 1:18.
jurisdiction
  27:8, 27:11,
  27:14.
.
.
< K >.
Kafkaesque
  10:8.
Kate 16:12.
keep 10:12.
Keith 13:9.
key 6:2.
kid 26:8,
  28:3.
Knowing
  29:16.
known 10:23.
kosher 20:16.
.
.
< L >.
last 2:24,
  29:25.
later 8:1.
Law 1:28,
  16:10, 18:4,
  28:2.

lawful 9:1,
  10:4.
lawfully 9:3,
  9:9, 9:19,
  14:11.
lawyer 9:15,
  11:2.
lawyers 10:9,
  10:14, 10:25,
  26:25, 29:17,
  29:18,
  30:1.
Leash 16:14.
least 26:13,
  28:11,
  29:20.
leave 25:10,
  25:11.
legally 9:14,
  9:15, 9:16,
  9:17, 9:18,
  9:23, 9:24,
  10:15, 10:16,
  10:17, 14:11,
  15:16, 22:23,
  23:2, 23:3,
  23:5, 23:7.
legitimately
  26:25.
less 13:13,
  22:20.
level 29:3.
life 28:18,
  29:18.
likely 16:16.
line 11:22.
link 12:17.
list 4:3.
listen 2:17.
lists 26:2.
litigation
  5:18.
Little 13:13.
LLC 1:28.
log 12:22,
  13:1.
long 2:24,
  12:21, 13:11,
  28:25.
longer 8:22.

look 2:16,
    27:20.
looked 21:16.
lose 7:18.
lot 23:16,
    23:18,
    25:5.
Lyons 2:3.
.
.
< M >.
M. 2:3.
Ma'am 18:20,
    20:23, 23:21,
    29:2, 29:7,
    29:8, 30:5.
machine 1:48.
Macklin 1:38,
    13:9.
maintaining
    10:3.
maintains
    3:16.
management
    16:13.
managing
    19:14.
matter 19:18,
    21:7, 21:24,
    30:11.
matters
    27:11.
mean 4:14,
    7:11, 9:14,
    9:16, 20:12,
    25:20, 27:22,
    28:14.
means 22:8.
meant 11:14,
    11:18.
measure 26:6.
mechanical
    14:21,
    15:1.
meet 2:12,
    2:13, 2:14,
    2:21, 2:24.
menu 4:2.
minute 17:11.
minutes 2:25,

    12:23,
    17:21.
miscommunicatio
    n 26:10.
miserable
    29:19.
mistake
    25:20.
mix 29:13.
moment 17:6,
    22:23, 23:4,
    27:4, 27:20,
    27:21.
monitor 3:13,
    3:17, 3:21,
    3:24.
months 10:10.
morning 2:6,
    2:22.
mother 24:18.
Motions Hearing
    1:16.
moving 4:7,
    4:19.
MR. BROWN 2:6,
    2:23, 2:25,
    3:2, 11:25,
    12:5, 24:6,
    24:11,
    30:6.
MR. EVERLY
    13:6, 13:9,
    13:13, 13:15,
    14:1, 14:9,
    14:12, 14:18,
    14:23, 15:4,
    15:9, 15:24,
    16:5, 16:8,
    16:17, 16:20,
    16:25, 17:5,
    17:9, 17:19,
    17:25, 18:2,
    18:7.
MR. WATSON
    18:12, 18:20,
    18:24, 19:2,
    19:9, 19:12,
    19:23, 20:4,
    20:18, 20:23,
    21:9, 21:23,

    22:5, 22:7,
    22:24, 23:5,
    23:9, 23:21,
    25:25, 29:2,
    29:7, 30:5.
Ms 6:25.
mute 6:10,
    6:21, 6:25,
    18:11.
.
.
< N >.
name 8:17,
    15:6, 16:6.
Names 16:1,
    16:9.
National
    16:10.
need 12:9,
    15:14, 26:20,
    27:21, 28:24,
    29:23,
    30:1.
Neumann 1:23.
new 25:12.
next 6:17,
    20:17,
    21:4.
Nina 16:11.
NO. 1:5.
none 2:19.
nonimmigrant
    19:3, 19:16,
    22:16, 22:25,
    23:10,
    25:2.
notation
    20:5.
note 22:2,
    22:9, 22:13,
    25:15.
nothing 5:6,
    5:7, 10:11.
notice 21:14,
    28:13,
    28:17.
novelty 20:19,
    22:13.
nuances 26:3.
NW 1:35,

    1:43.
.
.
.
< O >.
oath 14:8,
    15:12, 15:19,
    17:4, 18:17,
    18:19.
obligations
    21:18.
obvious 7:9,
    13:18.
Obviously 3:14,
    5:23,
    10:22.
occurred 4:2,
    20:5.
occurring
    29:8.
occurs 4:13.
offer 15:9.
Office 1:33.
Official 1:42,
    19:10, 19:14,
    19:18, 19:20,
    19:21, 20:9,
    20:10, 21:14,
    30:15.
officials
    20:19,
    21:12.
Okay 3:1, 3:20,
    3:23, 4:6,
    5:22, 8:19,
    9:3, 12:8,
    12:20, 15:6,
    16:6, 16:15,
    18:6, 18:19,
    18:25, 19:6,
    19:11, 19:19,
    20:2, 20:8,
    20:24, 21:8,
    21:21, 22:6,
    23:14, 23:22,
    24:19, 24:24,
    25:17, 26:7,
    27:24, 29:6,
    29:21.
One 2:13, 5:22,
    8:15, 23:22,

26:23,
28:2.
operational
    12:18, 13:22,
    14:12, 14:24,
    14:25.
order 16:3,
    26:13, 26:21,
    27:1, 27:17,
    28:9.
ordering 6:19,
    16:2, 17:3.
orders 2:12.
oversight
    21:1.
.
.
< P >.
p.m. 7:2, 8:11,
    8:12, 17:17,
    18:9.
paragraph
    23:24,
    23:25.
part 3:21.
participation
    19:4, 20:1.
particular
    23:23.
parties 2:4.
Patel 2:3,
    8:20, 8:22,
    9:16, 13:18,
    14:10, 14:16,
    15:15, 15:16,
    19:21, 20:9,
    21:15, 22:23,
    23:24, 24:2,
    26:24.
Pause 7:1,
    8:11, 11:20,
    12:24,
    17:10.
pay 13:21.
penalty
    15:19.
pending 12:8.
people 3:21,
    13:22, 16:15,
    23:18,

26:18.
Perfect 29:9.
period 24:25,
    25:3.
periods 25:5.
perjury
    15:19.
person 6:17,
    8:18, 14:7,
    16:7, 16:23,
    22:9,
    26:19.
phone 6:9,
    6:17, 6:18,
    6:19, 6:20,
    7:25, 8:2,
    8:3, 8:6,
    11:12, 11:15,
    13:24, 14:7,
    17:3, 17:13,
    23:15, 30:1,
    30:2.
physically
    12:5.
pick 25:22,
    28:12.
picked 10:19,
    10:20, 26:15,
    26:21.
place 27:12.
Plaintiff 1:7,
    1:22, 5:1,
    11:23, 24:3,
    24:15, 24:16,
    29:17,
    29:18.
plaintiffs 2:7,
    26:17, 28:11,
    28:16,
    29:15.
please 2:4,
    2:16, 5:10,
    6:25, 7:7,
    8:6, 11:15,
    13:2, 13:7,
    24:14.
point 10:2,
    15:10, 22:21,
    23:1, 23:11,
    26:2.

pointed 26:3.
policy 15:1.
portions
    3:14.
position 3:4,
    8:20, 9:5,
    11:25,
    16:18.
post 3:12.
potentially
    27:22.
practical 5:24,
    7:5, 15:17,
    18:22.
practically
    29:19.
precursor
    5:3.
preface 14:2.
prefacing
    16:9.
prepared 5:15,
    5:16, 5:17,
    6:2.
Present 1:38.
presents
    7:10.
pretty 18:6.
preventing
    12:3, 12:6.
primarily
    16:11.
problem 4:19.
proceed 27:6.
proceeding
    29:3.
Proceedings
    1:48, 7:1,
    8:11, 9:8,
    10:21, 27:10,
    27:13, 30:7,
    30:11.
proceedings.
    11:20, 12:24,
    17:10.
produced
    1:48.
professors
    21:17.
program 19:5,

19:15, 20:1,
    21:2.
progress 3:1,
    29:4.
Progressive
    13:15.
provide 3:18,
    14:14,
    16:9.
provided 15:10,
    25:4.
PSO 19:18.
pulled 20:13,
    21:19.
purpose 3:20.
pursuant 22:14,
    22:17.
put 6:10, 6:21,
    6:23, 9:8,
    10:20, 15:22,
    17:4, 18:17,
    18:19, 26:7,
    26:20.
.
.
< Q >.
quality 26:5,
    26:11,
    29:1.
question 4:24,
    5:13, 5:18,
    5:20, 5:23,
    6:3, 7:9,
    7:21, 9:11,
    9:14, 9:24,
    9:25, 10:1,
    12:10, 12:15,
    14:10, 14:21,
    14:25, 15:1,
    15:5, 15:8,
    19:24, 20:2,
    20:3, 20:4,
    20:18, 21:4,
    21:6, 21:25,
    22:8, 23:3,
    23:12.
questions 5:22,
    13:18, 13:19,
    13:22, 13:24,
    15:7, 15:21,

16:16, 18:16,
  21:2.
quite 5:4.
.
.
< R >.
raise 19:8.
raised 19:7,
  21:2.
raises 19:3,
  19:9,
  19:23.
rather 13:18,
  28:9.
re-examining
  26:5.
reach 20:20.
realize 10:8,
  29:11.
really 4:24,
  17:22.
receive
  12:11.
received 10:6,
  12:14, 23:25,
  25:19.
recently
  23:17.
recess 17:11,
  17:17,
  18:9.
reckless
  21:19.
record 2:5,
  4:4, 4:15,
  7:6, 20:6,
  24:3, 25:24,
  26:1,
  30:11.
recorded
  1:48.
Reddy 1:23.
regulations
  19:16.
reiterate
  14:18.
relates 19:4,
  19:16, 19:25,
  21:9,
  21:24.

relationship
  21:1,
  21:13.
relief 27:20,
  28:14,
  29:17.
removal 9:8,
  27:10,
  27:13.
repercussions
  28:5.
report 2:18,
  2:20.
Reported
  1:41.
Reporter 1:42,
  30:15.
representative
  21:11, 21:12,
  21:21, 21:23,
  26:20.
representatives
  20:20, 20:21,
  20:22.
requesting
  24:2.
requirement
  22:1.
requires
  21:7.
rescrubbing
  26:1.
resolution
  3:2.
respond 12:12,
  12:16.
response 7:5,
  10:6, 12:11,
  12:15, 14:14,
  14:19.
responses
  14:2.
restraining
  27:1.
review 21:7,
  29:1.
revisited 22:2,
  22:3.
revocations
  25:16.

revoked
  23:11.
Richmond
  1:24.
road 28:21.
routinely
  25:1.
RPR 1:41,
  30:9.
run 18:18.
Rutledge
  1:29.
.
.
< S >.
S. 13:10, 23:2,
  29:20.
satisfied 8:4,
  20:15.
saw 2:15,
  2:18.
saying 20:6,
  26:18, 27:1,
  30:1.
says 5:5,
  13:19, 15:2,
  23:25,
  25:9.
SC 1:30.
school 12:3,
  19:10, 19:14,
  19:18, 19:21,
  20:8, 20:10,
  20:19, 21:12,
  21:14,
  28:3.
schools 3:17,
  3:19.
Schrodinger
  9:23.
scope 27:23.
second 2:15,
  2:18, 8:17.
Secretary
  3:12.
Security 3:12,
  16:10,
  27:10.
seek 8:24,
  22:9, 28:13,

29:17.
seems 26:9,
  27:3, 29:9.
seen 25:8.
sent 11:12.
serious 11:7.
Services
  22:11.
set 28:23.
setting
  29:22.
settled
  29:20.
SEVIS 3:6, 3:8,
  3:14, 3:20,
  3:24, 4:2,
  4:4, 4:10,
  4:13, 5:2,
  5:12, 5:14,
  5:24, 6:5,
  7:6, 7:11,
  7:18, 14:21,
  14:22, 15:3,
  15:18, 18:23,
  18:24, 19:1,
  20:12, 21:15,
  22:4, 22:8,
  22:10, 23:19,
  24:2,
  29:12.
shall 21:25.
shorthand
  1:48.
shouldn't
  25:21.
simple 7:9.
sir 13:5,
  13:12, 18:11,
  24:24,
  25:17.
situation
  22:1.
somebody 3:25,
  5:14, 15:3,
  15:14.
somehow 11:5,
  23:17.
someone 3:24,
  4:7, 5:24,
  6:1, 6:4,

6:17, 6:18,
  7:10, 7:17,
  12:20, 14:21,
  14:22, 15:18,
  18:23, 19:1,
  20:6, 23:15,
  26:17.
somewhere 15:2,
  20:13.
soon 17:20.
sooner 29:8.
sorry 3:9,
  5:17, 20:21,
  22:3,
  24:24.
sort 13:18.
sought 24:21,
  27:20.
specific
  12:10.
spoke 26:2.
spot 28:1.
stalling
  16:4.
stamp 25:4.
start 15:18.
starting
  23:11.
State 22:15,
  23:10, 23:15,
  24:1, 24:4,
  24:16, 25:19,
  25:20, 25:22,
  25:23, 26:5,
  26:11, 28:25,
  29:10.
States 1:1,
  1:18, 1:33,
  8:25, 9:2,
  9:4, 9:9,
  9:20, 10:20,
  14:11, 19:17,
  22:16, 22:23,
  23:4, 23:6,
  23:8, 25:6,
  25:10, 25:12,
  25:13.
status 2:18,
  3:14, 4:9,
  4:11, 4:16,

7:18, 9:1,
  9:7, 10:4,
  10:12, 12:1,
  19:3, 22:24,
  22:25, 23:13,
  24:8, 24:11,
  24:21, 24:22,
  24:23,
  25:7.
statute 3:16.
stay 6:8, 6:11,
  6:16, 6:18,
  6:20, 6:24.
Ste 1:24.
stenographic
  30:10.
steps 17:6,
  21:5.
Steven 1:22,
  2:6.
stop 7:22,
  28:20.
Street 1:35.
strides 29:4.
stripped
  27:10.
strong 29:10,
  29:12.
student 19:4,
  19:5, 19:12,
  19:14, 19:24,
  22:16, 25:23,
  26:14.
students 3:18,
  19:17.
studying 19:17,
  22:16.
subject
  15:19.
subsequent
  28:8.
supposed 9:16,
  20:11,
  26:9.
suspect
  28:16.
system 3:6,
  3:8, 3:16,
  4:15, 5:12,
  10:11,

19:13.
.
.
< T >.
T. 1:41,
  30:14.
talked 10:2,
  21:17.
team 29:5.
tells 19:19.
temporary
  27:1.
ten 17:11.
tentatively
  29:22.
terminate 7:18,
  9:7, 19:2,
  22:25.
terminated 4:5,
  4:7, 4:16,
  4:18, 5:2,
  5:11, 5:12,
  6:4, 7:6,
  9:6, 10:11,
  21:15, 23:19,
  24:3, 24:4,
  25:22, 25:24,
  29:12.
terminating
  5:14, 14:20,
  14:22, 15:3,
  15:18, 18:22,
  19:1.
termination
  22:4, 22:7.
terms 7:5,
  19:25, 21:5,
  22:24.
testify 8:5.
Texas 20:14,
  21:20.
THE CLERK
  2:2.
themselves
  2:4.
they've 25:9,
  25:10,
  29:4.
thinking
  11:2.

thinks 4:25.
third 15:8.
though 22:19.
today 8:5,
  13:18,
  28:3.
Todd 2:3.
TODD M. LYONS
  1:10.
tomorrow
  28:4.
totally 6:8.
touches 28:4.
tough 27:25.
towards 3:2.
Transcript
  1:16, 1:48,
  21:16,
  30:10.
transcription
  1:49.
transcripts
  20:9.
TRO 27:18,
  27:21, 28:9,
  29:14.
try 11:15,
  29:19.
trying 13:1,
  25:23.
Turn 6:21,
  6:25.
turned 22:14.
two 2:12, 2:14,
  2:19, 10:9,
  10:13, 13:13,
  13:22, 15:7,
  25:14,
  26:23.
TX 1:25.
.
.
< U >.
understand
  4:17, 14:1,
  22:21, 24:16,
  26:8, 27:25,
  29:24.
understanding
  3:3, 3:4,

5:1.
Understood
  13:25, 14:9,
  17:5,
  17:14.
unfortunate
  29:13.
Unfortunately
  16:17.
United 1:1,
  1:18, 1:33,
  8:25, 9:1,
  9:3, 9:9,
  9:19, 10:20,
  14:11, 19:17,
  22:16, 22:23,
  23:3, 23:6,
  23:8, 25:6,
  25:9, 25:11,
  25:13.
until 6:12,
  6:18, 17:23,
  24:11,
  29:20.
.
.
< V >.
valid 8:23,
  8:24, 24:2,
  24:10,
  24:11.
validity 24:25,
  25:3.
validly
  25:22.
various 26:5.
versus 2:3,
  8:25.
video 2:22,
  6:22, 6:23,
  6:25, 7:24,
  8:8, 12:22,
  18:5.
violate 16:3.
visa 5:3, 5:4,
  8:20, 8:22,
  8:24, 9:23,
  23:10, 23:11,
  24:2, 24:5,
  24:6, 24:7,

24:8, 24:10,
24:17, 24:21,
24:25, 25:3,
25:12, 25:14,
25:15, 25:21,
29:11.
visas 3:21.
visitor 19:5,
  19:13,
  19:15.
vs 1:8.
.
.
< W >.
wait 5:25.
waiting 7:4,
  8:17, 8:19,
  12:22.
wants 26:19.
Washington
  1:12, 1:36,
  1:44.
Watson 1:39,
  8:4, 11:6,
  15:12, 15:15,
  15:19, 15:21,
  17:2, 17:12,
  17:18, 18:10,
  22:19, 25:19,
  26:16, 28:20,
  28:25,
  29:24.
ways 26:23.
welcome
  18:10.
whatever 2:17,
  7:22.
whether 5:20,
  10:2, 10:3,
  10:14, 10:15,
  23:12,
  27:12.
White 6:25.
Will 2:4, 11:9,
  13:23, 14:2,
  16:9, 17:5,
  18:18, 19:24,
  25:3, 25:6,
  26:21, 28:20,
  29:23.

willing 11:6.
Wisconsin
  14:17, 21:11,
  21:14, 26:18,
  26:19.
within 4:13,
  5:12, 5:14,
  5:24, 6:5.
WITNESS
  20:25.
words 12:15.
working 16:25,
  17:20, 21:1,
  21:13,
  25:10.
works 19:14.
worries
  18:14.
writing 2:17.
.
.
< Y >.
years 13:13.
yourself 6:10,
  6:21.
yourselves
  6:23, 28:7,
  29:16.
Yup 17:8.

# Exhibit D

Order, *Patel v. Lyons*, 1:25-cv-01096-ACR,
April 17, 2025

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AKSHAR PATEL,

       *Plaintiff*,

   v.

TODD M. LYONS,

       *Defendant*.

Civil Action No. 25-cv-01096 (ACR)

## ORDER

For the reasons stated on the record at the April 16, 2025 hearing, and based on Defendant's representation that it has returned Plaintiff's record in the Student and Exchange Visitor Information System (SEVIS) to the "active" status, the Court **GRANTS** Plaintiff's Application for Temporary Restraining Order, Dkt. 2, insofar as the Court:

**ORDERS** that Defendant may not change or otherwise modify Plaintiff's record in SEVIS solely on the basis of his arrest in November 2018 for a violation of Reckless Driving and subsequent dismissal of charge on February 21, 2019, by the Montgomery County Court. The Court further

**ORDERS** that Plaintiff file a renewed Application for Preliminary Injunction by April 21, 2025, and that Defendant file its Opposition by April 29, 2025. The Court will hold an evidentiary hearing on Plaintiff's renewed Application on April 29, 2025.

This Order will remain in effect until further order from the Court or within 14 days of this Order, whichever comes first.

**SO ORDERED.**


Date: April 17, 2025                              _____
                                                 ANA C. REYES
                                                 United States District Court Judge

2

# Exhibit E

Transcript, *Nali v. Noem, et al.,* 1:25-cv-03969,
April 18, 2025

```
 1                    IN THE UNITED STATES DISTRICT COURT
                         NORTHERN DISTRICT OF ILLINOIS
 2                              EASTERN DIVISION

 3   VISHNU VARDHAN NALI,              )   Case No. 25 C 3969
                                       )
 4                   Plaintiff,        )
                                       )
 5            v.                       )
                                       )
 6   KRISTI NOEM, Secretary,           )
     Department of Homeland Security;  )
 7   TODD LYONS, Acting Director of    )
     the Immigration and Customs       )
 8   Enforcement, each in their        )
     official capacity and not         )
 9   individually; and UNITED STATES   )
     DEPARTMENT OF HOMELAND SECURITY,  )   Chicago, Illinois
10                                     )   April 18, 2025
                     Defendant.        )   10:48 a.m.
11

12                 TRANSCRIPT OF PROCEEDINGS - MOTION
              BEFORE THE HONORABLE MARY M. ROWLAND
13

14   APPEARANCES:

15
     For the Plaintiff:     JEFFREY GRANT BROWN PC
16                          BY:  MR. JEFFREY G. BROWN
                            65 W. Jackson Boulevard, Suite 107
17                          Chicago, Illinois 60604

18
                            LAW OFFICES OF SUSAN FORTINO-BROWN
19                          BY:  MS. SUSAN R. FORTINO-BROWN
                            53 W. Jackson Boulevard, Suite 1160
20                          Chicago, Illinois 60604

21
     For the Defendants:    MR. ANDREW S. BOUTROS
22                          INTERIM UNITED STATES ATTORNEY
                            BY:  MR. CRAIG A. OSWALD
23                          Assistant United States Attorney
                            219 S. Dearborn Street, 5th Floor
24                          Chicago, Illinois 60604

25
```

1    APPEARANCES (Cont'd):

2

     Also Present:        MR. STEPHEN NAVARRE

3

4    Court Reporter:      LAURA RENKE, CSR, RDR, CRR
                          Official Court Reporter
5                         219 S. Dearborn Street, Room 1224
                          Chicago, Illinois 60604
6                         312.435.6053
                          laura_renke@ilnd.uscourts.gov
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24                       * * * * *
                 PROCEEDINGS REPORTED BY STENOTYPE
25    TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

```
1        (Proceedings heard in open court:)
2             LAW CLERK:  All rise.  This court is now in session.
3        (Call to order.)
4             LAW CLERK:  Calling Case 25 CV 3969, Nali v. Noem.
5             You may be seated.
6             THE COURT:  Good morning.
7             MR. BROWN:  Good morning, Judge.  I am Jeff Brown on
8    behalf of plaintiff, Vishnu Nali.
9             And with me is Susan Fortino-Brown.  She is Mr. Nali's
10   immigration counsel.
11            In the way of full disclosure, she is also my spouse.
12   And --
13            THE COURT:  I won't hold that against her.
14            MR. BROWN:  And she picked out my tie this morning,
15   Judge.
16            THE COURT:  Okay.  Well, I won't hold that against her
17   either.
18            MR. BROWN:  Also present is Mr. Steve Navarre, who we
19   would like to call as an expert witness in the matter.  He is
20   an immigration practitioner.
21            THE COURT:  Okay.
22            Can I get your name, though, again?
23            MS. FORTINO-BROWN:  Sure.  Susan Fortino,
24   F-O-R-T-I-N-O, hyphen, Brown, B-R-O-W-N.
25            THE COURT:  Okay.
```

4

1          MR. OSWALD:  Good morning, your Honor.  Craig Oswald

2     on behalf of the United States.

3          THE COURT:  Good morning.

4          Okay.  So I wasn't expecting briefing so quickly.  I

5     was going to talk to you about briefing today.  But I

6     appreciate the briefing.  I know I got a response sometime last

7     evening, or maybe it came in yesterday, and then I appreciate

8     your reply.

9          So I have read it this morning.

10          There's a lot of information here.  Whenever people

11     start talking to me about the CFR, I -- I know I'm --

12          MR. BROWN:  It can make one sleepy.

13          THE COURT:  Well, I know I have to pay attention.

14     I'll say that.  I don't know the CFRs, I'm sure, as well as

15     Mr. Oswald does in this particular area.

16          MR. OSWALD:  Thank you, your Honor.  But it's

17     misplaced.

18          THE COURT:  Yeah.

19          Okay.  So where should we begin?

20          MR. OSWALD:  Your Honor, I just had one other thing

21     that we received this morning, which is, you know, I think

22     counsel submitted last night or this morning four cases that

23     went on their side.  This is a case that we just received this

24     morning -- and I gave counsel a copy --

25          THE COURT:  Okay.

1          MR. OSWALD:  -- from the -- from Detroit, the Southern

2    District of Michigan.  And this is denying the TRO --

3          THE COURT:  Okay.

4          MR. OSWALD:  -- in a similar situation.  So I wanted

5    to present it.  And if I could do so.

6          THE COURT:  Yeah.

7          MR. OSWALD:  I've given counsel a copy.

8          THE COURT:  Okay.

9      (Tendered.)

10          THE COURT:  So I knew there was a case pending in

11   Michigan.

12          So you have a witness here, which is interesting.

13          Do you intend to call any witnesses?

14          MR. OSWALD:  No, your Honor.

15          THE COURT:  Even if I set this over for a preliminary

16   injunction hearing?

17          MR. OSWALD:  I'm not sure about that, your Honor.  But

18   I'm not ready with any witnesses this morning.

19          THE COURT:  Uh-huh.  Okay.  Well, no.  That's fair.

20          MR. OSWALD:  Mr. Press, who filed the brief, he's in

21   Atlanta.  His father passed away, and he's down there --

22          THE COURT:  Sorry to hear that.

23          MR. OSWALD:  -- resolving matters for that.  So I --

24   we don't have any witnesses here this morning.

25          THE COURT:  Because -- so, you know, when I think

1    about the irreparable injury prong, I guess my questions

2    arise -- and I'm not an immigration expert by any stretch of

3    the imagination.  But I'm -- the government's brief leaves me

4    confused.  And I -- you know, I need a lot of education in the

5    immigration area.

6              But what I'm understanding is that Mr. Nali -- am I

7    saying that correctly?

8              MR. BROWN:  Yes, your Honor.

9              MS. FORTINO-BROWN:  Yes.

10             THE COURT:  Mr. Nali was terminated -- I'm just going

11   to pull the e-mail here so I have the language correctly.

12             He was terminated in SEVIS.  Now, SEVIS is just a --

13   it's a kind of a collect -- it's a database, basically, so

14   universities and the government can speak to each other.  I can

15   get my head around that.

16             So he was terminated in SEVIS.  And that's basically

17   DHS saying, "We're terminating you."

18             They didn't tell him why.  Okay?  I want to be clear.

19   The government brief says he was terminated because of the

20   criminal records check.  But that's not accurate.  The e-mail

21   says he was terminated, quote, "OTHER - Individual identified

22   in criminal records check and/or has had their VISA revoked."

23   So he wasn't told why.  He was left to wonder.

24             In fact, based on the government brief, his visa was

25   not revoked for another week because the e-mail was sent on

1    April 8th, and the visa was revoked I think -- I don't know --
2    I'm going to say April 15th.  I could have that date wrong, but
3    at some point.
4              And, of course, that goes to the State Department, so
5    that would be a different set of defendants.  Okay.  I'm not
6    inviting that.
7              So he gets told that his SEVIS is terminated.  He's --
8    he doesn't know whether or not his visa is revoked.  Since then
9    his visa has been revoked.  I don't know that he's been told
10   about that, although he knows that through his litigation.  I
11   don't know that he's gotten any formal notification of that.
12             MR. BROWN:  He has not, Judge.  He has not received
13   any communication from the government.
14             THE COURT:  Okay.  So he's wandering around the
15   streets of Chicago without SEVIS, or at least in SEVIS he no
16   longers exists.
17             But what the government is telling me, what I don't
18   understand, is he still has F-1 status.  And so I feel like
19   this goes to irreparable injury mostly because, you know, what
20   you're arguing is, well, he has F-1 status, so he can work and
21   he still exists.  He still is here.  And he -- so there's no
22   irreparable injury.
23             But the thing is DePaul tells him, "You can't work.
24   We're not going to hire you.  We're not going to pay you."  God
25   knows a university in this day and age is not going to do

1      anything to violate any kind of government regulation, and I
2      certainly can't blame them for that.
3              Can you, Mr. Oswald?
4              MR. OSWALD:  I can't blame them for that.
5              THE COURT:  I'm sure they have a lot of regulations
6      relative to their participation in SEVIS, that if somebody is
7      terminated from SEVIS, they better not have a student enrolled
8      for class credits, they better not give them a diploma, and
9      they better not employ them.
10             MR. OSWALD:  As I under --
11             THE COURT:  I don't know what all the SEVIS
12     regulations are, but --
13             MR. OSWALD:  I understand the SEVIS system -- which
14     I'm new to this too -- is that it's a system that was set up --
15     as, you know, some of the briefs show --
16             THE COURT:  Yeah.
17             MR. OSWALD:  -- after 2001 when we had students where
18     we didn't know where they were from and what was going on.
19             THE COURT:  Sure.
20             MR. OSWALD:  So ICE set up the system.
21             THE COURT:  Sure.
22             MR. OSWALD:  So ICE doesn't control, like, work
23     authorization.  They don't control a lot of the stuff with the
24     student stuff.  They're monitoring this, and this is their
25     database.  And the university inputs the stuff.  The e-mail

1   you're referring to is issued by the university based upon

2   their reading of it.

3          And as I understand it from the affidavit that we

4   obtained and talking to people --

5          THE COURT:  Yes.

6          MR. OSWALD:  -- they use the term "prudentially

7   revoked" to say that that doesn't -- that that doesn't take --

8   that it doesn't deal with the F-1 status, that he's still

9   technically in status.

10         As I understand it, he's going to graduate in June.

11  There's nothing that precludes him from graduating in June.

12  He's not been placed in removal proceedings.  He's not --

13  there's nothing there.

14         I think that if he went out of the country and tried

15  to come back in, then he would have an issue with the SEVIS and

16  the revocation of the visa.  But as long as he stays in status,

17  he's -- he's fine to be here.

18         And if he seeks employment authorization -- I think he

19  might have employment authorization already if he's working on

20  some kind of training.  He can seek that from CIS, USCIS,

21  Citizenship and Immigration Services.  They're the ones that

22  would adjudicate that.  So that --

23         THE COURT:  Well, that's not my understanding, so

24  maybe --

25         MR. OSWALD:  But that's --

Case 1:25-cv-00691-DLC   Document 22   Filed 04/15/25   Page 97 of 183   PageID #:883

1          THE COURT:  -- I'm wrong.

2          MR. OSWALD:  Right.  But that's -- as I understand it,

3    that's my client's position is that they -- that he's still in

4    status technically, and he -- if he graduates in June, there's

5    nothing that precludes that from happening and that he's not --

6    he is not -- as the affidavit says, he's not -- they haven't

7    challenged his F-1 status now --

8          THE COURT:  I understand that.

9          MR. OSWALD:  -- that he's a student and that he's --

10   and that this is something that they would -- if they wanted to

11   remove him and say he was out of status, they would have to

12   issue a notice of intent to -- a notice to appear and place him

13   in immigration proceedings.

14         THE COURT:  Oh, well, that's good to hear.  I'm glad

15   to hear that.

16         But here's my problem.  What I understand is he still

17   has F-1 status, but because he's been terminated in SEVIS, he

18   can't work.  And maybe I'm wrong about this.  And this is why I

19   think maybe we need a hearing.  And I understand we have an

20   immigration expert here, who I assume is an immigration lawyer.

21   And I don't know if you want to present a witness or if you

22   just want to rely on this witness.

23         He can't work.  And I would be hard-pressed to think

24   that DePaul would give him a diploma or let him finish his

25   coursework while he is out of SEVIS because if I were the

1  president of DePaul -- and I'm not, I'm grateful -- I would be

2  very concerned about doing anything that would be in violation

3  of any of the SEVIS regulations.  But I don't know what the

4  SEVIS regulations are.  I'm happy to dig in and find out what

5  those are, but I sure don't know them as I sit here today.

6          So I'm looking at the irreparable injury prong, which

7  is what I'm required to do.  And I'm looking at lots of other

8  courts have been concerned about the irreparable injury.  And

9  I'm -- what I understand the government's position in the brief

10  to be -- and I hear you articulating it -- is because he's

11  still here and he has F-1 status, he doesn't have injury.  And

12  I'm disagreeing with you only because to me, it's a little bit

13  of a bogeyman, right?  Like, he has F-1 status, but if you

14  can't -- if you're not in this SEVIS system, you can't be at

15  your university and you can't work.

16          And, in fact, if you're not at the university and

17  working the way that you're -- that you came here to do, you're

18  in trouble because when you come here with your student visa,

19  you better be doing what you came here to do.  I mean, if you

20  come here on a student visa and you just start working as a --

21  I don't know -- as a fry cook, well, you're not in compliance

22  with your student visa --

23          MR. OSWALD:  Right, because we --

24          THE COURT:  -- of course, and we don't want people

25  doing that.

1       MR. OSWALD:  Right.  And that's the qualifications for

2 the student visa are you're supposed to be able --

3       THE COURT:  Right.

4       MR. OSWALD:  -- to support yourself.  You're supposed

5 to have -- it isn't -- it doesn't --

6       THE COURT:  Fair enough.

7       MR. OSWALD:  It doesn't require employment for you to

8 continue on with that, which is --

9       THE COURT:  Fair enough.  So we don't want him going

10 out and getting a job as a fry cook.

11       So my concern is what does the F-1 status really get

12 him.  So while I need to figure all that out and unwrap all

13 that, I'm wondering what to do.

14       Now, your brief has always -- has also raised a number

15 of issues about -- I don't know -- whether I have authority and

16 what the Seventh Circuit says as compared to what the Third

17 Circuit says and likelihood of success.  This is the likelihood

18 of success prong, and there's the APA claim, and then there's

19 the notice and due process claim.

20       And I need a little bit of time on -- to figure all

21 that out.  I mean, it might be news to you, but you're not my

22 only case.  And, in fact, you're not even my only emergency

23 case.

24       So how would you like to proceed?  I mean, I'm going

25 to -- my inclination is that he has some irreparable injury

1   here for a temporary -- some kind of temporary relief, and then

2   we would have a more fulsome hearing that I would definitely do

3   before the end of the month.

4          But if you want to have a hearing today -- just you

5   don't have a witness.  I'm happy to hear from your witness if

6   you'd like to.  That might give me all the information I need.

7   I'm just -- I'm very confused as to how you can be terminated

8   in SEVIS and still have F-1 status.  I just don't understand

9   that.  So I can --

10          MR. BROWN:  And, Judge, that was really the point of

11  this expert witness is to walk your Honor through that --

12          THE COURT:  Okay.

13          MR. BROWN:  -- for the benefit of the Court, the

14  connection between those things.

15          THE COURT:  Okay.  Would you like to proceed?

16          MR. BROWN:  And we're happy to put it on later, and we

17  would prefer to put it on now, Judge.

18          THE COURT:  Would you like to proceed with that?  That

19  might help me a lot, but you might want to also have somebody.

20  I don't know.  I don't expect this person who signed this

21  affidavit -- I'm sure they're giving this affidavit all over

22  the country.  I don't expect them to magically appear in every

23  courtroom, you know, but you could have somebody else from ICE.

24          But I am confused as to how a person in F-1 status can

25  be terminated in SEVIS and still -- what do they do?  If that

1    was me and I woke up this morning, what would I do?

2          MR. OSWALD:  I think that the answer is that -- from

3    our client is that he's still -- he's still in F-1 status.  And

4    if he graduates, he can graduate and receive his degree.  And I

5    don't think there's any impediment to that.

6          And if he goes out of the United States and would try

7    to come back in with that student visa, that's a separate

8    situation --

9          THE COURT:  Okay.

10         MR. OSWALD:  -- than what this is.

11         And I understand.  And I am familiar with -- with the

12   witness and counsel.

13         THE COURT:  Oh, okay.

14         MR. OSWALD:  And they're all very knowledgeable

15   immigration practitioners.  This is basically -- it's -- I

16   mean, he -- counsel is a witness, but he's an immigration

17   practitioner.

18         THE COURT:  Sure.

19         MR. OSWALD:  And he's -- I mean, he's -- he knows more

20   about it, certainly, than I do.

21         THE COURT:  Okay.

22         MR. OSWALD:  But I'm not -- I'm not in a -- you know,

23   I don't have a witness here today.  I mean, we might be able to

24   offer someone.  But that would be something that we would need

25   a few days.  I mean, this isn't, obviously, our only case to do

1   with it.  We have -- I have two hearings on Monday on similar

2   cases.  So --

3          THE COURT:  Sure.

4          MR. OSWALD:  -- I'm not in a -- in a -- at this point,

5   you know, we would -- I don't think that they're interested --

6   my client's not interested in reinstating -- agreeing to

7   reinstate the case without, you know -- on our own.

8          THE COURT:  You mean the SEVIS status.

9          MR. OSWALD:  The SEVIS status.

10         THE COURT:  Yeah.

11         MR. OSWALD:  Reinstate the SEVIS status.

12         And I think that at this point we don't believe that

13  there is irreparable harm because he does -- as the affidavit

14  from -- from -- that we attached to our response says, it was

15  prudentially revoked.  We haven't revoked his status as a

16  student, you know.

17         THE COURT:  So can he work?

18         MR. OSWALD:  I don't believe that he could work right

19  now.

20         THE COURT:  Okay.

21         MR. OSWALD:  But he can apply for employment

22  authorization.

23         MS. FORTINO-BROWN:  Your Honor, I'm going to --

24         MR. OSWALD:  Although he may have employment

25  authorization.  I go to counsel on that --

1          THE COURT:  Okay.  Okay.

2          MR. OSWALD:  -- because he may have employment

3  authorization.

4          THE COURT:  And can he get a -- can he finish his

5  coursework?  Given his status, his F-1 status but visa revoked,

6  out of SEVIS, terminated from SEVIS, can he continue his

7  coursework?

8          MR. OSWALD:  I think he can -- if he's got until --

9  between now and June, he can continue that and graduate.

10         THE COURT:  And he can get a diploma.

11         MR. OSWALD:  I believe so, your Honor.

12         THE COURT:  And there would be no retaliation against

13  DePaul for giving him a diploma.

14         MR. OSWALD:  I do not believe that there's any

15  retaliation.  I don't think this is against DePaul in any way,

16  shape, or form.

17         THE COURT:  Well, I'm asking if they gave a diploma to

18  a student who was terminated in SEVIS and had no visa but was

19  in F-1 status, would the administration guarantee that they

20  wouldn't take any retaliatory action against DePaul?

21         MR. OSWALD:  I would -- I would like to check with my

22  client and confirm that, your Honor.

23         THE COURT:  That would be good.  We'd need that in

24  writing.

25         MR. OSWALD:  Yeah.

1          MS. FORTINO-BROWN:  Your Honor, on the issue of

2     irreparable harm, the F-1 student experience carries with it a

3     whole program through which the F-1 student is entitled to

4     secure on-campus employment, which is what he has done.  And he

5     has been told that he can no longer work on campus because of

6     the SEVIS termination.

7          Separately, he is entitled, as long as he maintains

8     active SEVIS -- or active status in SEVIS, he is entitled to

9     pursue employment authorization under Optional Practical

10    Training.  And there is a very brief window in which he must

11    apply for that.  And that is with -- and we are close to that

12    window.  It is within a 30-day period of his -- of his

13    graduation.

14         And so if he doesn't have an active SEVIS, Mr. Nali

15    will not be eligible to take advantage of the USCIS-issued

16    employment authorization, which is valid for a year.  And then,

17    because he's in a STEM field, he's entitled to an additional

18    two years beyond that.  So three full years of Optional

19    Practical Training that is available to him only by virtue of

20    the fact that his SEVIS remains active.

21         MR. BROWN:  And, Judge, that's a separate employment

22    authorization from the employment authorization that he had

23    been working under as a student at DePaul.

24         THE COURT:  Okay.  So he can only get that -- so

25    that's part of your irreparable injury argument.

1          MR. BROWN:  Yes.

2          MS. FORTINO-BROWN:  Correct.

3          THE COURT:  But he can -- that's part of F-1, which he

4   still is F-1, but you have to be active in SEVIS in order to

5   qualify for those benefits.

6          MS. FORTINO-BROWN:  Your Honor, correct.  And there's

7   a specific citation to this fact in the USCIS Policy Manual at

8   Chapter 5, Section C. -- I've got it up on my computer, your

9   Honor -- C.2.  Eligibility for employment authorization under

10  Optional Practical Training is available only for someone with

11  an active SEVIS registration.

12         THE COURT:  Okay.  Does that come as news to you?  I

13  mean, I wouldn't expect you to know all that.

14         MR. OSWALD:  I would say SEVIS is a system that's

15  maintained by Immigration and Customs Enforcement, a different

16  agency than USCIS.  Even in their response, counsel says they

17  could -- they can apply for employment authorization.  It's a

18  short time window.  I would say they should apply when he is

19  eligible and that that would be a remedy that they could

20  pursue.  And if they don't have that, they can come back and

21  say, "We didn't get it in time" --

22         MS. FORTINO-BROWN:  If it's not --

23         MR. OSWALD:  -- or whatever.

24         MS. FORTINO-BROWN:  I'm sorry, your Honor.

25         MR. OSWALD:  But that's something that is not -- it's

1    not -- I understand what counsel is saying about SEVIS and that

2    some of this is automatic.  But there is a remedy that's

3    available to them at this point.  And my client's view is that

4    they should be pursuing that.

5           MS. FORTINO-BROWN:  That's what Mr. Navarre is

6    eligible -- is able to enlighten you on, your Honor, and to

7    give details about exactly --

8           THE COURT:  Okay.

9           MS. FORTINO-BROWN:  -- what's next --

10          THE COURT:  Okay.

11          MS. FORTINO-BROWN:  -- for this client.

12          THE COURT:  Okay.  So we'll proceed -- if it's okay,

13   we'll proceed with the witness and -- if you're prepared to do

14   that today.

15          MR. OSWALD:  I'm -- I'm really not prepared to handle

16   anything on a witness at this point, your Honor.  But, you

17   know, I'll proceed as the Court wishes to do.

18          THE COURT:  Okay.  Well, I'm offering -- my idea was

19   to enter some kind of temporary relief so that you could be

20   prepared for a hearing.

21          You filed a brief.  I didn't ask for that.

22          MR. OSWALD:  Right.

23          THE COURT:  And I would set this over for probably

24   late next week or early -- but certainly before the end of the

25   month.  But if your client wants to proceed more expeditiously,

1    then we're going to proceed this morning.

2            So I'm trying to accommodate the parties.  I

3    understand there's litigation all over.  This whole thing,

4    which is now on 12, 15 federal judges' dockets, could have been

5    handled differently.  But now there's 15 of us involved in

6    this.  So I would be willing to handle this differently, but

7    there would have to be some kind of interim relief.

8            If you want to work that out with me, I'm always

9    working things out with lawyers, always.  If you want to

10   proceed this morning, we're going to proceed this morning.

11           MR. OSWALD:  I -- I'm not prepared to agree to relief,

12   so --

13           THE COURT:  Call the witness.

14           MR. BROWN:  Thank you, Judge.

15           Your Honor, we're calling to the stand Mr. Steve

16   Navarre.

17           THE COURT:  Okay.

18           MR. BROWN:  Mr. Navarre, you can have a seat here.

19           THE COURT:  Watch your step.  Raise your right hand.

20       (Witness sworn.)

21           THE WITNESS:  I do.

22           THE COURT:  Okay.  Keep your voice up.  Speak into the

23   microphone so we can hear you.

24           THE WITNESS:  Okay.

25           Can I pour some water?

1    THE COURT:  You can.  But I would -- I'm not sure how
2  old that --
3    THE WITNESS:  Is it old?
4    THE COURT:  I'm not sure how old that water is, so I
5  would be cautious about it.
6    THE WITNESS:  Okay.
7    THE COURT:  Maybe, Jasmin, if you're hearing me, if
8  you could bring some water into the courtroom for the witness.
9  That would be great.
10    Okay.
11    STEPHEN NAVARRE, PLAINTIFF'S WITNESS, SWORN
12    DIRECT EXAMINATION
13  BY MR. BROWN:
14  Q.  Could you state your name --
15    THE COURT:  Some water will probably magically appear.
16  BY MR. BROWN:
17  Q.  -- for the record while you're pouring, Mr. Navarre.
18  A.  Yeah.  My name is Stephen Navarre.
19  Q.  Mr. Navarre, you are licensed as an attorney in Illinois,
20  correct?
21  A.  That's correct, yes.
22  Q.  How long have you been licensed?
23  A.  I was licensed in the fourth quarter of 1997.
24  Q.  And what is your area of practice?
25  A.  I practice exclusively since I became an attorney in

Navarre - direct

1   U.S. immigration and nationality law.

2          Prior to becoming an attorney, I worked at an

3   immigration law firm for seven years.  So I've been working in

4   this field for 34-plus years.

5   Q.  Worked in what capacity prior to being an attorney?

6   A.  As a legal assistant for licensed attorneys.

7   Q.  And you've been practicing in the area then for how long?

8   A.  27-plus years.

9   Q.  And what -- do you have a particular focus area within

10  immigration law?

11  A.  I and my firm work on employment-based nonimmigrant visas,

12  and I work with international students primarily who want to

13  stay in the U.S. beyond school but also counsel them on

14  maintaining status in school.

15         I also work with DSOs -- these are designated school

16  officials -- to -- who manage international students.

17  Q.  Do you have familiarity with the SEVIS system that we've

18  been talking about this morning?

19  A.  Yes, I do.

20  Q.  And how do you have that familiarity?  Describe that, if

21  you could, for the Court.

22  A.  My experience with the SEVIS system is in working with

23  questions from DSOs as to their responsibilities, the school

24  officials who have to work in the SEVIS system, and also

25  counseling international students in their obligations.

Navarre - direct

1    Q.  Do you do that on a regular basis?

2    A.  I do that on a regular basis.

3          I also -- every semester, I do seminars for

4    international students at Columbia College.  I've been doing

5    that for 20 years.

6          I actually did one earlier this week.  And the primary

7    topic that international students wanted to talk about at

8    Columbia College was termination of SEVIS records that they

9    have been hearing about.

10   Q.  Do you also have any representation of institutions,

11   universities, colleges?

12   A.  Over the years, I've helped a lot of colleges and

13   universities in various applications to USCIS, work visa

14   applications.

15   Q.  Now, in the course of your practice as an immigration

16   practitioner, tell the Court what your approach to learning and

17   ascertaining applicable immigration law is.  What sources do

18   you look for -- look at in order to counsel clients?

19   A.  Right.  So the primary source of immigration law is known

20   as the Immigration and Nationality Act.  That's a statutory

21   authority that's amended over the time.  It was originally

22   created in 1952 and amended a million times since then.

23          Below that is the Code of Federal Regulations.  That's

24   DHS regulations at 8 CFR, Department of State regulations at

25   22 CFR, and Department of Labor regulations at 20 CFR.

Case 4:25-cv-03699-DGZ Document 22 Filed 04/19/25 Page 21 of 26 Page ID of 187

1   Q.  And is that reliance typical for immigration practitioners,

2   your colleagues, in your experience?

3   A.  That's very typical.

4           And then also just to mention sort of below the

5   regulatory level then is government agency guidance, some of

6   which is particularly important because it's binding on

7   government employees.

8           So the Department of State has a foreign affairs

9   manual that their consular officers must abide by.  That is a

10  public document mostly.  Some parts are redacted.

11          The USCIS has a policy manual.  Immigration and

12  Customs Enforcement has various memos that they issue from time

13  to time.

14  Q.  Do you have --

15          MR. BROWN:  I'm sorry.

16          MS. FORTINO-BROWN:  May I ask questions of the witness

17  as well, your Honor?  Or would you rather not?

18          THE COURT:  Do you object to there being a

19  double-headed examination?

20          MR. OSWALD:  When they're married, no, your Honor.

21          THE COURT:  Okay.  Is that a marriage exception?  I've

22  not heard of that.

23          MR. BROWN:  Thank you, Judge.

24          THE COURT:  Go ahead.

25  BY MS. FORTINO-BROWN:

1    Q.  Mr. Navarre, are you familiar with the facts of the Nali

2    case?

3    A.  Yes.

4    Q.  And have you reviewed the documentation that Mr. Nali

5    received from DePaul University alerting him that his SEVIS

6    status had been terminated?

7    A.  Yes, I've seen that.

8    Q.  What conclusion did you draw after you saw that?

9    A.  Well, I guess the first conclusion is very clear that

10   DePaul University has a different interpretation of the

11   significance of termination in the SEVIS system than the

12   affidavit produced by the official within Department of

13   Homeland Security that the government produced as part of its

14   case.

15   Q.  And how are they different?

16   A.  DePaul University takes a position that, whether

17   termination in the SEVIS system precisely legally terminates

18   one's nonimmigrant visa status and authorization to physically

19   remain in the U.S., that it de facto terminates an

20   international student's participation in that program.

21           Can I continue?

22   Q.  Please.

23           MR. BROWN:  Please.

24           THE COURT:  Could you say that again.

25           THE WITNESS:  Yes.  Whether termination in SEVIS

Navarre - direct

1   precisely legally terminates an F-1 student's ability to
2   physically remain in the U.S., which I think is in dispute, and
3   the government claims it does not, it -- in DePaul University's
4   position and a position I agree with, that it in effect
5   terminates an international student's ability to continue to
6   participate fully in that program.

7           And if I can explain what I mean by that, your Honor.
8           THE COURT:  Yes.

9           THE WITNESS:  Okay.  I'd like to start off with when
10  someone comes to -- wishes to come to the U.S. to study at a
11  college or university, their first step is to apply to a
12  college or university and be accepted.

13          They then must apply at a U.S. consulate, to the
14  Department of State, for an F-1 visa and their passport.  In
15  order to do that, the school must issue a form called an I-20
16  form.  This is a U.S. government form.  It's been around in
17  various iterations forever.

18          When I first got into this business, the international
19  student offices at schools would pull up a typewriter and grab
20  a blank I-20 form and type it up and fill it out.

21          Ever since SEVIS was created, there is only one way to
22  produce an I-20 form, and that is in the SEVIS system.  The
23  designated school official at the university or college has to
24  create a record, open a record in the SEVIS system for the
25  student and within that system produce an I-20 form.  That form

Navarre - direct

is bar-coded and can only be produced technically in that
system.

And the student must have that form when they go to apply
for a visa at a U.S. consulate or embassy, and the
U.S. Department of State's Foreign Affairs Manual confirms
that.  It's absolutely essential.  They will not get a visa.

And the Department of State also has access and the
ability to check that SEVIS system to make sure that that
document is not fraudulent and they really are in that system.

The system was created to track student status and to
detect violations by the student of that status.  But it's --
it's become -- it's become larger than itself.

When a student comes to the U.S., based on that
program, they can go to school and attend school.  And as long
as they continue to go to class and they don't violate their
status, they can remain in the U.S.

But there's other benefits that international students
are accorded in this program.  Counsel mentioned earlier
various work authorization programs.  Those work authorization
programs require the generation by the school of an updated
I-20 form.  And that, again, can only be done in that SEVIS
system.

In the case of Mr. Nali, assuming for the moment that
he can stay in school and graduate in his current status, if he
wants to work on Optional Practical Training work

Navarre - direct

1    authorization, this program that is accorded to all
2    international students that grants him up to three years of
3    work authorization in the United States in his field --
4    BY MR. BROWN:
5    Q.  Following his graduation.
6    A.  -- following graduation, the school must generate an I-20
7    form that authorizes that.  And they can only do that if he has
8    an active SEVIS record.
9    Q.  So notwithstanding the government's contention that
10   Mr. Nali is presently in --
11   A.  Government counsel mentioned that Mr. Nali could always
12   apply to USCIS and make his case to USCIS.  That in practice is
13   not true.
14           USCIS will automatically deny any application for a
15   work authorization if it's not accompanied by an I-20 form
16   endorsed by the school authorizing this practical training.
17   And that form can only be done within the SEVIS system with a
18   valid, open student record.  A terminated record prohibits
19   that.
20   Q.  So it's your understanding --
21   A.  And so when -- I'm sorry.  And when -- and I'm sorry.  I
22   apologize.  I don't remember the name of the gentleman from DHS
23   who issued the affidavit.
24           MS. FORTINO-BROWN:  Watson, Watson.
25           THE WITNESS:  Mr. Watson.  This is where Mr. Watson

Case 4:25-cv-03959-DGZ Document 22 Filed 04/04/25 Page 29 of 75 Page ID #1302

 1  glides over the practical issues here because they are saying

 2  that there's no -- that the termination in SEVIS has no effect

 3  on this individual's status and ability to participate in the

 4  F-1 student program.  And that's simply not true.

 5  BY MS. FORTINO-BROWN:

 6  Q.  I have a -- can you explain about this -- why we are here

 7  today, what this -- what harm is this applicant -- this client

 8  going to be suffering, and what is the window in which he's

 9  going to have to make that application to DHS for his

10  employment authorization?

11  A.  The application for -- for post-graduation OPT work

12  authorization must be filed within a window.  I believe the end

13  date on that window is 30 days following graduation.

14  BY MR. BROWN:

15  Q.  And that assumes that Mr. Nali indeed could graduate in his

16  current status.

17  A.  That assumes that DePaul issue -- graduate -- that assumes

18  that he graduates from DePaul University.

19  Q.  Do you have an understanding one way or the other as to

20  whether DePaul would actually permit that given the current

21  status that it has explained Mr. Nali has?

22  A.  The letter from DePaul suggests that they're very nervous

23  about this.  And so I can't -- I'm not confident that DePaul is

24  willing to allow him to graduate.  I don't know.  I can't speak

25  for DePaul.

1    THE COURT: Well, is there a letter from DePaul that
2    I'm unaware of?
3    MR. BROWN: No, Judge. I'm referring to the exhibit
4    to the complaint, which is the e-mail from DePaul to Mr. Nali.
5    THE COURT: Okay.
6    BY MS. FORTINO-BROWN:
7    Q.  Any idea -- so just going again to the irreparable harm.
8    Mr. Nali is going to be -- if he's reinstated in SEVIS, he will
9    have potentially three years of employment authorization ahead
10   of him if we can reinstate him.
11   A.  Correct.
12   Q.  He has a degree -- he would have gotten a degree in a month
13   in -- a master's degree in business analytics.  Do you -- I
14   understand that you practice in this field.  You probably see
15   wages.  I don't -- can you give the judge any idea of what sort
16   of salary he might be looking at annually with a master's
17   degree in business analytics?
18   A.  My estimate would be initially starting out somewhere in
19   the 80 to $90,000 range.  I'm not a recruiter, but I do a lot
20   of these types of cases for employers for work visas.
21   BY MR. BROWN:
22   Q.  And in the course of that, you actually look at
23   governmental published sources that refer to ranges of salaries
24   for --
25   A.  Yes.  So it's very common for international students once

Navarre - direct

1   they get this work authorization to find employment with

2   companies who then sponsor them for work visas to stay on in

3   the U.S. and continue their careers beyond that.

4          Those work visas typically have prevailing wage

5   requirements, Department of Labor oversight requirements.  So

6   part of those work visa applications is we have to research and

7   pull information typically from the Department of Labor that

8   includes wage information.  So that's where I'm getting my

9   estimate from.

10  Q.   And right now, is it your understanding that Mr. Nali can

11  or cannot work lawfully?

12  A.   Right now?

13  Q.   Right now.

14  A.   I -- DePaul certainly believes that he cannot.  And I would

15  defer to them on this because it's their program.  He's working

16  on campus.

17         I think that that's -- I think the precise legal

18  question remains to be seen.  I don't think that's known yet.

19  Q.   But you're aware of the fact that DePaul's communicated to

20  Mr. Nali that all employment authorization, on or off campus --

21  A.   Yes.

22  Q.   -- must end immediately.

23  A.   Yes.

24         It seems to me in reading the pleadings in this case

25  and the affidavit that the government's position is that

Navarre - direct

1   termination in SEVIS is just nothing -- it doesn't really hurt

2   him at all -- and which I guess raises the question as to why

3   it was even done.

4           But that aside, I think it's important to understand

5   how technology has become so integral into -- into what we do.

6           And I guess the best analogy I can give you is that,

7   Judge, if you had a car 40 years ago, you could push-start that

8   car to start it if you had to.  Cars today -- think of the

9   government coming and disconnecting your electronics remotely

10  to your car and then telling you, "We didn't steal your car."

11          The fact that the government didn't steal your car is

12  irrelevant.  This is what the government is saying when they're

13  saying, "Well, he's got valid status.  He's just terminated in

14  SEVIS."

15          You cannot run your car without the electronics.  You

16  cannot participate in this F-1 student program fully without an

17  active SEVIS record.

18  Q.  And DePaul cannot grant Mr. Nali work authorization without

19  the SEVIS system showing him --

20  A.  Correct.

21  Q.  -- in a valid --

22  A.  And DePaul --

23  Q.  -- status.

24  A.  -- cannot independently resurrect that SEVIS record.  It's

25  been terminated by the government.  Only the government can

1   reactivate that.

2           MR. BROWN:  Thank you, Mr. Navarre.  That's all I

3   have.

4           Counsel?

5                         CROSS-EXAMINATION

6   BY MR. OSWALD:

7   Q.  Good morning, Mr. Navarre.

8   A.  Good morning, Counsel.

9   Q.  So good to see you again.

10          Can we -- so you started practicing in 1997.

11  A.  1997.

12  Q.  Just a baby in the field.

13          So when I started in '84, that was the Immigration and

14  Naturalization Service.

15          Can you explain to the judge how the -- that ended and

16  the various component entities that now comprise what INS used

17  to be.

18          And now there's three entities, right?  Can you

19  just --

20  A.  Correct.

21  Q.  -- briefly explain to give an overview of kind of the

22  responsibilities of each of these entities.

23  A.  Absolutely.  So following 9/11, Congress eventually passed

24  the Homeland Security Act, which -- which broke up old INS into

25  predominant -- primarily three entities:

1    USCBP, Customs and Border Protection, which is Border

2    Patrol and admission at airports and land -- inland borders;

3    Immigration and Customs Enforcement, whose primary job is to

4    investigate and initiate removal proceedings against people who

5    should not be in the United States; and USCIS, whose primary

6    job is to adjudicate and approve immigration benefits.

7    Q.  And in terms of immigration benefit issues, students would

8    a lot of times come in contact with USCIS -- correct? -- I

9    mean, because that's who's -- this is considered a benefit.

10   They typically are dealing with things in terms of student

11   status, right?

12   A.  Correct.  So I would say that international -- USCIS has

13   very little to do with the process of international students

14   coming to the U.S. and also maintain -- you know, pursuing

15   their course of study.

16   Q.  Right.  And who -- so we're talking about the three

17   component agencies --

18   A.  Right.

19   Q.  -- of DHS.

20       But there's another department that deals with them

21   coming in to begin with, and that's the State Department,

22   right?

23   A.  State Department, correct.

24   Q.  And what's their role in that?

25   A.  State Department's role is to issue visas.  And a visa,

Navarre - cross

1    remember, is a document in the passport that allows someone to

2    seek admission to the U.S.  And so that's the State

3    Department's role is to issue visas.

4    Q.  So they would issue visas and they can revoke visas too,

5    right?

6    A.  Yes, they can.

7    Q.  State Department.

8          And in this case, they apparently at some point

9    prudentially revoked, whatever that means, his student visa.

10         MR. BROWN:  Your Honor, just for the record, I would

11   object to the characterization as prudentially revoked.

12         Go ahead, Counsel.

13         THE COURT:  But that's a term of art, isn't it?

14         MR. OSWALD:  It's a term of art, and it's referred to

15   in the declaration.

16         THE COURT:  Overruled.

17         MR. OSWALD:  And, frankly, your Honor, I didn't

18   understand it until I was going through this.

19         THE COURT:  I agree.

20         THE WITNESS:  And prior to recent events, we have seen

21   that the Department of State would occasionally revoke people's

22   visas for conduct that they deemed was in violation of their

23   status.

24         And that decision by the State Department was simply

25   canceling the visa and their passport.  It had no effect -- the

1  State Department's action had no effect on someone's status in

2  the U.S.  It was only if they left the U.S., they no longer had

3  a valid visa to return to the U.S.

4  BY MR. OSWALD:

5  Q.  Right.  So if it's revoked, he can't -- this -- Mr. Nali

6  can't go out of the United States and come back in using a

7  revoked visa, right?

8  A.  Correct.  He would have to apply for a new visa.

9  Q.  And that's a State Department decision.

10  A.  Correct.

11  Q.  And the decision as to whether he's in status or not, which

12  of these component agencies would make that determination?

13  A.  Well, I -- in my opinion, both U.S. Immigration and Customs

14  Enforcement and USCIS have the ability to make a determination

15  as to whether someone is in or out of status.  How that would

16  come to their attention would vary.

17  Q.  Does Immigration and Customs Enforcement -- do they grant

18  people work authorization?

19  A.  No, they don't.

20  Q.  And who does that?

21  A.  USCIS.

22  Q.  And the system that we're talking about, the SEVIS system,

23  is run by what component?

24  A.  Immigration and Customs Enforcement.

25  Q.  Does USCIS have any -- are they running this database at

1   all?

2   A.   They are not -- to my knowledge, they are not running it.

3   They have access to it.

4   Q.   Right.  And so do the universities, right?

5   A.   Correct.

6   Q.   And so when you were talking about the e-mail that counsel

7   was referring to, that comes from the university --

8   A.   Correct.

9   Q.   -- right?

10        And that's the university's interpretation of the

11  status, right?

12  A.   Correct.

13  Q.   And they may be right, and they may not be right.

14  A.   Correct.

15  Q.   And in terms of -- in terms of work authorization in this

16  case, I think, you know, the filings are that this would be --

17  that there still would be the opportunity -- it's not automatic

18  under the SEVIS system -- but that he could apply to

19  immigration, USCIS, to get work authorization.  Is that

20  correct?

21  A.   Well, I -- so we have to be careful what we're talking

22  about.

23        So anyone can file an application with USCIS for

24  anything, right?  I can be single and file an application on

25  behalf of my fiancée if I want.  But whether or not -- you

1  know, whether or not I qualify for that is a whole another

2  question.

3         Now, to file an application for work authorization as

4  an international student, an absolute requirement is the form I

5  had mentioned before issued by the school that must be done

6  within the SEVIS system.

7  Q.  And how do you know that that's an absolute requirement?

8  A.  I'm basing this on my experience doing these applications

9  since before the SEVIS system existed and my experience working

10 with USCIS.

11        It's also on the USCIS website as a requirement.

12 Q.  And the affidavit says that in terms of this being -- that

13 this did not affect his F-1 status.

14        And do you agree with that, or do you disagree with

15 that?

16 A.  I disagree that this action terminating Mr. Nali's record

17 in the SEVIS system does not affect his F-1 status.

18        There's two things going on here.  What I believe the

19 affidavit is saying is a very precise argument that says

20 termination in the SEVIS system does not officially legally

21 terminate one's visa status in the U.S. in the sense that they

22 are immediately removable for being, quote, out of status.

23 Q.  Do you agree with that?

24 A.  That may technically be true.  I think -- I think there are

25 differing opinions on that.

Navarre - cross

1    But what's more -- what I also feel is that it's

2 irrelevant because the important question is whether this

3 affects his ability to be an F-1 student and get the benefits

4 of an F-1 student, and this clearly negatively affects that in

5 a permanent way.

6    Mr. Nali will not -- and I can say this is not an

7 opinion; this is a fact.  If Mr. Nali's SEVIS system status

8 remains terminated, he is positively, absolutely ineligible to

9 be accorded work authorization by USCIS under the OPT program.

10 And that is not my opinion; that is a fact.

11 Q.  And what is that based upon?  Where does that exist?

12 A.  USCIS rules.

13 Q.  And where are those rules?

14 A.  In the USCIS Policy Manual, in the instructions to the

15 USCIS application, which have force of regulation.

16 Q.  And the -- but there is -- or there would be a remedy for

17 employment authorization, right?  I mean, he could apply for

18 that, and he could be -- it talks about in the filing that

19 there is a 30-day window for him to -- with him to apply for

20 that for employment authorization.

21 A.  But only if his SEVIS record is reinstated by the

22 government.

23 Q.  And where does that exist within the -- I don't -- I'm not

24 following where that -- where the SEVIS requirement has

25 anything to do with that -- with the work authorization.

1   A.  I understand.  And it goes back to the requirements for

2   issuing the work authorization.  He is not eligible to be

3   granted OPT work authorization unless the OPT work

4   authorization is recommended by the school on Form I-20.

5           And it's on page 2 of Form I-20, and the school puts

6   in there, "Recommended and authorized for OPT postgraduation

7   work authorization for one year."  It's signed by the

8   designated student officer, and it's generated in the SEVIS

9   system.

10          As I said before, they cannot pull out a typewriter

11  and type up this form.  It has to be generated in the system.

12  The form is bar-coded by the system, and it's the only

13  authorized form.  And that form is absolutely required by USCIS

14  as evidence of that application.  And without it, it will not

15  be approved.

16          And I would tell any international student, "You

17  cannot get this.  If you file this application, you're wasting

18  your money.  It will absolutely 100 percent be denied."

19  Q.  What is the term that you use for the training program?  Is

20  it CPT?  What is the --

21  A.  OPT.

22  Q.  OPT?

23  A.  OPT is the postgraduation --

24  Q.  Okay.

25  A.  -- work authorization.

Navarre - cross

1    Q.  Right.

2    A.  It's Optional Practical Training, optional to the student

3    to take or not take if they want.

4         CPT is another training program for -- while students

5    are in school.

6    Q.  But he would want to be an OPT.  Is that correct?

7    A.  Correct, correct.

8    Q.  And does he have an OPT opportunity available already to

9    him that he's going -- that he will miss out on that he's

10   already lined up, as far as you're aware?

11   A.  Assuming that he grad -- oh, you mean a job?  An actual job

12   offering?

13   Q.  Right.

14   A.  I'm not aware.  I don't know.

15   Q.  And at this point he doesn't -- you're not aware that he

16   has any specific job training program set up that he would be

17   denied as a result of this.

18   A.  No, but I'm also not aware that he doesn't.

19   Q.  Right.  But you're assuming that he would -- that this all

20   would follow as a matter of course.  Is that correct?

21   A.  He would -- he -- well, under the program, he would need to

22   find an employer and get work, yes.

23            THE COURT:  Can I just ask as an aside --

24            MR. OSWALD:  Yes.

25            THE COURT:  -- because I'm following your questions.

Case 4:25-cv-03959-DGZ Document 22 Filed 04/25 Page 42 of 45 of Page ID #1235

1           These OPTs, are they always on the campus, these

2   Optional --

3           THE WITNESS:  No.

4           THE COURT:  -- Practical Trainings?

5           THE WITNESS:  No.  These --

6           THE COURT:  Because the university signs off on them.

7           THE WITNESS:  The university signs off on it and

8   authorizes the employee to get the work authorization.  But

9   then the work authorization is open work authorization with any

10  employer as long as the student is working in a job that's

11  connected to their field of study.

12          THE COURT:  Right.  But you could go and work for some

13  private company.

14          THE WITNESS:  Correct.

15          THE COURT:  But does the university then have to

16  verify that you actually have that job?

17          THE WITNESS:  The student goes into the SEVIS system

18  and enters the job information.

19          THE COURT:  I see.

20          THE WITNESS:  Okay?  And that's visible to the school

21  as well.

22          There is also an automatic termination of that work

23  authorization if the student does not get employment.  So if a

24  student gets work authorization and does not work for a period

25  of 90 days, then that work authorization and their record in

1    SEVIS is automatically terminated.  So you have to use it or

2    you will lose it.

3              THE COURT:  I'm sorry to interrupt.

4              MR. OSWALD:  Oh, fine, your Honor.

5    BY MR. OSWALD:

6    Q.  The -- there's -- I understand, you know, you're an expert

7    witness.  You're a legal expert, so this is --

8              But there are -- there have been a number of courts

9    that have talked about the SEVIS system, that there's no --

10   that there's no protected interest in a student having SEVIS,

11   being in the SEVIS system and having SEVIS records.

12             Is that -- are you aware of those cases?

13   A.  Can you explain what you mean by protected?

14   Q.  A liberty interest or some other interest that they are

15   entitled to say -- I mean, you have student status, right?  And

16   he's got a visa that gives him student status.

17             And then there's this database that you claim is

18   essential within this to fully enjoy all the benefits of F-1

19   status.

20   A.  Correct.

21   Q.  The interest -- I mean, there have been a number of courts

22   that we've cited that say you don't have a protected -- that

23   the student doesn't have a protected interest in the SEVIS

24   records per se.

25             Are you aware of those cases?

Navarre - cross

1   A.  Well, I'm not specifically aware of those cases.

2           And I think the question of whether -- so I've -- I've

3   described what, in my opinion, Mr. Nali would be missing out on

4   if this decision were not reversed.  I think it's a question

5   for all of you to argue and for you to decide, Judge, as to

6   whether that opportunity is -- is something that he deserves

7   protection for.  I think that's out of what I'm speaking here

8   today.  I don't think I can speak to that.

9           I can tell you that from a practical level, this

10  employment connection with the higher education that

11  international students come and participate in, on a practical

12  level, is a big part of what makes this country desirable for

13  international students to come to.

14          I think there would be a significant number -- I can't

15  put a percentage on it -- but I think a significant number of

16  students might go somewhere else to school if they did not have

17  this entry into the workforce and ability to work in their

18  field following graduation that they are all certainly aware of

19  when they come to the U.S. and go to school here.

20  Q.  Understood.

21          But in terms of employment, when you get a student

22  visa, you are supposed to be self-sufficient economically,

23  right?

24  A.  Yes.  You have to show that you are able to support

25  yourself, correct.

Navarre - cross

1  Q.  And so when we're talking about references to the poverty

2  line or, you know, that we're working at the poverty line or

3  whatever in terms of this gentleman, Mr. Nali, he's supposed to

4  have resources available to be able to pay for his tuition and

5  his support -- right? -- when he comes in to meet the visa

6  requirements.

7  A.  Are we talking -- I don't know anything about a discussion

8  on the poverty line.

9  Q.  Well, there was a reference in the filings that we're

10 talking about that this is going to deny him the ability to

11 work, deny him the ability to support himself.

12       That's really not an issue in terms of being able to

13 support yourself.  You're supposed to be -- when you come from

14 a foreign country and you're a student, you're not supposed to

15 have to work in order to support yourself as a student to stay

16 in status, right?

17 A.  Correct, while one is in school.

18       But when one graduates -- when an international

19 student graduates, typically then they need to work.  If

20 they're going to stay in the U.S., they need to work and

21 support themselves.

22 Q.  Yeah, I understand that point.

23 A.  Okay.

24 Q.  But I'm talking about the actual student status.

25 A.  Correct.

Navarre - redirect

1        THE COURT:  Okay.  Thank you.

2        MR. OSWALD:  Thank you, your Honor.

3        THE COURT:  So when they're students, they're not

4 doing work-study?  That's not part of being --

5        THE WITNESS:  They can do work-study, absolutely.

6        But part of the eligibility for an F-1 when someone

7 initially comes to go to school is that they do have to show

8 that they have the ability to, you know, pay tuition and living

9 expenses.  They have to show that, that there's financial

10 support there as a student.

11        But they absolutely can participate in work-study if

12 it's approved under what's called the Curricular Practical

13 Training, or CPT work authorization, which also has to be

14 approved in SEVIS.

15        MR. BROWN:  Judge, if we could, just to follow up.

16        THE COURT:  Yeah.

17        REDIRECT EXAMINATION

18 BY MS. FORTINO-BROWN:

19 Q.  Mr. Navarre, there's a little bit of confusion, just so

20 that we can state the record, and I'm going to advise the Court

21 of this.

22        Mr. Nali has been working part time on campus under

23 what's called Curricular Practical Training, which is available

24 to students while they're in school, and so he has been

25 supporting himself through that.

Navarre - redirect

1    And to your knowledge, is he -- you mentioned earlier

2   that you don't believe he's working.  Could he go back and work

3   tomorrow under this Curricular Practical Training?

4   A.  Well, I -- I don't think there's a definite answer to that.

5   I think DePaul has made it clear that he cannot.

6        The Curricular Practical Training is also approved on

7   a SEVIS-generated I-20 form.  Now, if he's terminated in SEVIS,

8   is that SEVIS-generated I-20 form also out of date as well?  I

9   don't think the government in their affidavit has gone into

10   that detail of the significance of the termination of SEVIS.

11   But a form generated in SEVIS is probably also defunct since

12   the system is.

13        MS. FORTINO-BROWN:  Your Honor, just, once again, I

14   would refer to the USCIS Policy Manual section that outlines

15   exactly the requirement.  We're talking after graduation and

16   then to apply for postgraduation OPT, which is called Optional

17   Practical Training.  That is in this section.

18        And SEVIS is clearly delineated there as a requirement

19   for the entire F-1 experience, including an application for

20   Optional Practical Training.

21        THE COURT:  Yeah.  And those -- those regulations that

22   you're citing to and that the witness cited to and even the

23   USCIS website, is that what's attached to your reply?

24        MS. FORTINO-BROWN:  No.  This is something new that we

25   just have pulled up, your Honor.

1    MR. BROWN:  We can submit a copy of this to your Honor
2    for the record.
3          MS. FORTINO-BROWN:  Oh, you have a copy, Jeff.
4          MR. BROWN:  Yeah, we have it printed out here.
5          But I can refer you to the citation for the record,
6    Judge.
7          THE COURT:  Okay.  Why don't you do that.
8          MS. FORTINO-BROWN:  It is the U.S. Citizenship and
9    Immigration Service's Policy Manual, Chapter 5, Practical
10   Training.
11         And then the sections that we're referring to are B.
12   for Curricular Practical Training, which is granted while the
13   student remains in school -- and that's what Mr. Nali has --
14   had, I should say.
15         And then Section C. is for student Optional Practical
16   Training.  And within that section, you would go to Section 1,
17   Pre-Completion OPT, for the full outline.  And it refers
18   repeatedly to the SEVIS registration as a required element.
19         THE WITNESS:  Excuse me, Counsel.  This is from
20   memory, so it might not be correct.  But above Chapter 5 in
21   that policy manual, I believe there's a volume number.  And the
22   volume -- I don't remember the number, but it's -- it should be
23   Nonimmigrants.
24         THE COURT:  Mm-hmm.
25         THE WITNESS:  Just if -- for people searching for

Navarre - examination

1    this.  I think there's another level above it.

2         MR. BROWN:  And, Judge, we can submit a copy of this

3    and file it on the record.

4         THE COURT:  Okay.

5         MR. BROWN:  Or deliver it to your Honor.

6         THE COURT:  Okay.  So are you through with your

7    questions?

8         MS. FORTINO-BROWN:  I am.  We are.

9         THE COURT:  Okay.  All right.  So I have some

10   questions because I'm confused about some other things.

11                         EXAMINATION

12   BY THE COURT:

13   Q.  This terminating based on arrest versus conviction, I don't

14   know if we're terminating -- let me get my e-mail again.

15        Where is that?  How do I look up the authority to do

16   that?

17   A.  I think that's a good question, your Honor, because I don't

18   have an answer for that.  Until 2 --

19   Q.  I've seen some language, I think, in the 8 -- in maybe

20   8 CFR about terminating for, you know, a crime of violence or a

21   conviction or over a -- so it's a felony, something,

22   conviction --

23   A.  Right.  My --

24   Q.  -- that carries a sentence.

25   A.  Until recent -- until the last few weeks, I have only heard

1    of termination in SEVIS as something done by Immigration and

2    Customs Enforcement as part of an overall removal proceeding

3    for someone who has committed acts that render them removable

4    from the United States.

5            So a conviction for a violent crime or something like

6    that would -- would typically lead the government to initiate

7    removal proceedings and terminate -- and if they're in F-1 visa

8    status, termination in SEVIS would be part of that process.

9            MR. BROWN:  And, Judge, if I could --

10           THE COURT:  Because I'm going -- I think we've talked

11   a lot about irreparable injury, Counsel, and I'm wondering

12   about likelihood of success on the merits, right?  So it's a

13   different inquiry.

14           MR. BROWN:  Right.

15           THE COURT:  And, of course, we have the APA and we

16   have due process, and I think you've raised in your brief some

17   challenging concepts about the Due Process clause.  But I'm

18   wondering about the APA, and I'm wondering about arbitrary and

19   capricious.

20           And I don't know anything about canceling -- well, I

21   guess we're not worried about canceling a visa here because

22   that's the State Department.

23           And so I'm trying to figure out about terminating in

24   SEVIS.  And, you know, I don't know how often this happens.

25   I'm not going to see much case law on this except this recent

1   stuff, and everybody is rushing on these decisions, which I

2   don't think is the best way to make these decisions,

3   particularly when there are complex administrative rules and

4   regulations underlying them, which frustrates me.

5           So is any -- how do you -- are you -- can the

6   administrative agencies, whether we're talking about ICE or

7   USCIS, terminate you in SEVIS because of an arrest for a

8   misdemeanor?  That is my question.

9           MR. BROWN:  Judge --

10          THE COURT:  If somebody could just tell me the answer

11  to that.

12          MR. BROWN:  If I can just respond briefly.

13          We allege in the -- actually, in the complaint -- it's

14  paragraph 3 -- the -- that Mr. Nali is not guilty of the,

15  quote, "commission of any crime of violence for which a

16  sentence of more than one year imprisonment may be imposed."

17          And that is a quote from the Code of Federal

18  Regulations.  The citation is 8 CFR 214.1(g).

19          THE COURT:  Right.

20          MR. BROWN:  That section sets forth the regulatory

21  grounds for conditions of a student nonimmigrant's admission

22  and continued stay.

23          And, again, we're talking about crimes of violence.

24          THE COURT:  No, no.  I know the difference between a

25  misdemeanor and a felony, and I understand the difference

Navarre - examination

1    between an arrest and a conviction.

2    BY THE COURT:

3    Q.  So given that I have a misdemeanor arrest, no conviction --

4    so I have a presumption of innocence, which I think applies to

5    people who are noncitizens -- what -- what am I supposed to

6    look at in terms of the ability of -- maybe you're not the

7    expert on this.  I don't know.  But you're sitting here, and

8    you're under oath.

9    A.  Well --

10   Q.  So my question is, what do I look at -- because I have to

11   look at likelihood of success for an APA action, which is, is

12   there arbitrary and capricious action here.  And the government

13   doesn't even think I have the authority, probably, to look at

14   that.

15          But if I were to spend my weekend looking at it, what

16   is the authority of USCIS to terminate --

17   A.  Or Immigration and Customs Enforcement to terminate.

18   Q.  Okay.  There you go.

19   A.  In the SEVIS record.

20   Q.  Okay.  So that's -- okay.  So you're correcting me on the

21   agency.  Okay.

22          So to terminate in SEVIS.

23   A.  I don't know of any -- I don't know of any authority.  This

24   is unprecedented, in my opinion.  I have never seen it before.

25          MS. FORTINO-BROWN:  Your Honor, if I could also

Navarre - examination

1  interrupt.

2       It is a ministerial act.  There is no discretion

3  involved in whether or not this individual should be maintained

4  in SEVIS.  He has not been convicted of or engaged in any

5  conduct that would render him in violation of his F-1

6  nonimmigrant status.

7       THE COURT:  Well, let me ask the expert, if you don't

8  mind, because this is testimony.

9  BY THE COURT:

10 Q.  Is it ministerial?  I mean, that doesn't make sense to me.

11 I mean, you must have some discretion that if you -- let's say

12 you're charged with an egregious act and you're not -- you

13 know, you murder the head of a big -- a big --

14 UnitedHealthcare -- right? -- and you're here on an F-1 visa

15 and there is a -- there's going to be a criminal trial, so it's

16 going to go on for a while and you're in custody but you're not

17 convicted because there's, you know, two-year trial schedule or

18 whatever.  I mean, would it be ministerial?

19      I mean, wouldn't the -- ICE have the -- if that's the

20 correct agency.  Wouldn't they have the ability at that point

21 to start removal proceedings?  Or -- I mean, I don't understand

22 that it would be ministerial.

23 A.  Well, I mean, they could -- they could start removal

24 proceedings.  The question of whether or not he's removable

25 would go to the section of the law regarding removal.

1      But this is -- this is completely outside that.

2   The -- the -- an arrest is never a grounds for removability.

3   Q.  Well, what about for canceling --

4   A.  And your example, you know --

5   Q.  Yeah.  Well, I'm just trying to come up with something

6   egregious.

7   A.  I know.

8   Q.  But what about for canceling you in SEVIS, for terminating

9   you in SEVIS?

10  A.  There's -- there's no regulatory authority for ICE to

11  cancel someone in SEVIS that I'm aware of other than their

12  claimed broad authority to -- granted by Congress to keep

13  America safe.  But that -- but that's -- there's nothing in --

14  there's nothing, to my knowledge, in the regulations governing

15  immigration law that authorizes ICE to terminate someone in

16  SEVIS.

17      A colleague of mine said in a communication, an e-mail

18  to a group of us, that, you know, the SEVIS system was created

19  to track students maintaining and in some cases violating their

20  status so that the government could see that.

21      It wasn't created for the government to step in and

22  revoke the students' ability to do this or not.  We have laws

23  for that.  Those laws are called remove -- law is grounds of

24  removability.  And SEVIS has the authority to remove someone if

25  they commit and are convicted of a criminal act that makes them

Navarre - examination

1    removable.

2    Q.   Well, how would they do that?  Why not just remove them

3    from SEVIS?  You mean they'd go through a removal proceeding?

4    A.   They often go through removal.  It's done every day for

5    people who are removable.

6    Q.   If they're here on an F-1 visa and they're in the SEVIS

7    system.

8    A.   Correct.  If someone in -- if someone in F-1 status commits

9    and is convicted of a removable offense, they will be placed in

10   removal proceedings.

11        Now, an immigration judge may give them voluntary

12   departure and end that and let that -- you know, let that play

13   out quickly.  But that's the procedure the government has for

14   removing people that they don't want in the United States.

15   Q.   So you'd be in a removal proceeding, and then your SEVIS

16   status would be terminated.

17   A.   Probably at the conclusion of that.  I -- I honestly don't

18   know what the government does with regard -- when that's done.

19   But at some point, yes, their SEVIS record would be terminated

20   or would expire.

21        I mean, if someone commits a -- your Honor, if someone

22   commits a criminal -- a violent criminal offense and they're

23   convicted, let's assume for the moment that that person is

24   incarcerated for that offense.

25   Q.   But -- and they're a student.

1    A.   Correct.

2    Q.   Yeah.

3    A.   Well, very shortly thereafter at some point, they're no

4    longer going to be a student.  They're going -- they're not

5    going to continue being enrolled in the school.  They're going

6    to be in prison.  And so their SEVIS record will terminate on

7    its own.  That's probably how that usually happens.

8           ICE stepping in and terminating a SEVIS record without

9    any ground of removability is what is new and unprecedented.

10   And myself and other immigration attorneys do not know where

11   the authority to do that comes from.

12   Q.   So you would -- so it's your opinion or your expert

13   testimony --

14           THE COURT:  And is there any objection to finding him

15   an expert to testify in this area?

16           MR. OSWALD:  I have so many reasons to object to him,

17   but I -- not as an expert, your Honor.

18           THE COURT:  Okay.

19   BY THE COURT:

20   Q.   So it's your testimony as an expert that -- what is your

21   opinion in terms of Mr. Nali being removable with this arrest?

22   A.   He's not removable on the basis of an -- of this arrest.

23   He would first need to be convicted.  And then the conviction

24   would have to be determined to be a crime of moral turpitude.

25   And then it would have to not fit under the petty offense

1    exception to that ground of removability.

2              THE COURT:  Okay.

3              Do you have any other questions?

4              MR. BROWN:  Sorry, Judge?

5              THE COURT:  Do you have any other questions?

6              MR. BROWN:  No, not for the witness, Judge.

7              THE COURT:  Okay.  Thank you.

8              MR. OSWALD:  Your Honor, I have some.

9              THE COURT:  Sure.  Sure, sure, sure.  Please.  Sorry.

10                       RECROSS-EXAMINATION

11   BY MR. OSWALD:

12   Q.  Mr. Navarre, we got your -- as I understand your testimony,

13   that our client in the affidavit says SEVIS separate from

14   student status.

15            So when you're talking about the student status, to

16   revoke the student status, you're reading the student status

17   regulations that apply to that, right?  And it's student status

18   that they would be out of -- out of student status would be

19   reading the F-1 regulations into the SEVIS system.  Is that

20   correct?

21   A.  I'm not sure I understand your question.

22   Q.  Well, in terms of when you're talking about what the

23   steps -- okay.

24            Looking at it from ICE's point of view, they would say

25   it's separate.  There is -- when the judge is looking for

1    guidance on this as to what you can do in SEVIS, there is none.

2    Isn't that really correct?

3    A.   That's correct.

4    Q.   There's not SEVIS regulations.  They're not -- this goes

5    into the -- there's not a regulation that says, "This is what

6    goes in."  We've got policy memoranda, you know.  And what

7    you're talking about is the practical import of how data has

8    kind of taken over and that that data is all part of the same

9    system.

10   A.   Mm-hmm.

11   Q.   But there's no SEVIS regulation that says, "Judge, you

12   know, you'd only take this person" -- "you put this person in

13   the system in this situation.  You take them out in this

14   situation."  There's no restriction on that, SEVIS per se.  Is

15   that accurate?

16   A.   No restriction on what ICE can do in the system?

17   Q.   Right, what ICE could do with the system --

18   A.   Oh, but --

19   Q.   -- or that they would take somebody, to terminate

20   somebody's status and then say, "You may terminate status under

21   this situation."

22   A.   There is no --

23   Q.   In terms of SEVIS.

24   A.   To my knowledge, there is no regulation that authorizes ICE

25   to terminate any status in SEVIS.

Navarre - recross

1   Q.  But there's no -- there's no requirement that they do so --

2   that they put things into SEVIS status, is there?  I mean --

3   A.  No.  ICE --

4   Q.  -- is there regulation on SEVIS?

5   A.  No.  My understanding of the SEVIS system as it was created

6   is that ICE's job was to manage it in the sense that keep it up

7   and functioning.  The government was providing a system for

8   schools and students to report what they are doing.

9           There's no section in SEVIS where ICE reports.  You

10  see what I mean?  ICE is not a user in the system.

11  Q.  But they're maintaining the system.

12  A.  They're maintaining it.  So, you know, they have to pay the

13  bills and make sure it stays up and running.  But there's no

14  authority in the regulations that ICE can step in and

15  arbitrarily, for whatever reason that they feel is appropriate,

16  to terminate a SEVIS record.

17  Q.  But there's no regulation that requires --

18  A.  I guess you're saying there's no regulation that prohibits

19  them from doing that?

20  Q.  Right, right.

21  A.  Well, but regulations usually describe what a government

22  agency does, not what they're --

23  Q.  Is there a regulation that just deals with SEVIS?

24  A.  There are references to SEVIS in the regulations.  But --

25  in 8 CFR 214.2(f), which is the section on international

 1   students, it discusses.  But all the regulations discuss what

 2   the schools and what the students must do because they are the

 3   participants in it.

 4   Q.  But the termination of status -- I think it's 214.1 --

 5   right? -- (d) or something like that.

 6   A.  Right.

 7   Q.  And I'm off the top of my head, so I don't have it right

 8   here.

 9   A.  Right.

10   Q.  But that -- your testimony -- I mean, you're reading in

11   those requirements on what you do to terminate somebody's

12   student status as also regulating what goes in and out of

13   SEVIS?

14   A.  Again, I'm not sure I understand your question.

15   Q.  Well, the argument that ICE makes, this is a separate

16   system from the student status system.

17   A.  Correct.

18   Q.  "We maintain a database.  We have a computer system."

19   Basically, "We can do what we want."

20         You -- that has nothing to -- and their argument is

21   that that has nothing to do with termination of student status.

22   A.  Right, right.

23   Q.  And if you buy that argument -- that's not your testimony.

24   I'm not trying to put words in your mouth.

25   A.  No, no.  I understand.  I understand.

1  Q.  And I'm not saying it.  But if you buy that argument that

2  they're separate, there's no SEVIS regulation that really

3  regulates what goes in and out of SEVIS, right?

4  A.  Correct.

5  Q.  There is a regulation on student status, and that's a

6  separate -- well, you would say it's not --

7  A.  But I would say -- but I think the problem with the

8  government's argument is the idea that these are two separate

9  things.

10  Q.  Right.

11  A.  And that -- and I think -- I hope that that has -- that I

12  made clear from my testimony that I -- instead, I see these as

13  completely intertwined and inseparable.

14  Q.  And that's -- I agree that's your testimony.

15  A.  Okay.

16  Q.  And that's fair, and I'm just asking for the distinction

17  here as to what the judge has to determine.

18  A.  Right.

19        THE COURT:  Right.  And I appreciate your

20  clarification because I think what you're saying, if I can --

21  and you can tell me if I'm wrong -- is it's not like SEVIS has

22  some list that says, "Okay.  This is what" -- for ICE -- "Dear

23  whoever is in charge of ICE.  Here's the reasons you can

24  terminate someone in SEVIS."

25        MR. OSWALD:  Right.

Navarre - recross

1       THE COURT:  "Here's reasons you can't terminate

2   someone in SEVIS."  I mean, SEVIS is kind of this -- I mean, it

3   is a database.

4       MR. OSWALD:  Right.

5       THE COURT:  And ICE has obligations to keep it going.

6       I would imagine that there's rules when you say

7   regulations in SEVIS, that the universities have obligations or

8   rules about what they have to keep track of or how often they

9   have to update or whatever.  I'm sure there are obligations in

10  that regard and obviously obligations on the students.

11      But there's not a regulation that says, "ICE can only

12  terminate for this reason."

13      MR. OSWALD:  That's correct.

14      THE COURT:  Okay.  Do you know, Counsel, is there

15  any -- so there's no regulations.  There's no -- there's

16  nothing I can look at that says, "Okay.  This is ICE's

17  authority with respect to SEVIS for why they can terminate."

18      MR. OSWALD:  I -- I know of none.

19      THE COURT:  Yeah, okay.  And that seems consistent

20  with the testimony.

21      MR. OSWALD:  We agree, you know, on something.

22      THE COURT:  Okay.  Anything else?

23      MR. OSWALD:  I have nothing further.

24      THE COURT:  Anything else?

25      Okay.  Well, I appreciate that because I didn't

1    understand that, so thank you.

2         Anything else?

3         MR. BROWN:  Judge, I think we've already moved

4    admission.  Your Honor has accepted Mr. Navarre's testimony as

5    an expert.  But if I've overlooked that detail, I think

6    counsel's indicated no objection.

7         THE COURT:  Okay.  Yeah, I'll grant that motion.  And

8    I just wanted to clarify that for the record.

9         Okay.  I think you can be excused.  Thank you.

10        THE WITNESS:  Thank you.

11        MR. BROWN:  Thank you.

12        And, Judge, once again, on this issue of Mr. Nali's

13   participation as an F-1 student, his failure to maintain F-1

14   student status under the SEVIS system happens under the

15   regulations when he fails to maintain a full course of study or

16   engage in unauthorized employment or other violations of this

17   regulation we've been talking about, 8 CFR 214.2(f).

18        214.1(e) and (g) outlines the specific circumstances

19   where certain conduct by a nonimmigrant visa holder, like being

20   engaged in unauthorized employment or providing false

21   information to DHS or being convicted of a crime of violence

22   with a potential sentence of more than a year, those things

23   constitute a failure to maintain status.

24        None of those things have transpired here, so none of

25   the grounds under the regulation exist for his termination of

1   status per se.

2            THE COURT:  I understand.

3            MR. BROWN:  You understand.

4            And then separately this issue of whether his status

5   is his status and whether it is properly reflected in SEVIS may

6   be two different things.  But you've heard the testimony about

7   the impact of the failure to keep his status in SEVIS affects

8   him.

9            THE COURT:  Right.  So let me get some clarification

10  on that.

11           So he -- he's lost his employment at DePaul.  I

12  understand that.  I don't think that that's contested.

13           And I would like some clarification as to whether or

14  not he is going to be able to get a diploma in June, which is

15  two months away -- month and a half away.  Is he going to be

16  able to get a diploma?  Do we know that?  Does he have an

17  answer to that?

18           MR. BROWN:  I can't say that we have an answer to

19  that, Judge.  We don't have evidence one way or the other.  My

20  read of DePaul's e-mail to him is that he wouldn't.  But I'm

21  reading the same document as the Court is looking at, and

22  that's the only evidence we have on that score.

23           THE COURT:  Okay.

24           Can I get more on that?  Or is that -- is he not able

25  to get me any more information on that?

1          MR. BROWN:  We can certainly reach out to DePaul and

2     get what their position is, Judge.

3          THE COURT:  And then there is this application, which

4     would be 30 days after whatever the graduation date is.  I

5     don't know.

6          MR. BROWN:  Which is the date in early June, but I

7     don't have it off the top of my head.

8          THE COURT:  Right.  Well, that's a matter of public

9     record.  But there's that date, and then there's 30 days later,

10    so we're talking early July.

11         So I think I have my arms wrapped around the

12    irreparable injury piece.

13         Would anybody like to -- well, first of all, let me

14    ask you, Mr. Oswald.  Given the testimony, would you like an

15    opportunity to present a witness?  Because I had a lot of

16    confusion about that whole thing.  I feel some clarity.

17         I think it's different than what your affidavit said,

18    or at least it clarified for me this sort of being in F-1

19    status versus having a visa versus being in the SEVIS database

20    and the impact of not being in the SEVIS database, which I

21    think there's a big impact to that.  Maybe you disagree.

22         Do you want me to have a hearing next week?  Totally

23    up to you.

24         MR. OSWALD:  Yeah.  I would like to at least talk to

25    my client as to the testimony that's been here this morning --

1          THE COURT:  Okay.

2          MR. OSWALD:  -- and see what they -- how they would

3    like to handle that.

4          THE COURT:  Any objection to that?

5          MR. BROWN:  No objection, Judge, though I don't think

6    it interferes with your ability to enter an order preliminarily

7    and immediately.

8          THE COURT:  Okay.  And then my second question -- so

9    I'm going to get a status report about whether or not we need

10   another hearing.

11         And then my second question -- because you guys did

12   very rushed briefing, which I appreciate, and I imagine that's

13   because there's lots happening in other courts.

14         But is -- would anybody like to address, aside from

15   the briefing -- and I can read the briefing, so you don't need

16   to repeat -- the idea of likelihood of success on the merits?

17   Because you gave me the Third Circuit case.  I've read the

18   Third Circuit case because I had it.

19         The defendant responded with some Seventh Circuit case

20   law.  I read the brief about the Seventh Circuit case law, but

21   I haven't actually read the Seventh Circuit cases because I

22   just read it this morning, so I haven't had a chance.  I will

23   pull those cases, of course, and look at them.  So I --

24   obviously, Seventh Circuit's in the building, so I've got to

25   pay attention to what they say, so I've got to read those and

1  digest those.

2      I don't know if -- I read your reply very quickly.  I

3  don't know if you responded to the Seventh Circuit cases.  I

4  can't recall.

5      MR. BROWN:  I did not, your Honor.  And we'd like an

6  opportunity to supplement it.

7      THE COURT:  So I don't know if -- but do you want to

8  say anything about likelihood of success, or do you want to

9  just let me read stuff?

10      MR. OSWALD:  Well, we -- if you give us, both sides,

11  the opportunity --

12      COURT REPORTER:  Speak in your microphone, please,

13  Mr. Oswald.

14      MR. OSWALD:  If you give us, both sides, the

15  opportunity to file something in writing, you know, a short

16  period of time on the issue of likelihood of success, I think

17  we would take advantage of that opportunity.

18      THE COURT:  Okay.  Why don't I do that.

19      Okay.  So I understand that some judges are entering

20  orders that say things like don't deport him.  Don't arrest him

21  for immigration matters.  Don't remove him from the country,

22  things like that.  I'm going to enter something like that.  I

23  don't expect anything like that to happen to Mr. Nali.

24      I want to really look at this SEVIS thing.  I've heard

25  a lot of testimony.  I understand that there's now a case out

1    of Indiana and a case out of Michigan that are struggling.

2    I've seen the thir -- 20 cases that all entered TROs right

3    away.  And those cases didn't have hearings, which I really

4    appreciate that I got to hear from a witness because I love

5    lawyers, but I feel like witnesses are helpful.

6             And I'm just going to do this as a preliminary

7    injunction and not as a -- not that I'm going to grant a

8    preliminary injunction, but I'm just going to do it and not --

9    all these other judges were, like, doing TROs and then

10   hearings, you know, a week later, which is double -- double the

11   fun, double the work.

12            So I'm going to just do it, either grant the

13   preliminary or not grant it.  And we can go from there.

14            So do you have any objection to -- I know Judge

15   Coleman granted some kind of TRO that said keep your hands off

16   him.

17            MR. OSWALD:  I -- I'm not really in the position -- I

18   mean, I don't think that there's any threat to his removal.

19   I -- I can't really agree to anything, but I don't think that

20   that would be -- you know, that's not going to be -- I don't

21   think that is going to be an issue here.

22            MS. FORTINO-BROWN:  On behalf of our client, your

23   Honor, he is really quite concerned.  He's afraid to even --

24            THE COURT:  Oh, I'm sure.

25            MS. FORTINO-BROWN:  -- walk the streets.

1          THE COURT:  I'm sure he is.

2          MS. FORTINO-BROWN:  So we would ask that your Honor

3    would enter something to protect him.

4          THE COURT:  I'm sure he is.

5          So I know that's not what you're seeking.

6          MS. FORTINO-BROWN:  Exactly.

7          THE COURT:  I mean, I understand you're seeking

8    something much more fulsome.  And I understand he's not

9    working, and I understand the implications of that.  And I

10   don't want to encourage anyone to engage in improper conduct in

11   order to eat.  So that's not a good thing.

12         So I'm going to enter a TRO that will be sort of akin

13   to what Judge Coleman -- I don't know if you're following that

14   case.

15         MR. BROWN:  Judge, I'm sorry.  I haven't.

16         THE COURT:  Yeah, and they did something kind of

17   different because they filed it as a habeas, I think.  So

18   different -- different kind of legal issues presented, although

19   they may be a multi-count thing.  But --

20         MR. OSWALD:  We have a hearing on that on a

21   preliminary injunction, I believe, on Monday morning.

22         THE COURT:  Yeah.

23         MR. OSWALD:  So that's continuing on with that.

24         And I have another hearing with Judge Ellis, I think,

25   in the afternoon.

1          THE COURT:  Okay.  So she entered -- she just set some

2     briefing, and she entered -- Meg, do you have a copy of that

3     handy?

4          LAW CLERK:  I don't have a copy of the order.  I have

5     the case number I can give --

6          THE COURT:  Okay.

7          LAW CLERK:  -- for counsel's purposes.  It's

8     25 CV 4024.  I can print a copy of the order.

9          MR. BROWN:  Thank you.

10          THE COURT:  I'm going to actually pull it up so I can

11     tell you what the -- what it provided.

12          LAW CLERK:  I don't think it ruled on the TRO, but --

13          THE COURT:  I thought she entered some --

14          LAW CLERK:  She did enter a minute order.

15          MR. OSWALD:  There's a variety of ways of telling us

16     not to touch your client and remove him or anything.  I mean,

17     it's probably ten ways of saying it.

18          THE COURT:  I have -- is it 8040?

19          LAW CLERK:  40 -- I can e-mail you the text right now.

20          THE COURT:  So while we figure that out, I'll ask you

21     for a status in terms of whether you want another hearing.

22     When would be convenient for you to file the status?

23          MR. OSWALD:  Could we do that Tuesday?

24          THE COURT:  Sure.  Close of business Tuesday.

25          MR. OSWALD:  Yeah.

1        THE COURT: And then in terms of further briefing, do

2 you want to do cross briefings on Wednesday? Would that give

3 every -- I know you have a lot. Would that give everybody

4 breathing time? And knowing that then I'm just going -- unless

5 you ask for a hearing, I'm going to then issue an order. Now,

6 if you ask for a hearing -- if you ask for a hearing, I'll

7 probably strike the briefing --

8        MR. OSWALD: Right.

9        THE COURT: -- and say let's come back. We'll have

10 the hearing, and then we'll set briefing again.

11        MR. OSWALD: Right.

12        THE COURT: But assuming if you don't ask for a

13 hearing, would that make sense, or should I just get your

14 status and then set briefing?

15        MR. OSWALD: It's -- I mean, you can set a status and

16 then we could -- you know, if you want to set Wednesday or

17 Thursday or something in there for us to do cross briefs and

18 then you want to do a preliminary, you know, hearing.

19        THE COURT: I'll just issue an order. Yeah, I'll

20 issue an order.

21        MR. BROWN: Cross briefs without responses to the --

22 yes.

23        THE COURT: Yes, no.

24        MR. BROWN: Right.

25        THE COURT: No, no, no.

1        Okay.  So we'll get a status close of business on

2  Tuesday.  Talk to each other in the meantime.  I don't -- you

3  don't have other witnesses?

4        MR. BROWN:  No, not here, Judge.

5        THE COURT:  Okay.  I mean, that you would want to

6  present again.

7        MR. BROWN:  No.

8        THE COURT:  Okay.  So close of business Tuesday.

9        And then I'll set briefing for Thursday, cross

10  briefings, to sort of supplement.  I mean, what I'm struggling

11  with is the likelihood of success, for both of you to

12  understand.  But you can brief anything.

13        And -- but if you talk and in the status you say,

14  "Hey, we need a witness.  We're coming back.  Can we strike the

15  briefing?" you know, I'll read that status report, and I'll pay

16  attention to what you tell me.

17        MS. FORTINO-BROWN:  Quick question, your Honor, if you

18  wouldn't mind.  If we could also supplement the record with

19  more information from Mr. Nali, perhaps an affidavit, as to

20  some of these holes that we're not knowing about with the

21  facts.

22        THE COURT:  Yes.  Irreparable injury, yeah.

23        MR. BROWN:  And we'll do our best to obtain what

24  information we can from DePaul with respect to --

25        THE COURT:  Yes, I understand.

1       MR. OSWALD:  And, your Honor, that would be -- it

2   would be helpful -- I mean, if you can get something from

3   DePaul as to their understanding --

4       THE COURT:  Yeah.

5       MR. OSWALD:  -- as soon as possible so we can respond

6   to that or --

7       THE COURT:  Yeah.

8       MR. OSWALD:  -- clarify or whatever.

9       MR. BROWN:  Sure.

10      THE COURT:  Right.  And if that means another hearing,

11  then that's what that means.  And then we'll take that into

12  account in terms of briefing.

13      Looking at Judge Coleman's hearing.  This is a habeas

14  corpus, declaratory judgment, and injunctive relief.  It's a

15  lot of words.

16      During the pendency of the motion, the Court orders

17  that plaintiff may not be moved anywhere outside the Court's

18  jurisdiction, and plaintiff not be detained for immigration

19  purposes in any way, shape, or form.  That's my neighbor.  I

20  set the status -- set this matter for status.  So that's pretty

21  plainspoken.

22      MR. BROWN:  That would be acceptable.

23      THE COURT:  Okay.  So I'll enter something akin to

24  that.  Okay?

25      MR. BROWN:  Thank you, your Honor.

1          MS. FORTINO-BROWN:  Thank you.

2          THE COURT:  But it doesn't really get to where we're

3    going.

4          MR. BROWN:  Right.

5          THE COURT:  And it doesn't address irreparable -- it

6    doesn't really address irreparable injury, and it doesn't

7    address likelihood of success.

8          MR. OSWALD:  Right.

9          THE COURT:  It's just really saying to the person, you

10   know, be calm.

11         MR. OSWALD:  I understand.  And -- but as is in the

12   affidavit, they're not contesting that he's -- even though

13   they're saying he's in status.  So I don't think there's going

14   to be a problem with dealing with, you know, bringing that

15   order or any problem with it.  But there's -- it doesn't

16   address the major issue.

17         THE COURT:  Yeah.  So I have so much respect for you.

18   And I -- in fact, I think I was at an event where you received

19   an award because of your years of service in this area.

20         The way that your client is conducting this kind of

21   stuff, it's causing fear.  And maybe that's the point.  I don't

22   know.  And now we have all this litigation for courts who are

23   getting hit by budget cuts, you know, every year, so we're all

24   slammed, which is -- no judge should ever complain because we

25   get -- we have the best jobs.  And when judges complained and I

1   was a lawyer, I always thought get a real job.  So I take my

2   own advice.

3          But there's so many different ways to deal with this

4   kind of stuff.  And I just hope, because I have so much respect

5   for you, Mr. Oswald, and I trust that your client has a lot of

6   respect for you, that, you know, you can talk to them about the

7   manner because there's no reason to put this guy into terror.

8   But that's outside my lane.

9          Okay.  I'll hear from you on Tuesday, and we'll either

10  be back here or you'll file briefs.

11         Thanks, everybody for all --

12         MR. BROWN:  Thank you, your Honor.

13         THE COURT:  -- the excellent briefing.

14         MR. OSWALD:  Thank you.

15         MR. BROWN:  We wish you a Good Friday.

16         THE COURT:  Yeah.  Have a good weekend.

17     (Concluded at 12:20 p.m.)

18                          * * * * *

19     I certify that the foregoing is a correct transcript of the

20  record of proceedings in the above-entitled matter.

21

22  /s/ LAURA RENKE                          April 19, 2025
    LAURA RENKE, CSR, RDR, CRR
23  Official Court Reporter

24

25

1              I N D E X

2    WITNESS                                                    PAGE

3    STEPHEN NAVARRE

4        Direct by Mr. Brown ............................... 21
         Cross by Mr. Oswald .............................. 33
         Redirect by Ms. Fortino-Brown ...................... 46
5        Exam by the Court ................................ 49
         Recross by Mr. Oswald ............................ 57

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit F

Order, *Nali v. Noem, et al.,* 1:25-cv-03969,
04/18/2025

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF NextGen 1.8 (rev. 1.8.3)
### Eastern Division

Vishnu Nali

                Plaintiff,

v.

                Case No.: 1:25−cv−03969
                Honorable Mary M. Rowland

Kristi Noem, et al.

                Defendant.

---

# NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Friday, April 18, 2025:

      MINUTE entry before the Honorable Mary M. Rowland: Motion hearing held on 4/18/2025. Plaintiff Nali brings suit for violation of his due process rights under the Fifth Amendment and the Administrative Procedure Act arising from Defendants' termination of his Student and Exchange Visitor Information Systems ("SEVIS") record. [3]. Plaintiff Nali moved for a temporary restraining order to (i) enjoin Defendants from terminating his F−1 student status under the SEVIS system, and (ii) require Defendants to set aside their F−1 student status termination determination. [4]; [5]. The motion was presented to the Court on 4/18/25 and expert witness testimony was taken. Defendants to submit a status report by 4/22/25 at 5 pm CST to indicate whether they request a hearing on the motion to present witnesses. Plaintiff granted leave to supplement the record as discussed on the record. The parties to file cross−briefs by 4/24/25 at 5 pm CST. Once fully briefed, the Court will take the motion under advisement. During the pendency of the motion, the Court orders that defendants may not arrest or detain Plaintiff or cause Plaintiff to be arrested or detained based on the revocation of his F−1 visa or the termination of his SEVIS record or for any immigration purpose and may not remove Plaintiff or cause Plaintiff to be removed from the Northern District of Illinois. Mailed notice. (jg, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at **www.ilnd.uscourts.gov**.

# Exhibit G

Declaration of Brian Childs, Senior Director of
the International Student & Scholar Services
Office of Western Michigan University

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

B K, et. al.,

      Plaintiffs,

v.

Noem, et al.

      Defendants.

Case No. 1:25-cv-419

Hon. Jane M. Beckering

Magistrate Judge Phillip J. Green

I, Brian Childs, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1. I am the Senior Director of the International Student & Scholar Services office of Western Michigan University. Western Michigan University ("WMU") is certified by the Student and Exchange Visitor Program ("SEVP") to enroll nonimmigrant F-1 students at our institution. SEVP uses the Student and Exchange Visitor Information System ("SEVIS") to track and monitor F-1, M-1, and J-1 nonimmigrants.

2. All SEVP-certified schools are required to have a Designated School Official (this includes the Primary DSO, or "DSO" and any other "DSO"). I am one of the DSOs for WMU. The DSO is responsible for the institution's communication with the SEVP program, updating F-1 student records, helping F-1 students maintain their status by providing guidance, and creating the form I-20 for F-1 students. Among other things, I lead our team of twelve DSOs and help advise WMU students on work authorization, applying for a driver's license, transferring to a new school, traveling outside of the United States, and navigating

class absences while ensuring students do not violate the terms of their F-1 nonimmigrant status. I have maintained the role of a DSO at WMU since December 7, 2024. I have also been a DSO for over ten years having served at previous institutions (Bowling Green State University, University of California – Santa Cruz, and California State University, Monterey Bay).

3. The SEVIS program collects, maintains, and analyzes information for nonimmigrants in the F, M, and J visa categories. Upon an F-1 student's acceptance into WMU, a DSO is responsible for registering the student in SEVIS and issuing a Form I-20, "Certificate of Eligibility for Nonimmigrant (F-1) Student Status – For Academic and Language Students." This I-20 is submitted and managed through SEVIS, and the form is required for the F-1 student to apply for a visa, enter the United States, and apply for various benefits. As a DSO, I am also responsible for the termination of SEVIS records on behalf of WMU.

4. There are a number of ways a DSO can end programs in SEVIS. They can cancel the SEVIS record in initial status, complete the program, shorten the program, or terminate the record.

5. The SEVIS record may be terminated by WMU for a number of reasons. Many of the reasons a student would be terminated are geared around the student not fulfilling the requirements of being an F-1 student, including failing to enroll, not taking a full course load, participating in unauthorized employment, among others. These terminations all carry significant negative consequences.

6. Depending on the reason for termination, WMU contacts the student to inform them of the SEVIS record termination and the requirement to depart the United States, in accordance with the relevant guidance and regulations. For example, if an F-1 student withdraws from

the program prior to its completion with DSO authorization, we inform the student that they must leave the United States within 15 days of the SEVIS record termination date. However, if the SEVIS record is terminated for a violation of F-1 status, we inform the student that there is no grace period and they are required to leave the United States immediately.

7. It should be noted that there are also benign or informational reasons that a student's status may be terminated in SEVIS. For example, when a student changes or adjusts status from an F-1 to another nonimmigrant visa or Permanent Resident status, the SEVIS record is terminated and the individual is then governed by the rules of the new status. Regardless of the reason for the termination, all SEVIS terminations result in the loss of all benefits by the student associated with their student status.

8. As a DSO, I have personally overseen the termination of F-1 student SEVIS records for a number of reasons, including student authorized early withdrawal, failure to enroll, unauthorized employment, and unauthorized drop below full course.

9. In order to terminate a student's SEVIS record, a DSO is required to select a Termination Reason from a drop-down list within SEVIS.

10. Beginning March 28, 2025, a number of WMU students had their SEVIS record terminated by SEVP. This was first discovered by me on April 3, 2025 when I performed my own check of student SEVIS records. Initially, each of these students' Termination Reason was listed in SEVIS as "Otherwise Failing to Maintain Status."

11. For the students initially terminated by SEVP between March 28, 2025 and April 8, 2025 based on "Otherwise Failing to Maintain Status," the reason was switched to "Other." "Other" is not a Termination Reason that is or has ever been available in the drop-down

menu available to DSOs. All students terminated since April 8, 2025 by SEVP have been terminated with the "Other" Termination Reason.

12. When "Otherwise Failing to Maintain Status" is used as the Termination Reason, an explanation must also be provided. The students being terminated with this reason were all provided one of two explanations, "Student identified in criminal records check. Terminated pursuant to INA 237(a)(1)(C)(i)/ 8 USC 1227(a)(1)(C)(i)" or "Individual identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated." All three of the WMU Plaintiffs here had the second explanation.

13. When the Termination Reason was switched to "Other" on or around April 8, 2025, the explanations were all changed to "Individual identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated." In all my experience as a DSO, I had never seen this Termination Reason or explanation for student terminations before the recent terminations by SEVP.

14. Plaintiff Madan B K is a Western Michigan University student. Plaintiff B K's SEVIS record was terminated on April 4, 2025 with the initial reason of "Otherwise Failing to Maintain Status." The termination explanation field stated, "Individual identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated."

15. Plaintiff Geran "Gloria" Gao is a Western Michigan University student. Plaintiff Gao's SEVIS record was terminated on April 10, 2025. The Termination Reason was "Other." The termination explanation field stated, "Individual identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated."

16. Plaintiff Pranil Titare is a Western Michigan University student. Plaintiff Titare's SEVIS record was terminated on April 4, 2025. The Termination Reason was "Otherwise Failing to Maintain Status." The termination explanation field stated, "Individual identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated."

17. WMU received no notice of these students' SEVIS terminations from any federal agency, including SEVP. The terminations were only discovered because of my personal review of WMU's SEVIS account.

18. It was then my office's responsibility to communicate to the WMU Plaintiffs that their SEVIS records had been terminated.

19. WMU has never received guidance from SEVP or any other federal agency pertaining to a student's necessary departure or departure dates for the newly added Termination Reason "Other."

20. As a general matter, a DSO may submit a correction request in SEVIS should an error have occurred on a student's record. There are three correction options available on a Terminated record: "Request Change to Program Dates," "Student Status," and "Request Change to Termination Reason."

21. When the record is terminated, the program dates do not change, thus submitting a "Request Change to Program Dates" is not appropriate and cannot be used to correct the student's SEVIS status. Using "Request Change to Termination Reason" will merely change the Termination Reason and will not change the SEVIS status back to active, so that correction request is not appropriate. This leaves the "Student Status" reason as a possible option. However, instructions in SEVIS clearly indicate to use this option for a

DSO error. SEVIS states (emphasis added), "Use this to change the student's current SEVIS record status to the correct one. **Only use this if the student's record is in an incorrect status due to a DSO error.** Do not use this if the student failed to maintain his immigration status and requires reinstatement." These terminations were not the result of any DSO error so this is not an appropriate request to make. As such, the Corrections request does not provide an available option to properly return a student to Active status in this case.

22. When a SEVIS record is terminated, a DSO can no longer update the record to convey changes in student information such as name, address, enrollment status, or adjustment to the program completion date. However, the school is required by 8 C.F.R. § 214.3 (g)(2) for the school to update this information in SEVIS. As such, if a student was terminated in SEVIS, but still seen to be in F-1 status, it would be impossible for WMU to comply with federal regulatory requirements and thus the student would also be noncompliant with the regulations. In addition, after the termination of a SEVIS record, a DSO cannot print an I-20 for the student.

23. It is and has always been the understanding of WMU that all F-1 international students must maintain a valid I-20 in SEVIS in order to remain in valid F-1 status.

24. Upon enrollment in WMU, F-1 international students are required to review and sign WMU's "Maintaining International Student Status/Enrollment" form. This form is meant to provide an overview of the requirements of F-1 students to remain in valid F-1 status.

25. This form states, among several other requirements, that the student "must maintain a valid, unexpired I-20 or DS-2019 at all times. This includes correct education level, major, current funding, and correct personal data."

26. 8 C.F.R. § 214.2(f)(5)(iv) states that an F-1 student who "otherwise fails to maintain status is not eligible for an additional period for departure."

27. Given WMU's standard practice and the legal requirements of 8 C.F.R. § 214.2(f)(5)(iv) and 8 U.S.C. § 1227(a)(1)(C)(i), it was WMU's understanding and belief that a student terminated under the "Otherwise Failing to Maintain Status" category must immediately depart the United States.

28. However, given the uncertainty of the legal effect of the novel Termination Reason "Other," we immediately advised each of our students in this situation to consult outside immigration counsel to evaluate the consequences of the termination.

29. Over the next two weeks, I discovered several other SEVIS terminations and also advised those students to seek outside legal counsel.

30. Even prior to the March and April 2025 SEVIS terminations, it has always been clear that once an F-1 student's record in SEVIS is terminated, regardless of the reason, that student immediately loses all on- and off-campus employment authorization based on their F-1 nonimmigrant status. This includes employment authorization for on-campus employment, graduate assistant positions, Curricular Practical Training ("CPT"), Post-Completion Optional Practical Training ("OPT"), as well as the STEM OPT extension for those who have completed a degree in science, technology, engineering, or mathematics.

31. The interruption in on-campus employment authorization has a significant impact on student workers and graduate assistants who rely on work authorization positions to pay their tuition. This also has an adverse impact on the institutions that depend on graduate assistants to teach classes and perform critical research.

32. Similarly, termination of employment authorization, including CPT and OPT, not only causes harm to the student, but also the student's employer.

33. The WMU students working on OPT, which includes Plaintiff Titare, whose SEVIS records were terminated by SEVP had their OPT canceled and the end date on their OPT in SEVIS changed by SEVP to match the termination date. It is impossible to argue that such students, including Plaintiff Titare, still have OPT employment authorization.

34. Additionally, students are not able to leave and re-enter the United States on a terminated SEVIS record. The Study in the States guidance also explains that, upon termination, Immigration and Customs Enforcement ("ICE") may investigate to confirm the student has departed.

35. While the Department of Homeland Security ("DHS") has always had the ability to terminate a student's SEVIS records, I have never witnessed or have any knowledge of SEVIS terminations conducted in a manner similar to the March/April 2025 wave of terminations. I have no knowledge of DHS SEVIS record terminations for students who have not clearly violated the relevant international student regulations.

36. Historically, I am aware of only limited circumstances in which DHS has conducted SEVIS terminations for students. For example, they would terminate a student's SEVIS record if they were approved for a Change of Status.

37. There are procedures to correct a student's SEVIS status, but it does not appear that the students in this matter are eligible for this process. SEVIS reinstatement necessitates that the student has failed to maintain the terms of his or her immigration status. Since the students did not fail to maintain the terms of their immigration status, reinstatement would be improper.

38. Even if reinstatement was an option that made sense in this case, for students on post-completion OPT, this would still not be an option. 8 C.F.R.§ (f)(16)(i)(C) requires that someone applying for reinstatement "[i]s currently pursuing, or intending to pursue, a full course of study in the immediate future at the school which issued the Form I-20." These students do not apply to, nor are they admitted to new programs while also pursuing their practical training, because their intention is to engage in practical training.

39. Given the circumstances described in this Declaration and the Complaint, WMU is unaware of any proper mechanism for the impacted students' records in SEVIS to be reactivated. Therefore, it is the understanding of WMU that the affected students, who no longer maintain a valid I-20, are ineligible to continue their time in the United States or retain any employment authorization associated with their F-1 nonimmigrant status.

40. Termination of a student's record in SEVIS is a serious matter that carries with it significant, life-changing consequences for a student, including those that impact a student academically, socially, physically, and emotionally. Accordingly, the termination of a SEVIS record is typically done after a thorough examination of a student's potential infraction in the context of established regulations governing international students and scholars.

41. SEVIS Termination should not be undertaken lightly. It has serious ramifications on a student's ability to study, afford their time in the U.S., ability to travel to see loved ones, and more.

42. The unilateral and abrupt nature of the federal government's termination of SEVIS records over the past three weeks is far outside the ordinary course, is inconsistent with how such

terminations are normally handled, and does not appear, in my opinion and experience, to have been thoughtfully communicated and carried out.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of April 2025.

Brian Childs, Ed.D.
Designated School Official (DSO)
Senior Director
International Student & Scholar Services
Haenicke Institute for Global Education
Western Michigan University
wmich.edu/international
269-387-5873

# Exhibit H

Copy of Notice of Intent to Deny, U.S.
Citizenship and Immigration Services, April 18,
2025



April 18, 2025

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
California Service Center
2642 Michelle Drive
Tustin, CA 92780



**U.S. Citizenship
and Immigration
Services**



1OE0930560264



A130-184-944

c/o DANIEL WILLIAM OLDENBURG
CLINE WILLIAMS
233 SOUTH 13TH ST STE 1900
LINCOLN, NE 68508

Form I-129,
Petition for a Nonimmigrant Worker

<u>PREMIUM PROCESSING</u>

<u>NOTICE OF INTENT TO DENY</u>

On March 6, 2025, your organization,                                        , filed a Form I-129,
Petition for a Nonimmigrant Worker (Form I-129), with U.S. Citizenship and Immigration Services
(USCIS), seeking to classify                        (beneficiary) as a temporary worker in a specialty
occupation (H-1B) under section 101(a)(15)(H)(i)(b) of the Immigration and Nationality Act (INA).

Section 101(a)(15)(H)(i)(b) of the INA relates to an alien:

> ...who is coming temporarily to the United States to perform services...in a specialty occupation
> described in section 214(i)(1)..., who meets the requirements for the occupation specified in
> section 214(i)(2)..., and with respect to whom the Secretary of Labor determines and certifies to
> the Attorney General that the intending employer has filed with the Secretary an application
> under 212(n)(1).

You seek new employment for the beneficiary and requested that USCIS change the beneficiary's
status.

You stated on the petition that you are a public school district with 583 employees. You seek to
employ the beneficiary as an Elementary Teacher.

In visa petition proceedings, the petitioner bears the burden of establishing eligibility for the benefits
sought. *Matter of Brantigan*, 11 I&N Dec. 493 (BIA 1966).

USCIS reviewed the initial record of evidence for eligibility in accordance with the INA; Title 8, Code
of Federal Regulations (8 CFR); and any other applicable statutes and regulations, and could not
determine whether you had established eligibility for the benefit sought.

In accordance with *Matter of Chawathe*, 25 I&N Dec. 369 (AAO 2010), USCIS has examined the
evidence of record for relevance, probative value, and credibility, both individually and within the
context of the totality of the evidence, and determined that you have not established eligibility for the
requested classification by a preponderance of the evidence.

Accordingly, USCIS intends to deny the petition and any change of status for reasons discussed below. In accordance with 8 CFR 103.2(b)(16)(i), when USCIS intends to make a decision that will be adverse to you and it is based on information of which you are unaware, USCIS must notify you and allow a period of time for rebuttal.

We have encountered potentially adverse information related to the beneficiary. In order to continue processing your application or petition, we require an updated address for the beneficiary so that we may collect biometric data.

## Maintenance of Status

The first issue to be discussed is whether the beneficiary maintained the beneficiary's nonimmigrant status.

INA 248(a) states, in part:

> The Secretary of Homeland Security may, under such conditions as he may prescribe, authorize a change from any nonimmigrant classification to any other nonimmigrant classification in the case of any alien lawfully admitted to the United States as a nonimmigrant who is continuing to maintain that status...

8 CFR 248.1(b) states:

> Except in the case of an alien applying to obtain V nonimmigrant status in the United States under §214.15(f) of this chapter, a change of status may not be approved for an alien who failed to maintain the previously accorded status or whose status expired before the application or petition was filed, except that failure to file before the period of previously authorized status expired may be excused in the discretion of USCIS, and without separate application, where it is demonstrated at the time of filing that:
>
> > (1) The failure to file a timely application was due to extraordinary circumstances beyond the control of the applicant or petitioner, and USCIS finds the delay commensurate with the circumstances;
> >
> > (2) The alien has not otherwise violated his or her nonimmigrant status;
> >
> > (3) The alien remains a bona fide nonimmigrant; and
> >
> > (4) The alien is not the subject of removal proceedings under 8 CFR part 240.

USCIS records show that the beneficiary attended            `University as an F-1 nonimmigrant from August 7, 2022 to May 11, 2024 (N0017163255). The beneficiary was approved for post-completion Optional Practical Training (OPT) from July 10, 2024 to July 9, 2025 (IOE9700371633). However, records show that the Department of State revoked the beneficiary's F-1 visa on March 20, 2025. According to the beneficiary's SEVIS record (N0017163255) their F-1 nonimmigrant status was terminated on April 10, 2025 because of the criminal records check and the revocation of their F-1 visa.

You filed the current petition on March 6, 2025. It appears that the beneficiary is not in valid F-1 nonimmigrant status, as such, the request for a change of nonimmigrant status may not be approved. If the petition is approved, it will be forwarded to a U.S. consulate abroad for visa processing. Therefore, identify a location abroad for visa notification.

As such, the beneficiary failed to maintain the beneficiary's nonimmigrant status.

USCIS encourages you to sign up for a USCIS online account. To learn more about creating an account and the benefits, go to https://www.uscis.gov/file-online

## CRIMINAL OFFENSES

 Records show the beneficiary has been arrested. You provided no evidence to account for, and explain, the circumstances surrounding the beneficiary's arrest.

USCIS records currently indicate that the beneficiary's criminal history as follows:

- The beneficiary's arrest and charges on February 22, 2025.

You must provide documentation about the beneficiary's arrest, the associated charges, and the subsequent dispositions for each charge, whether dropped, suspended, or resulting in a conviction.

Please submit certified copies of all court and police records showing the charges and dispositions for every arrest listed above. This evidence is requested even if the beneficiary's criminal records were sealed, expunged, cleared, or otherwise closed. Certified court dispositions should be issued from the court that held jurisdiction over the beneficiary's criminal proceedings.

The documents you provide should address each of the following:

    a)  The final disposition or outcome (sentence, probation, dismissal, etc.) of all charges since the beneficiary's admission as a F-1 nonimmigrant. The charges and dispositions must be specifically identified, listing only numeric citations or legal codes is not sufficient unless provided with clarifying documentation.

    b)  If the beneficiary was convicted of any charges, you should also provide evidence showing whether the charge for which the beneficiary was convicted was classified as a felony or misdemeanor. You may submit a copy of the pertinent statute, sentencing guideline, or statement from the court clerk or police department for this purpose.

If the beneficiary's conviction resulted in an alternative sentencing program, suspended sentence, or the participation in a rehabilitative program (such as a drug treatment or community service program), you should submit an original or court certified copy of the beneficiary's sentencing record for each incident, and evidence that the beneficiary completed their sentence. Specifically, you should submit:

    a)  An original or certified copy of the beneficiary's probation or parole record, or
    b)  Evidence that the beneficiary completed an alternative sentencing program, suspended sentence or rehabilitative program.

If a final disposition is not available, the beneficiary should obtain a certified letter from the court confirming the lack of court records. All submitted documentation should be original or a certified copy. Certified copies must include a court seal stamp on the document.

Please note, USCIS will consider all credible evidence submitted in support of your Form I-129, but will determine, in its sole discretion, the evidentiary value of all documentation submitted.

You are afforded 30 days from the date of this notice to submit additional information, evidence or arguments to support the petition.  Additionally, when USCIS serves a notice by mail, three days are added to the prescribed period in which to respond. Any such evidence or arguments will be carefully reviewed prior to a final determination in this matter.  Failure to respond, however, will result in adjudication of the petition on the basis of the record, as it is now constituted, including the information referred to above.

USCIS encourages you to sign up for a USCIS online account. To learn more about creating an account and the benefits, go to https://www.uscis.gov/file-online

**Your response must be received in this office by May 21, 2025.**

**PLACE THE ATTACHED COVERSHEET AND THIS ENTIRE LETTER ON TOP OF YOUR RESPONSE.**

Sincerely,

John M. Allen
SCOPS Deputy Associate Director of Adjudications

USCIS encourages you to sign up for a USCIS online account. To learn more about creating an account and the benefits, go to https://www.uscis.gov/file-online



**PREMIUM PROCESSING**
**COVERSHEET**
**SCANNING REQUIRED**
PLEASE RETURN THE REQUESTED INFORMATION AND
ALL SUPPORTING DOCUMENTS **WITH**
**THIS PAGE ON TOP TO:**
**USCIS TSC**
**Attn: RFE/NOIT/NOIR/NOID RESPONSE**
**6046 N Belt Line Rd. STE 111**
**Irving, TX 75038-0011**
If your response is 25 pages or less, you have the option to reply by fax at **(802) 860-6932**.
If you have any questions, you may contact the Premium Processing Team via e-mail
at: **CSC-PREMIUM.PROCESSING@USCIS.DHS.GOV**
or call our toll-free number **(866) 315-5718**.

Please check the appropriate box regarding if there is a new Form G-28, Notice of Entry of Appearance as
Attorney or Accredited Representative, additional fees, additional forms, etc.  Please place the new Form
G-28, additional fees, additional forms directly under this sheet.

**Yes, there is:**

☐ **A New G-28**      ☐ **Additional Fees**

☐ **Additional Forms**      ☐ **Other:**

If you have moved, write your current address in the blank area below. Please be sure to write clearly.

> **(Select appropriate check box)**
>
> ☐ **Applicant/Beneficiary**      ☐ **Petitioner**
>
> **New Address:**

As required by Title 8, Code of Federal Regulations (8 CFR) section 265.1, *Reporting change of address*:
Except for those exempted by section 263(b) of the Act, all aliens in the United States required to register
under section 262 of the Act must report each change of address and new address within 10 days of such
change in accordance with instructions provided by USCIS.

### NOTICE OF INTENT TO DENY

Form I-129, Petition for a Nonimmigrant Worker



IOE0930560264

COLMAN, MARC

A130-184-944

California Service Center
P.O. Box 30113
Tustin CA 92781





**U.S. Citizenship
and Immigration
Services**



66508$2095 C012