**EXHIBIT INDEX**

**Second Supplement to Consolidated Reply to Defendants' Responses in Opposition to Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction and Motion to Proceed Under Pseudonym**

*Arizona Student Doe #1*

*v.*

*Donald J .Trump, et al.*

| Exhibit No. | Description |
|:---:|:---|
| A | Declaration of PDSO Nusha Shishegar, April 21, 2025 |
| B | Order on Motion for Temporary Restraining Order, Mohammed H. v. Donald Trump et al, 0:25-cv-01576-JWB-DTS, D. Minn., April 22, 2025 |
| C | NAFSA: Association of International Educators Biography, Nusha Shishegar, April 23, 2023 |
| D | Demonstrative Exhibit: Comparative Circumstances of Arizona Student Doe #1 and Mohammed H. |

# EXHIBIT A

## Declaration of PDSO Nusha Shishegar, April 21, 2025

**DECLARATION OF NUSHA SHISHEGAR**

I, Nusha Shishegar, hereby declare under the penalty of perjury to the following:

1) I have served as a Primary Designated School Official (PDSO) for approximately 15 years and as a Designated School Official (DSO) for approximately 18 years.

2) All academic institutions certified by Immigration and Customs Enforcement's (ICE) Student Exchange Visitor Program (SEVP) to admit F-1/M-1 students into their programs are required to have at least one PDSO to communicate with SEVP and to ensure compliance with numerous student reporting requirements required by regulation[1] through SEVP's Student and Exchange Visitor Information System (SEVIS).[2]

3) I use SEVIS to monitor F-1 students and/or F-2 dependents who maintain their status.

4) Academic Institutions through PDSOs and Designated School Officials (DSO) are required to validate the SEVIS record of each student within 30 days of the start of every required academic term to confirm that someone is enrolled in a full course of study.

5) DSOs use SEVIS to update F-1/M-1 student addresses which are required to be reported by the principal holder within 10 days of moving to a new residence.

6) DSOs use SEVIS to approve or recommend an F-1 student for off-campus employment authorization, including Curricular Practical Training (CPT) or Optional Practical Training (OPT).

7) If a student transfers to another school, DSOs use SEVIS to send the student's record to another school for a new educational program.

8) DSOs use SEVIS to change the educational level if the student changes academic levels (such as when a student progresses from a bachelor's program to a graduate program) or majors within levels (such as an associates degree student who continues to a new associates degree program after graduation).

9) If a student fails to comply with the terms of her F-1/M-1 status, DSOs are required to terminate the student's SEVIS record.[3]

10) Termination of a student's SEVIS record ends all of the benefits of F-1/M-1 status, including but not limited to all on- and/or off-campus employment authorization such as CPT and OPT.

11) United States Citizenship and Immigration Services (USCIS) will also not approve an OPT employment authorization document (EAD) if a SEVIS record is terminated.

---

[1] https://www.ice.gov/sevis/schools/reg#2143g

[2] https://studyinthestates.dhs.gov/2014/04/students-what-dso; https://www.ice.gov/sevis/dso-requirements

[3] https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/terminate-a-student

12) USCIS will consider a terminated record as a lack of status or failure to maintain status for the student, which renders the student out of status.[4]

13) After a student's SEVIS record is terminated, SEVP advises that the student must either apply for reinstatement or the student and dependents must leave the United States immediately.[5]

14) If a student fails to maintain F-1/M-1 status, the DSO can recommend the student for reinstatement on SEVIS Form I-20.[6]

15) DSOs cannot recommend students for reinstatement if they have not failed to maintain F-1/M-1 status and are instead maintaining F-1/M-1 status as confirmed by SEVP through an active SEVIS record.

16) The Department of Homeland Security (DHS), through ICE and United States Customs and Border Protection (CBP), have always considered a SEVIS termination as termination of F-1/M-1 lawful status in the United States.

17) The U.S. Department of State (DOS) will not issue an F-1/M-1 visa to a student based upon a terminated SEVIS record.

18) CBP will not admit an F-1/M-1 student into the United States on a terminated SEVIS record.[7]

19) I am familiar with the thousands of SEVIS terminations ICE initiated in March and April 2025.

20) I am familiar with the notices that advised DSOs that students with terminated SEVIS records had to leave the United States.

21) DSOs have contacted the SEVP Response Center (SRC) to request a correction of the terminated SEVIS records and SRC has indicated that the record is not eligible for a "data fix" or correction.

22) I have read and considered the sworn testimony of Andre Watson, Assistant Director, National Security Division, Homeland Security Investigation, U.S. Immigration and Customs Enforcement, U.S. Department of Homeland Security.

23) In particular, I have read and considered the statement from Mr. Watson that "Terminating a record in SEVIS does not terminate an individual's nonimmigrant status in the United States."

24) In my experience, ICE has always taken the opposite position that terminating a record in SEVIS does result in the termination of an F-1/M-1 student's nonimmigrant status in the United States.

25) The position of Mr. Watson is different than the public position of ICE and all previous statements and guidance I received during my career.

---

[4] 8 CFR 214.2(f)(16), 8 CFR 214.2(f)(6)(iii), 8 CFR 214.2(f)(7)(iii) and 8 CFR 214.3(g)(1).

[5] https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/terminate-a-student

[6] https://studyinthestates.dhs.gov/2016/07/how-should-f-or-m-student-file-reinstatement

[7] https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/terminate-a-student

26) The position of Mr. Watson is also discordant with language found in the regulations at 8 CFR 214.2(f) and 8 CFR 214.3(g).

27) A termination of the SEVIS record would naturally terminate a student's F-1/M-1 status and cut off any ability for the student to maintain F-1/M-1 status absent being approved by the USCIS for reinstatement after the USCIS accepts the student's reason for the status violation.

28) Additionally, the F-1/M-1 student would not be eligible for reinstatement if according to the position of Mr. Watson that SEVIS termination does not affect F-1/M-1 status because reinstatement is only available if the student has violated status.

29) Furthermore, ICE has notified F-1 students with OPT Employment Authorization Documents (EAD) through the SEVP Portal that their OPT authorization has summarily ended which would not occur if, according to the position of Mr. Watson, that SEVIS termination does not affect F-1 status.[8]

30) Moreover, a termination of SEVIS records disallows any student (especially students on CPT or OPT) to continue maintaining status because such students need an active SEVIS record to meet regulatory program reporting requirements.[9]

31) ICE indicates that "For DHS to fulfill [its national security] mission, the information contained within SEVIS and the portal must be accurate, complete and up to date. Inaccurate information jeopardizes an international student's ability to legally remain in the United States."[10]

32) Students with a terminated SEVIS record are left with no options: they will not be able to timely meet ICE's numerous reporting requirements through SEVIS which would otherwise be a requirement to maintain lawful status.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of April 2025.

Nusha Shishegar

---

[8] https://www.uscis.gov/policy-manual/volume-2-part-f-chapter-5  (USCIS Policy Manual stating that failure to maintain status is one of the few reasons for automatic termination of OPT). Also 8 CFR 214.2(f)(9)(ii)(A) (employment authorization is automatically terminated whenever the student fails to maintain status)

[9] https://studyinthestates.dhs.gov/sevp-portal-help/maintain-information/opt-student-reporting-requirements; https://studyinthestates.dhs.gov/assets/sevpstemoptreportingrequirementsfinal.pdf

[10] https://studyinthestates.dhs.gov/sevp-portal-help/maintain-information/opt-student-reporting-requirements

# EXHIBIT B

## Order on Motion for Temporary Restraining Order, Mohammed H. v. Donald Trump et al, 0:25-cv-01576-JWB-DTS, D. Minn., April 22, 2025

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Mohammed H.,

     Petitioner,

v.

Donald J. Trump, *in his official capacity as President of the United States*; Pamela Bondi, *in her official capacity as Attorney General of the United States*; Peter Berg, *in his official capacity as Saint Paul Field Office Director, United States Immigration and Customs Enforcement*; Jamie Holt, *in her official capacity as St. Paul Agent in Charge for Homeland Security Investigations for U.S. Immigration and Customs Enforcement*; Todd Lyons, *in his official capacity as Acting Director, United States Immigration and Customs Enforcement*; Kristi Noem, *in her official capacity as Secretary of the United States Department of Homeland Security*; Marco Rubio, *in his official capacity as Secretary of State*; Ryan Shea, *in his official capacity as Freeborn County Sheriff*; and Mike Stasko, *in his official capacity as Freeborn County Jail Administrator*,

     Respondents.

Civ. No. 25-1576 (JWB/DTS)

**ORDER ON
MOTION FOR TEMPORARY
RESTRAINING ORDER**

---

Amanda S. Mills, Esq., Anupama D. Sreekanth, Esq., and Joseph T. Dixon, III, Esq., Fredrikson & Byron, P.A.; Benjamin Casper, Esq., and Teresa J. Nelson, Esq., American Civil Liberties Union of Minnesota; Hanne Margit Sandison, Esq., The Advocates for Human Rights; and Linus Chan, Esq., University of Minnesota Detainee Rights Clinic, counsel for Petitioner.

Ana H. Voss, Esq., United States Attorney's Office, counsel for Respondents Donald J. Trump, Pamela Bondi, Peter Berg, Jamie Holt, Todd Lyons, Kristi Noem, and Marco Rubio.

David John Walker, Esq., Freeborn County Attorney's Office, counsel for Respondent
Ryan Shea.

The allegations in this case, if proven, would reflect a grave misuse of
immigration authority and a breach of the Constitution's basic principles. Petitioner
Mohammed H. claims he is being held by the federal government not for some
disqualifying offense or violation of visa terms, but for expressing political views that the
Executive Branch disfavors. His allegations, if substantiated, strike at the heart of the
First Amendment and challenge fundamental guarantees of due process. This temporary
restraining order is issued to preserve jurisdiction and prevent irreparable harm while
Petitioner's claims are adjudicated.

## BACKGROUND

Petitioner is a 20-year-old Bangladeshi national studying Management
Information Systems at Minnesota State University, Mankato. (Doc. No. 1-1, Petitioner
Decl. ¶¶ 2, 5–9.) He lawfully entered the United States in 2021 on an F-1 student visa and
was, until his arrest last month, in good standing with his university. (*Id.*) On March 28,
2025, Department of Homeland Security ("DHS") officers detained Petitioner outside his
home, purportedly based on a visa revocation and termination of his SEVIS record—the
Student and Exchange Visitor Information System, a federal database used to track
international students. (*Id.* ¶¶ 42–44, 58; Doc. No. 1 ¶¶ 64–65.) Petitioner remains in
Immigration and Customs Enforcement ("ICE") custody at the Freeborn County Jail in
Albert Lea, Minnesota. (Petitioner Decl. ¶¶ 47–48; Doc. No. 1 ¶ 7.)

After a bond hearing on April 9, 2025, the Immigration Court found that Petitioner is not a danger to the community and ordered him released on a $7,500 bond. (*See* Doc. No. 1-2, Ex. B at 3–6.) DHS appealed the decision and invoked an automatic stay under 8 C.F.R. § 1003.19(i)(2), blocking Petitioner's release pending the outcome. (*Id.* at 3; Doc. No. 1 ¶ 36.) The government later cited Petitioner's 2023 misdemeanor disorderly conduct conviction as a contributing factor justifying its enforcement action. (*See* Doc. No. 1-8, Ex. H at 3.) But as the Immigration Court noted, that offense resulted in a stayed sentence after which Petitioner completed probation. (Doc. No. 1-2, Ex. B at 3–4.)

Petitioner alleges he was targeted because of his protected speech, including social media posts advocating for Palestinian human rights, and not for any legitimate immigration violation. (Doc. No. 1 ¶ 78; Petitioner Decl. ¶¶ 11–12, 57–59; Doc. No. 9, 2d Petitioner Decl. ¶ 6.) He further alleges that his arrest is part of a broader DHS campaign to silence or chill pro-Palestinian expression among international students. (*See* Doc. No. 1 ¶¶ 17–47; Doc. No. 8 at 2–10.) He claims that his ongoing detention violates his First Amendment free speech rights, his Fifth Amendment due process rights, and the Administrative Procedure Act. (*See* Doc. No. 1 ¶¶ 83–101.) He now seeks a temporary restraining order ("TRO") that either requires his immediate release from custody or bars Respondents from transferring him away from the District of Minnesota. (Doc. No. 6.)

## DISCUSSION

### I.   Legal Standard

A TRO is an extraordinary remedy, which the movant must establish is warranted. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). Courts evaluating TROs

consider (1) the threat of irreparable harm to the movant; (2) the balance between the threatened harm and the injury an injunction will inflict on the opposing parties; (3) the movant's likelihood to succeed on the merits of their claims; and (4) the public interest. *See Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)). Where, as here, the government is the opposing party, the last two factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

No single factor is determinative. *See United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998). The core question is whether justice requires preserving the status quo until the merits are determined. *See Dataphase*, 640 F.2d at 113.

Upon review, Petitioner has made a sufficient showing to warrant emergency relief. The record is not sufficiently developed to award immediate release, and ultimate relief is generally not properly awarded through a TRO. *See Lindell v. United States*, 82 F.4th 614, 618 (8th Cir. 2023). However, precluding Petitioner from being transferred maintains the status quo so the merits of his habeas petition can be fairly decided.

## II.    Analysis

### A.    Likelihood of Success

The likelihood of success factor requires Petitioner to show he has a fair chance of prevailing on his claims. *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1343 (8th Cir. 2024). It is not a decision on whether he will ultimately win. *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007). To obtain relief, he needs to satisfy this factor on

one of his claims. *See United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 742–43 (8th Cir. 2002). Petitioner makes a sufficient showing on all of his claims.

### 1.     First Amendment violations

Petitioner primarily claims an ongoing violation of his First Amendment rights. The First Amendment generally precludes the government from restricting expression because of its message, ideas, subject matter, or content. *Ashcroft v. Am. Civ. Liberties Union*, 535 U.S. 564, 573 (2002). These protections extend to noncitizens residing within the United States. *Bridges v. Wixon*, 326 U.S. 135, 148 (1945).

Petitioner alleges that DHS acted against him based on his statements regarding matters of public concern—specifically, the ongoing violence in Palestine. Though there is no direct evidence of motive, he points to a pattern of enforcement disproportionately affecting similarly situated international students, public statements by federal officials linking dissent to disloyalty, and the suddenness of the arrest following his online expression. These allegations raise substantial First Amendment concerns. *See Ragbir v. Homan*, 923 F.3d 53, 71 (2d Cir. 2019) (recognizing that retaliatory enforcement implicates First Amendment protections even in the immigration context).

The record supports a plausible inference that DHS targeted Petitioner based on his public expression of support for Palestinian human rights and his criticism of violence in Gaza. This aligns with a broader pattern of surveillance and punitive immigration enforcement against similarly situated students, as documented by DHS policy memoranda and public statements by federal officials. (*See* Doc. No. 10, Sreekanth Decl., Exs. 2, 11, 13, 16–20; *see also* Doc. No. 1-9.) Petitioner's First Amendment allegations

5

are enough on their own to satisfy the likelihood of success factor.

## 2. Administrative Procedure Action violations

Petitioner also asserts violations of the Administrative Procedure Act ("APA"),
which governs how federal agencies promulgate and enforce regulations. His SEVIS
status was terminated without notice or opportunity to respond. And his visa was
allegedly revoked under 8 U.S.C. § 1201(i) based on a misdemeanor that had already
been disclosed to U.S. officials. Under 8 C.F.R. § 214.1(d), termination of student status
is limited to specific grounds such as failure to maintain a full course load, unauthorized
employment, or violation of status conditions. *See Jie Fang v. Dir. U.S. Immigr. &
Customs Enf't*, 935 F.3d 172, 175–76 (3d Cir. 2019).

Petitioner's disclosed misdemeanor conviction does not fall within any of these
regulatory categories. And DHS's termination of his SEVIS record without invoking one
of the permissible bases points to a departure from agency rules. (*See* Sreekanth Decl. Ex.
22, ICE Policy Guidance No. 1004-04 (June 7, 2010) (noting that visa revocation alone
does not justify SEVIS termination without further process).) Agencies must adhere to
their own binding regulations, both substantively and procedurally. *See United States ex
rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265–68 (1954). In addition, the allegations
that Respondents acted against Petitioner because of his speech, if proven, would violate
two existing DHS policies against targeting individuals for exercising free speech rights
or factoring free speech into an enforcement decision. (*See* Doc. No. 8 at 30.)

After initially charging Petitioner with failure to maintain status under
Immigration and Nationality Act § 237(a)(1)(C)(i), DHS introduced a new basis for

removal nearly three weeks later on April 18, 2025: visa revocation under § 237(a)(1)(B). (Sreekanth Decl. Ex. 15.) Confusingly, the March 28, 2025 Record of Deportable/Inadmissible Alien form identifies Petitioner's "current charge" as failure to maintain status under § 237(a)(1)(B), but also states that Petitioner "is amenable to removal from the United States [sic]section 237(a)(1)(B)." (*See* Doc. No. 1-3, Ex. C at 4.) The inconsistent and unexplained shift in rationale raises serious concerns about pretextual enforcement in violation of the APA.

### 3.    Due Process violations

Finally, Petitioner claims that his continued detention violates due process. After an immigration judge ordered his release, DHS invoked an automatic stay with no additional showing of danger or flight risk. This results in prolonged detention without an individualized justification. And it raises serious due process concerns under the Fifth Amendment, even in the immigration context where judicial deference is high but not without constitutional safeguards. *See Zadvydas v. Davis,* 533 U.S. 678, 700 (2001) (Executive Branch has broad latitude in realm of immigration but remains subject to important constitutional limitations). As alleged, Petitioner raises a sufficient question over whether Respondents are using detention and removal proceedings—civil processes—for punishment and retribution, and not to advance the legitimate purposes of immigration detention. *See id.* at 690 (recognizing that ensuring future appearances and preventing danger to community are two legitimate reasons for immigration detention).

DHS has not offered any explanation—let alone a lawful one—for why Petitioner's status was terminated outside of the expressly enumerated regulatory

grounds. That absence of reasoning is itself a legal deficiency that goes to the merits. Taking adverse action without identifying the rule being applied or the rationale behind it lacks both transparency and accountability. The resulting void undermines the fairness that due process requires.

## B.   Irreparable Harm

It is well settled that even minimal loss of First Amendment freedoms constitutes irreparable injury. *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds by Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012). Because Petitioner has shown a fair chance of prevailing on his First Amendment claim, there is a sufficient showing of irreparable harm from that alleged violation of his free speech rights. *See id.* (recognizing that establishing likelihood of success on First Amendment claim also establishes irreparable harm as a result of the deprivation).

Even so, additional harms are not speculative and reinforce the need for immediate relief. Petitioner remains detained, unable to attend classes, access timely and apparently needed medical care, or even to consult freely with counsel. His hernia condition has worsened while in custody. (Petitioner Decl. ¶¶ 13–25, 50–53.)

Although Petitioner could very well lose this semester's tuition, the disruption to his education extends beyond financial loss. A sudden removal from academic life mid-semester not only impedes his progress toward a degree but also puts at risk his eligibility for future study and lawful presence. Academic suspension or termination carries long-term reputational and professional consequences—particularly for international students, whose ability to remain in the United States is tied to uninterrupted enrollment.

Furthermore, should DHS transfer Petitioner out of this District—as it has done to detainees in other cases—his habeas petition may become practically unreviewable. Once a petitioner is removed from the jurisdiction of the detaining court, access to counsel may be severed, the custodian may no longer be subject to the Court's authority, and the petitioner's ability to participate meaningfully in litigation may be impaired or lost completely. These are concrete, ongoing and imminent injuries that cannot be remedied after the fact. *See, e.g.*, *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (finding reasonable fear of being subject to unlawful detention absent temporary relief may constitute irreparable harm).

### C.      Balance of Harms and Public Interest

The government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). Compared to the harms that Petitioner faces, nothing indicates that the government will suffer from not being allowed to transfer Petitioner out of the District. *See Nebraska v. Biden*, 52 F.4th 1044, 1047 (8th Cir. 2022) ("[T]he equities strongly favor an injunction considering the irreversible impact [the challenged agency] action would have as compared to the lack of harm an injunction would presently impose.").

An Immigration Judge has already determined that Petitioner is not a danger to the community and ordered his release on a $7,500 bond to address his minimal flight risk. There is no apparent logistical, administrative, or security need to relocate Petitioner. The public interest, by contrast, strongly favors the enforcement of constitutional safeguards.

9

*See, e.g.*, *Phelps-Roper*, 545 F.3d at 690 (recognizing that "it is always in the public interest to protect constitutional rights"); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) ("The public interest is served when administrative agencies comply with their obligations under the APA."). Preserving access to judicial review and preventing unlawful detention are compelling issues of public importance.

### D.      Security Bond

A bond under Fed. R. Civ. P. 65(c) is not necessary here because the TRO seeks to prevent ongoing constitutional violations, the petitioner is detained and unable to post a bond, and the government faces no identifiable risk of monetary loss. A bond is also not warranted given that this matter is closely intertwined with important public interests. *See, e.g.*, *Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016).

## CONCLUSION

This Court does not prejudge the ultimate resolution of Petitioner's claims. But the allegations are serious. If the government uses civil detention to suppress lawful viewpoint expression, it risks damaging the legitimacy of both the immigration system and the Executive Branch discretion that undergirds it. The legitimacy of the rule of law depends not just on legal form, but also on *lawful purpose*. The record here warrants emergency relief in favor of restraint.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings in this case, **IT IS HEREBY ORDERED** that:

1.      Petitioner's Motion for Temporary Restraining Order (Doc. No. 6) is

**GRANTED IN PART**.

2.      Respondents, or any person acting in concert with Respondents, shall not

remove, transfer, or otherwise facilitate the removal of Petitioner from the jurisdiction of

this Court (the District of Minnesota) pending further court order.

3.      This Order shall remain in effect for 14 days from the date of entry, unless

extended by further court order under Federal Rule of Civil Procedure 65(b)(2).


Date: April 22, 2025                              *s/ Jerry W. Blackwell*
Time: 4:53 p.m.                                   JERRY W. BLACKWELL
                                                  United States District Judge

# EXHIBIT C

# NAFSA: Association of International Educators Biography, Nusha Shishegar, April 23, 2023



# Nusha Shishegar

## Senior Coordinator, International Student Programs

### Glendale Community College

#### Past Chair, Region XII

Nusha Shishegar began her international student services career at UC Irvine Extension in 2001. She has previously held positions as P/DSO and/or A/RO at Claremont Graduate University, CSU San Bernardino's College of Extended Learning, and Keck Graduate Institute. In 2019, she assumed her present role of Senior Coordinator of the International Student Programs Office at Glendale Community College. Nusha has proudly served the National Association of International Educators (NAFSA) in several volunteer capacities, including as a former International Student & Scholar Regulatory Practice Committee Member (2018-2020), Region XII's Southern District Chair Stream (2016-2019), Region XII's Student Regulatory Ombudsman (2018-2020) and Conference Apprentice (2021). She has served as Conference Chair for Region XII (2022). She is an active member on the LA PIER and NAFSA International Student Advising Network (ISTA) email forums, providing responses and advice to international student advisors from around the nation.



**NAFSA: Association of International Educators**

**Phone:** 1.202.737.3699

1425 K Street, NW, Suite 1200, Washington, DC 20005

Copyright 1998-2024. NAFSA. All Rights Reserved.

Terms of Use | Privacy Policy | Accessibility

# EXHIBIT D

## Demonstrative Exhibit: Comparative Circumstances of Arizona Student Doe #1 and Mohammed H.

# Comparative Circumstances of Arizona Student Doe #1 and Mohammed H.

|  | Arizona Student Doe #1 | Mohammed H. |
|---|---|---|
| Lawfully admitted in F-1 status prior to visa revocation and SEVIS termination? | Yes | Yes |
| In good standing with university and compliant with terms of student nonimmigrant status prior to visa revocation and SEVIS termination? (8 C.F.R. § 214.1 (d)-(f); 8 C.F.R. § 214.2(f)(1)). | Yes | Yes |
| Convicted of a crime of violence for which a sentence of more than one year imprisonment may be imposed? (8 C.F.R. § 214.2(g)). | No | No |
| Placed into removal proceedings and served with an Notice to Appear (NTA) charging them with removability pursuant to INA § 237(a)(1)(A)(C)(i) [8 U.S.C. § 1227(a)(2)(C)(i)], for failing "to maintain the nonimmigrant status in which the alien was admitted . . . or to comply with the conditions of such status"? | No | Yes[1] |
| Subsequently "arrested and detained pending a decision on whether the alien is to be removed from the United States" pursuant to INA § 236(a) [ 8 U.S.C. § 1226(a)]? | No | Yes |

[1] After initially charging Mohammed H. with failure to maintain status under INA § 237(a)(1)(C)(i), DHS introduced a new basis for removal ***nearly three weeks later*** on April 18, 2025: visa revocation under § 237(a)(1)(B).